MAS-20030912

barney

04/14/2005

02:15 PM

# Commonwealth of Massachusetts
## SUFFOLK SUPERIOR COURT
### Case Summary
### Civil Docket

## SUCV2005-00536
## Boston Society of the New Jerulsalem et al v Great American Ins Co

| | | | |
|---|---|---|---|
| **File Date** | 02/11/2005 | **Status** | Disposed: transfered to other court (dtrans) |
| **Status Date** | 03/16/2005 | **Session** | F - Civil F |
| **Origin** | 1 | **Case Type** | A99 - Misc contract |
| **Lead Case** | | **Track** | F |

| | | | | | |
|---|---|---|---|---|---|
| **Service** | 05/12/2005 | **Answer** | 07/11/2005 | **Rule12/19/20** | 07/11/2005 |
| **Rule 15** | 07/11/2005 | **Discovery** | 12/08/2005 | **Rule 56** | 01/07/2006 |
| **Final PTC** | 02/06/2006 | **Disposition** | 04/07/2006 | **Jury Trial** | No |

### PARTIES

**Plaintiff**
Boston Society of the New Jerulsalem
Active 02/11/2005

**Private Counsel 561147**
Nicholas Carter
Todd & Weld
28 State Street
31st floor
Boston, MA 02109
Phone: 617-720-2626
Fax: 617-227-5777
Active 02/11/2005 Notify

**Plaintiff**
Bostonview Corporation
Active 02/11/2005

*** See Attorney Information Above ***

**Plaintiff**
Edward  MacKenzie
Active 02/11/2005

*** See Attorney Information Above ***

**Plaintiff**
Thomas  Kennedy
Active 02/11/2005

*** See Attorney Information Above ***

case01 245784 y y y y y y

Page 1 of 2

MAS-20030912

barney

**Commonwealth of Massachusetts**

SUFFOLK SUPERIOR COURT

**Case Summary**

**Civil Docket**

04/14/2005

02:15 PM

## SUCV2005-00536

## Boston Society of the New Jerulsalem et al v Great American Ins Co

| **Defendant** | **Private Counsel 010100** |
|---|---|
| Great American Ins Co | Stephen J Abarbanel |
| Service pending 02/11/2005 | Robinson & Cole LLP |
| | 1 Boston Place |
| | Boston, MA 02108 |
| | Phone: 617-557-5900 |
| | Fax: 617-557-5999 |
| | Active 03/16/2005 Notify |
| | |
| | **Private Counsel 544458** |
| | Barbara O'Donnell |
| | Robinson & Cole LLP |
| | 1 Boston Place |
| | 25th floor |
| | Boston, MA 02108-4404 |
| | Phone: 617-557-5945 |
| | Fax: 617-557-5999 |
| | Active 03/16/2005 Notify |

### ENTRIES

| Date | Paper | Text |
|---|---|---|
| 02/11/2005 | 1.0 | Complaint & Jury demand |
| 02/11/2005 | | Origin 1, Type A99, Track F. |
| 02/11/2005 | 2.0 | Civil action cover sheet filed |
| 03/10/2005 | 3.0 | Affidavit of compliance by Nicholas Carter with proof of service of complaint re: Great American Ins Co. to the Commissioner of INsurance for the Commonwealth |
| 03/10/2005 | 4.0 | Request upon clerk to default (55a) re: Great American Ins Co by Boston Society of the New Jerulsalem |
| 03/15/2005 | | Certified copy of petition for removal to U. S. Dist. Court of Deft. Great American Insurance Company U. S. Dist.#(05-10494WGY). |
| 03/16/2005 | | Case REMOVED this date to US District Court of Massachusetts |

### EVENTS

I HEREBY ATTEST AND CERTIFY ON

*April 14 2005*, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____
*Assistant Clerk*

*Suffolk Superior Civil # 05 -536* ✓



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE
2005 MAR 15  P 3:46
U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| **BOSTON SOCIETY OF THE NEW JERUSALEM, INCORPORATED, BOSTONVIEW CORPORATION, EDWARD MACKENZIE, and THOMAS KENNEDY,**<br><br>        **Plaintiffs,**<br><br>    **v.**<br><br>**GREAT AMERICAN INSURANCE COMPANY,**<br><br>        **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

05 10494 WGY

**CIVIL ACTION NO.**

I hereby certify on _____ that the foregoing document is true and correct copy of the
☐ electronic docket in the captioned case
☐ electronically filed original filed on
☒ original filed in my office on _____
Sarah A. Thornton
Clerk, U.S. District Court
District of Massachusetts
By:_____
Deputy Clerk

## NOTICE OF REMOVAL

Defendant, Great American Insurance Company ("GREAT AMERICAN"), hereby gives

notice of its removal of Civil Action No. 05-0536 filed in the Superior Court Department of the

Trial Court, Suffolk County, Commonwealth of Massachusetts, to this Court pursuant to 28

U.S.C. §§1441(a) and 1446, and in accordance with 28 U.S.C. §1332.  In support of its Notice of

Removal, GREAT AMERICAN states as follows:

## THE STATE COURT ACTION

1.      On or about February 11, 2005 plaintiffs commenced a civil action (the "State

Court Action") by filing a Complaint (the "Complaint") against GREAT AMERICAN in the

Superior Court Department of the Trial Court, Suffolk County, Massachusetts, as Civil Action

No. 05-0536.  Plaintiffs attempted to serve the Commissioner of Insurance for the

Commonwealth of Massachusetts, as attorney and process agent for GREAT AMERICAN, with

the Summons and Complaint in the State Court Action on or about February 15, 2005. The

Insurance Commissioner transmitted a copy of the Summons and Complaint to GREAT

AMERICAN by certified mail received by it on February 18, 2005. A copy of the Summons and

Complaint sent to GREAT AMERICAN is attached as Exhibit A.

2.      GREAT AMERICAN has not yet answered the Complaint.

## THE PARTIES

3.      Plaintiff Boston Society of the New Jerusalem, Incorporated (the "Church") is a

church located at 140 Bowdoin Street, Boston, Massachusetts that was organized by an act of the

Massachusetts Legislature in 1823.

4.      Plaintiff Bostonview Corporation ("Bostonview") is a nonprofit corporation

organized under the laws of Delaware with its principal place of business at 140 Bowdoin Street,

Boston, Massachusetts.

5.      Plaintiffs Edward MacKenzie and Thomas Kennedy are individuals residing in the

Commonwealth of Massachusetts.

6.      GREAT AMERICAN is an insurance company organized under the laws of Ohio

with a principal place of business in Ohio, and is authorized to do business in the

Commonwealth of Massachusetts.

## THE NATURE OF THE DISPUTE

7.      Plaintiffs' Complaint seeks damages pursuant to a dispute about insurance

coverage under Non-Profit Organization Executive Protection and Employment Practices

Liability Insurance Policy (the "Policy") GREAT AMERICAN issued to the Church. More

specifically, among other things, plaintiffs seek reimbursement of the costs incurred by them in

2

three separate matters they call the Federal Lawsuit, the State Lawsuit, and the Attorney General's Action. According to their Complaint, plaintiffs incurred costs of more than $400,000 in connection with the Federal Lawsuit alone (Complaint, ¶3), and in their prayer for relief request judgment for three times the defense costs they incurred in all three matters.

## STATUTORY REQUIREMENTS FOR REMOVAL

8.     The State Court Action is a civil action over which this Court has diversity jurisdiction under 28 U.S.C. §1332(a)(1). Great American is entitled to remove the State Court Action to this Court pursuant to 28 U.S.C. § 1441(a) in that:

   a.     GREAT AMERICAN is, and was at the time of the commencement of the State Court Action, domiciled in Ohio with its principal place of business in Ohio.

   b.     The Church is, and was at the time of the commencement of the State Court Action, organized under the laws of Massachusetts with its principal place of business in Boston, Massachusetts.

   c.     Bostonview is, and was at the time of the commencement of the State Court Action, a Delaware corporation with its principal place of business in Boston, Massachusetts.

   d.     Edward MacKenzie and Thomas Kennedy are, and were at the time of the commencement of the State Court Action, citizens of the Commonwealth of Massachusetts.

   e.     The amount in controversy exceeds $75,000, exclusive of interest and costs.

9.     The State Court Action is pending in this judicial district.

10.    This Notice of Removal is filed within the thirty-day period described in 28 U.S.C. §1446(b).

3

11.    GREAT AMERICAN has attached true and accurate copies of all process, pleadings and orders which plaintiffs have attempted to serve on it in the State Court Action.

12.    Written notice of the filing of this Notice of Removal will be given promptly by GREAT AMERICAN to counsel for plaintiffs as specified in the attached Certificate of Service, as required by 28 U.S.C. §1446(d).

13.    A copy of this Notice of Removal will be filed promptly by GREAT AMERICAN with the Clerk of the Superior Court Department of the Trial Court, Suffolk County, Massachusetts, in accordance with 28 U.S.C. §1446(d).

14.    Pursuant to Loc. R. 81.1, Great American will file, within thirty (30) days after filing this Notice of Removal, certified or attested copies of all records and proceedings in the Suffolk Superior Court Action and a certified or attested copy of all docket entries in the Suffolk Superior Court Action.

WHEREFORE, Great American Insurance Company respectfully requests that this Court take this action from the Superior Court of the Commonwealth of Massachusetts, Suffolk County, to the United States District Court for the District of Massachusetts.

Dated:  March 15, 2005                Respectfully submitted,

                                      GREAT AMERICAN INSURANCE COMPANY

                                      Stephen J. Abarbanel BBO# 010100
                                      Barbara A. O'Donnell BBO# 544458
                                      ROBINSON & COLE LLP
                                      One Boston Place
                                      Boston, MA  02108-4404
                                      (617) 557-5900

**Of Counsel:**

Peter F. Lovato III
Ellen Jenkins
BOUNDAS SKARZYNSKI WALSH & BLACK, LLC
200 East Randolph Drive, Suite 7200
Chicago IL 60601
(312) 946-4200
(312) 946-4272 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March 2005, I have served the foregoing document upon all parties to this action by sending a copy by first class mail, postage prepaid, to plaintiffs' counsel of record in this action:

Nicholas B. Carter, Esq.
Todd & Weld LLP
28 State Street
Boston, MA 02109

Barbara O'Donnell

5

*Suffolk Superior Civil # 05-536*

# COMMONWEALTH OF MASSACHUSETTS

IN CLERKS OFFICE

**SUFFOLK, ss**

**SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT**

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | | |
|---|---|---|
| **BOSTON SOCIETY OF THE NEW JERUSALEM, INCORPORATED, BOSTONVIEW CORPORATION, EDWARD MACKENZIE, and THOMAS KENNEDY,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **CIVIL ACTION No. 05-0536** |
| **v.** | ) ) | |
| **GREAT AMERICAN INSURANCE COMPANY,** | ) ) ) | |
| **Defendant.** | ) ) | |

## NOTICE OF FILING OF NOTICE OF REMOVAL

PLEASE TAKE NOTICE that on the 15th day of March, 2005, pursuant to 28 U.S.C. §§1441 and 1446, we filed with the Clerk of the United States District Court for the District of Massachusetts the Notice of Removal attached as Exhibit A, thereby removing this action from this Court to the United States District Court for the District of Massachusetts.

Pursuant to 28 U.S.C. §1446(d), proceedings in this Court shall proceed no further.

Dated: March 15, 2005

Respectfully submitted,

GREAT AMERICAN INSURANCE COMPANY

*[signature]*

Stephen J. Abarbanel BBO# 010110
Barbara A. O'Donnell BBO# 544458
ROBINSON & COLE LLP
One Boston Place
Boston, MA 02108-4404
(617) 557-5900

**Of Counsel:**

Peter F. Lovato III
Ellen Jenkins
BOUNDAS SKARZYNSKI WALSH & BLACK, LLC
200 East Randolph Drive, Suite 7200
Chicago IL 60601
(312) 946-4200
(312) 946-4272 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March 2005, I have served the foregoing document upon all parties to this action by sending a copy by first class mail, postage prepaid, to plaintiffs' counsel of record in this action:

Nicholas B. Carter, Esq.
Todd & Weld LLP
28 State Street
Boston, MA 02109

Barbara O'Donnell

2

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss:

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

|  |  |
|---|---|
| BOSTON SOCIETY OF THE NEW JERUSALEM, INCORPORATED , BOSTONVIEW  CORPORATION, EDWARD MACKENZIE, and THOMAS KENNEDY, <br><br> Plaintiffs, <br><br> v. <br><br> GREAT AMERICAN INSURANCE COMPANY, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

05-0536

CIVIL ACTION
NO..

## **COMPLAINT**

### **Introduction**

1.      Plaintiffs Boston Society of the New Jerusalem, Incorporated ("Church"),

Bostonview Corporation ("Bostonview"), Edward MacKenzie ("MacKenzie") and

Thomas Kennedy ("Kennedy") (collectively "Plaintiffs" or "Insureds") bring this action

against Great American Insurance Company ("Great American") for breach of their

insurance agreement and for bad faith in handling the Insureds' insurance claims in

violation of G.L. c.93A and G.L. c.176D.

2.      On  February 27, 2004, the Insureds were sued in the United States District

Court for the District of Massachusetts ("the Federal Lawsuit") for alleged wrongful

conduct in the operation of the Church.  Pursuant to the insurance agreement, Great

American had a duty to defend the Church and Bostonview, as well as Mr. MacKenzie

and Mr. Kennedy as directors, trustees, officers, and/or employees of these two entities.
Great American, however, denied coverage based on a self-serving and obviously
unreasonable construction of the insurance policy and the Federal Lawsuit.

3.      The United States District Court ordered the case expedited, and the
litigation that ensued was intense and expensive – costing in excess of $400,000.  The
Insureds had to bear this expense entirely on their own.

4.      The United States District Court ultimately found that the plaintiffs had not
and could not allege viable RICO claims against Mr. MacKenzie and Mr. Kennedy,
dismissed those claims with prejudice, and because those were the only federal claims
asserted, remanded the remaining state law claims to state court for consideration.

5.      The plaintiffs in the Federal Lawsuit then asserted virtually the same
claims against the Insureds in this Court ("the State Lawsuit").  After further briefing and
a hearing, this Court dismissed all of the plaintiffs' state law claims, finding, in part, that
the plaintiffs lacked standing.

6.      In denying coverage of the Federal Lawsuit, Great American took the
position that the "insured v. insured" exclusion in the insurance agreement applied,
arguing that each and every claim was brought or joined by a parishioner, George Chapin
("Chapin"), purportedly on behalf of the Church, and that Mr. Chapin therefore was suing
in the name of an "insured."

7.      The "insured v. insured" exclusion, however, clearly does not apply as
(a) Massachusetts law makes plain that a parishioner does not have standing to bring
claim against a church for alleged misconduct in the management of church operations or
finances, (b) two of the claims in the Federal Lawsuit were not brought by Mr. Chapin

2

either on his own behalf or on behalf of the Church, and (c) the most significant claims in the Federal Lawsuit – to seize control of the Church and all of its property – were brought solely by an entity that is indisputably not an insured. That entity, the General Convention of the New Jerusalem in the United States of America, Inc. ("the General Convention"), is an independent voluntary association of Swedenborgian churches to which the Church used to belong prior to the Federal Lawsuit. Great American's decision to shirk its duty to defend the Federal Lawsuit was patently unreasonable and constitutes bad faith claims handling in violation of G.L. c.93A and G.L. c.176D.

8.      Great American later agreed to provide coverage for the State Lawsuit, but only after this Court dismissed the State Lawsuit in its entirety, significantly limiting Great American's exposure. Great American wrongfully delayed making this coverage decision and since then has withheld payment to the Insureds to reimburse for their defense costs to date and has challenged and not paid for any of the legal work performed by Joseph Nolan, Esq., retired Justice of the Massachusetts Supreme Judicial Court who represented the Church and Bostonview in the State Lawsuit. This constitutes a breach of the insurance agreement and bad faith claims handling in violation of G.L. c.93A and G.L. c.176D.

9.      Notably, in light of Great American's decision to defend the State Lawsuit, its decision not to defend the Federal Lawsuit is even more unjustifiable given that the State Lawsuit and the Federal Lawsuit involved the same parties and virtually identical claims.

10.      Great American also breached the insurance agreement and engaged in bad faith claims handling in response to the Insureds' request for coverage of a separate

claim brought by the Office of the Attorney General for the Commonwealth of

Massachusetts ("Attorney General"). Based on erroneous information communicated to

the Attorney General by at least one of the plaintiffs involved in the Federal Lawsuit and

the State Lawsuit, the Attorney General, on November 13, 2003, initiated an action in

this Court (Civil Action No. 03-5408A) ("the Attorney General's Action"). Specifically,

the Attorney General served a Civil Investigative Demand ("CID"), seeking the

production of documents and other information from the Church concerning its

governance and financial operations.

      11.    The Attorney General's Action culminated on or about June 14, 2004

when the Attorney General filed a one-count Complaint against the Church and moved

simultaneously for the entry of a Consent Judgment and for a dismissal of the Complaint.

On or about June 16, 2004, the Court endorsed the Consent Judgment, which required the

Church to make periodic reports to the Attorney General about the management of the

Church's finances and to implement various policies and procedures relating to the

handling of Church monies. The Consent Judgment did not contain any findings of

wrongdoing by the Insureds.

      12.    The Church incurred substantial legal costs in responding to the Attorney

General's Action. Yet Great American has agreed to cover only a fraction of those costs,

arguing that only the filing of the Attorney General's Complaint and the Consent

Judgment is covered and that responding to the Attorney General's antecedent and

subsequent requests for discovery/information is not covered.

13.    Great American's extremely limited coverage of the Attorney General's Action is a breach of the insurance agreement and represents bad faith claims handling in violation of G.L. c.93A and G.L. c.176D.

14.    Great American should be required to reimburse the Insureds for all their defense costs and attorneys' fees incurred in defending the Federal Lawsuit, the State Lawsuit and the Attorney General's Action, and Great American should be required to pay treble damages given its bad faith in handling the Insureds' requests for coverage. In addition, Great American should be required to reimburse the Insureds for their costs and attorneys' fees incurred in seeking to obtain insurance coverage through the present lawsuit.

### Parties

15.    Plaintiff, Boston Society of the New Jerusalem, Inc. is a church located at 140 Bowdoin Street, Boston, Massachusetts.

16.    Plaintiff, Bostonview Corporation is a corporation which is located at 140 Bowdoin Street, Boston, Massachusetts. Bostonview owns the building at 140 Bowdoin Street, which contains the Church Chapel, the Church's administrative offices and an apartment house.

17.    Plaintiff, Edward MacKenzie, is an individual who, since September 2003, has held various positions as an officer, trustee, director and employee at the Church and Bostonview. He is currently an employee of the Church and director of Bostonview. He is a citizen of the Commonwealth of Massachusetts.

18.    Plaintiff, Thomas Kennedy, is an individual who, since before September 2003, has held various positions as an officer, trustee and director at the Church and

5

Bostonview. He is currently a trustee of the Church and director of Bostonview. He is a citizen of the Commonwealth of Massachusetts.

19.    Defendant, Great American Insurance Company is an insurance company with a principal location at 580 Walnut Street, Cincinnati, Ohio.

### Factual Background

#### i.    Insurance Policy

20.    The Church and Bostonview purchased a directors and officers liability insurance policy for non-profit organizations from Great American ("the Policy"). The Policy covered claims made against the Church, Bostonview and any of its officers, directors, trustees, or employees during the period from November 4, 2003 to November 4, 2004. A copy of the Policy is attached hereto at Exhibit A. The Policy provided aggregate insurance of $1,000,000 and imposed a duty to defend and to indemnify upon Great American where any claim against one of the Insureds triggered coverage under the terms of the Policy.

#### ii.    Leadership Change at the Church

21.    During the period May to September 2003, the Church and Bostonview underwent a change in leadership. At duly held meetings of the Church, the members voted overwhelmingly in favor of these leadership changes. A handful of disgruntled, former Church leaders, who were voted out of office in these elections, sought to challenge the election and the new leadership, including Mr. MacKenzie and Mr. Kennedy. They fabricated claims that the new leaders, including Mr. MacKenzie and Mr. Kennedy, had obtained control of the Church through fraud and were

misappropriating Church funds. They also sought the removal of the Church's pastor, Reverend Steven Ellis, who supported the change in leadership.

22.    The few disgruntled former Church leaders complained to the General Convention and requested that the General Convention take action against Rev. Ellis. The General Convention took steps toward removing Rev. Ellis as pastor, and the Church responded by disaffiliating from the General Convention. The General Convention then spearheaded a lawsuit (the Federal Lawsuit) against the Church, Bostonview and two of the new leaders, Edward MacKenzie and Thomas Kennedy. This lawsuit was joined by one member of the Church, George Chapin, and by the Massachusetts Association of the New Jerusalem (Swedenborgian), a voluntary association of Swedenborgian churches in New England. These plaintiffs filed their Complaint in Federal Court in Boston, Massachusetts on February 27, 2004. They subsequently withdrew the Complaint, abandoning a motion for preliminary injunction, and re-filed the Complaint on March 2, 2004. A copy of the Complaint (without exhibits) filed in the Federal Lawsuit is attached at Exhibit B.

### iii.    Great American's Disclaimer of Coverage of the Federal Lawsuit

23.    On March 1, 2004, the Insureds provided notice of the Federal Lawsuit and a copy of the Complaint to their insurance agent. A copy of the Notice of Claim letter is attached hereto at Exhibit C.

24.    On March 2, 2004, the insurance agent put Great American on notice of the Federal Lawsuit and requested that Great American provide a defense pursuant to the terms of the Policy.

25.     On March 25, 2004, Great American disclaimed coverage. A copy of this

letter is attached hereto at Exhibit D. In this disclaimer letter, Great American wrote:

> [Coverage] is specifically excluded by the Insured v. Insured clause of the Great
> American policy. In that regard, I direct you to Section IV.H. of the policy which
> states:
>
>> This policy does not apply to any Claim made against any Insured:
>
>> H.     *by or for the benefit of, or at the behest of the Organization*
>>         or a Subsidiary or any entity which controls, is controlled
>>         by, or is under common control with the Organization or a
>>         Subsidiary, or any person or entity which succeeds to the
>>         interest of the Organization or Subsidiary; (emphasis in
>>         March 25, 2004 letter)
>
> <u>Clearly, this Claim is being brought on behalf of and in the name of the
> Organization, by a member</u>, in conjunction with related national and state entities.
> <u>Each and every count of the complaint states that it is being brought by the
> plaintiff, George Chapin, on behalf of himself, the Church, (our Insured),
> Bostonview, (an Insured entity of the Church)</u>, and all others similarly situated, as
> members of the Church and beneficial stockholders of Bostonview. <u>This action is
> being brought in the name of Mr. Chapin by and for the benefit of the Church,</u>
> which has allegedly been the victim of the individuals named as defendants
> herein. <u>In light of the foregoing, we assume no duty to defend</u> any Insured in this
> litigation. (emphasis added)

26.     In denying coverage, Great American self-servingly ignored that the

General Convention, which is not an "insured," brought claims against the Church and

Bostonview. Even if George Chapin suing on behalf of the Church were a party to each

claim, which he was not, Great American still had an obligation to defend against the

claims insofar as they were asserted by the General Convention because it is undisputed

this entity is not an "insured" pursuant to the Policy.

27.     In addition, Great American ignored that George Chapin was not a party

to Counts IV and V of the Complaint. Indeed, Count IV is a request for a declaratory

judgment that the General Convention is entitled to all of the Church's property. In

paragraph 146, the request for a declaratory judgment is made solely in the name of the "Denomination," which was a term used by the plaintiffs in the Federal Lawsuit to refer to the General Convention.

28.     Even if George Chapin were a party to Counts IV and V, it is clear from the face of the Complaint that he did not assert those claims on behalf of the Church. The absence of any express language in Counts IV and V indicating that those claims were being asserted by George Chapin as derivative claims on behalf of the Church stands in stark contrast to each of the other claims in the Complaint where it is expressly stated that George Chapin was asserting his claims derivatively. The omission of that "derivative claim" language in Counts IV and V plainly demonstrate that these claims were not being brought by or on behalf of the Church. Therefore, the "insured v. insured" exclusion would not apply to these claims.

29.     Great American, moreover, knew or should have known that George Chapin as a parishioner, with no independent claim to the Church's property, had no standing to assert any of the claims in the Complaint. This is a matter of black letter law in Massachusetts and was the basis for this Court's later dismissal of all the claims against the Insureds.

30.     On May 13, 2004, the Insureds provided to Great American the legal invoices of Edwards & Angell LLP and Todd & Weld LLP, legal counsel respectively to the Church and Bostonview and to Mr. MacKenzie and Mr. Kennedy in the Federal Lawsuit. The Insureds requested reimbursement of these legal bills.

31.     On May 28, 2004, Great American acknowledged receipt of these legal bills. However, Great American refused to reimburse the Insureds' bills stating that it

9

had disclaimed coverage. A copy of the May 28, 2004 letter is attached hereto at <u>Exhibit</u> <u>E</u>.

32. On June 9, 2004, the Insureds sent a letter to Great American requesting that Great American reconsider its disclaimer of coverage and agree to reimburse the Insureds for the costs of their legal defense. A copy of this June 9, 2004 letter is attached hereto at <u>Exhibit F</u>.

33. On August 9, 2004, Great American responded by stating that it would investigate the coverage issue. Accordingly, Great American requested additional materials from the Church and Bostonview, including by-laws, any agreements between the Church/Bostonview and the General Convention, and copies of all minutes when the Church voted to disaffiliate from the General Convention. Copies of these materials were provided to Great American. Great American did not provide any further response concerning coverage for another four months.

34. On September 10, 2004, Mr. MacKenzie and Mr. Kennedy, by and through their separate counsel, reiterated the request for reimbursement of their legal bills incurred in defending the Federal Lawsuit. A copy of the September 10, 2004 letter is attached hereto at <u>Exhibit G</u>.

35. After further requests for coverage, Great American, on December 15, 2004, again disclaimed coverage of legal defense costs in connection with the Federal Lawsuit. A copy of the December 15, 2004 letter is attached hereto at <u>Exhibit H</u>.

### iv.    **The Federal Lawsuit**

36. The Federal Lawsuit was litigated intensively from March 2004 through July 2004 as the Court expedited discovery and scheduled the trial to occur in September

2004. There was substantial written discovery, including the production of many boxes

of documents by all parties. There were approximately thirteen depositions taken in the

case; many of these depositions lasted two days. There also was significant motions

practice. All of this litigation was a necessary part of preparing to try the Federal

Lawsuit, and it was extremely expensive for the Insureds.

37.     On or about July 20, 2004, the Federal Court dismissed the Federal

Lawsuit with prejudice on the ground that the plaintiffs were unable to establish support

for their federal racketeering claims. The Court declined to exercise supplemental

jurisdiction over the remaining state law claims and remanded those claims to state court

for consideration. A copy of the Federal Court's Order is attached at Exhibit I.

### v.    The State Lawsuit

38.     On or about August 4, 2004, the same plaintiffs – the General Convention,

the Association and George Chapin – filed virtually the same claims in this Court against

the same defendants – the Church, Bostonview, Mr. MacKenzie and Mr. Kennedy ("the

State Lawsuit"). A copy of the Amended Complaint (without exhibits) is attached hereto

at Exhibit J.

39.     On September 10, 2004, Great American was put on notice of the State

Lawsuit. See Exhibit G.

40.     On or about December 7, 2004, after reviewing and hearing oral argument

on motions to dismiss brought by the Church, Bostonview, Mr. MacKenzie and Mr.

Kennedy, this Court allowed the motions and dismissed all of the plaintiffs' state law

claims. Among other findings, this Court found that George Chapin had no standing as a

matter of law to pursue any of the claims of alleged mismanagement and

misappropriation of assets. A copy of the Court's Memorandum of Decision is attached hereto at <u>Exhibit K</u>.

### vi.   Great American's Agreement To Cover At Least Some Of The Defense Costs Arising From The State Lawsuit

41.   On December 15, 2004, Great American sent a letter to legal counsel for the Insureds stating that the insurer would agree to provide coverage for the State Lawsuit, with a reservation of rights. In the same letter, Great American re-confirmed its prior decision to deny coverage of the Federal Lawsuit. <u>See Exhibit H</u>.

42.   Though it ultimately agreed to provide a defense in the State Lawsuit, Great American wrongfully delayed several months before announcing that decision until after the State Lawsuit was dismissed and has "reserved its rights" to disclaim coverage at a later date. It also has wrongfully withheld payment of any of the defense bills that were submitted to it months ago and it has challenged all of the bills that were submitted for reimbursement by Joseph Nolan, Esq., retired Justice of the Massachusetts Supreme Judicial Court, who represented the Church and Bostonview in defense of the State Lawsuit. Great American's mishandling of the Insureds' request for a defense of the State Lawsuit constitutes a breach of the insurance agreement and bad faith.

### vii.   No Reasonable Basis To Accept Coverage of The State Lawsuit But To Deny Coverage of The Federal Lawsuit

43.   There is no reasonable basis for Great American to agree to defend the State Lawsuit, but continue to deny coverage of the Federal Lawsuit. In the December 15, 2004 letter, Great American acknowledged that "the current state court litigation arises from the earlier litigation filed on or around February 27, 2004 [the Federal

Lawsuit]." See Exhibit H, page 1. There is in fact no substantive difference between the claims in the Federal Lawsuit and the State Lawsuit.

44.    Also, in the December 15, 2004 letter, Great American contends that "some of the counts set forth in the amended state court complaint appear to now have been brought exclusively by the National and State organizations [also known respectively as the General Convention and the Association]. In particular, the National and State organizations seek to obtain a declaration that they are entitled to hold the assets of the Local Congregation as a result of its disaffiliation from the denomination." See Exhibit H, page 4. Count I of the Amended Complaint embodies exactly this kind of request by the General Convention for a declaration that it is entitled to hold the assets of the Church. Significantly, Count I of the Amended Complaint is word for word the same as Count IV of the Complaint in the Federal Lawsuit. Great American denied coverage of the Federal Lawsuit without basis and in bad faith.

### viii.    Attorney General's Action

45.    In or about the Fall of 2003, several of the disgruntled former Church leaders, including George Chapin, went to the Attorney General and repeated their false allegations about alleged misconduct at the Church in the elections and in the management of Church monies.

46.    As a result of these allegations, the Attorney General commenced an action against the Church in this Court (Civil Action No. 03-5408A) by serving a Civil Investigative Demand upon the Church. The CID was far-reaching and requested all minutes and records concerning any meetings at the Church, all documents concerning

membership in and the election of officers at the Church, and all of the Church's financial records.

47.    The Church produced all of the requested documents to the Attorney General at great expense and effort.

48.    After reviewing these documents, the Attorney General negotiated a Consent Judgment with the Church in order to settle the Attorney General's Action. A copy of the Consent Judgment is attached hereto at Exhibit L. As one of the conditions of settlement, the Attorney General required that the Church agree to develop and implement policies and procedures and hire an interim Chief Financial Officer to ensure that the Church manages its operations and financial affairs in a prudent and appropriate manner. See Exhibit L, ¶ 7. As another condition of settlement, the interim Chief Financial Officer is required to make quarterly reports to the Attorney General concerning the Church's financial operations. See Exhibit L, ¶¶ 8-9.

49.    The Attorney General and the Church endorsed the Consent Judgment on or about June 14, 2004.

50.    The Attorney General took steps to have the Consent Judgment endorsed and entered by this Court. Accordingly, on or about June 14, 2004, the Attorney General filed a Complaint in this Court (Civil Action No. 04-2597). A copy of the Attorney General's Complaint is attached at Exhibit M. On or about June 15, 2004, the Attorney General and the Church moved for the entry of the Consent Judgment and the dismissal of the Attorney General's Complaint, which was allowed.

14

### ix.    Great American's Disclaimer Of Coverage Of Most Defense Costs Arising From The Attorney General's Action

51.    In a letter dated December 9, 2004, the Church gave notice of the Attorney General's claims to Great American and requested coverage. A copy of the December 9 letter (without attachments) is attached hereto at Exhibit N.

52.    The Policy provides for coverage of any "Claim" against the Church. "Claim" means "any proceeding initiated against an Insured, including any appeals therefrom, before (a) any governmental body which is legally authorized to render an enforceable judgment or order for money damages or other relief against the Insured. . . ."

53.    The CID and the Attorney General's Complaint were, for all practical purposes, part and parcel of the same claim, as the Attorney General's Complaint and the Consent Judgment were the end-result of the discovery the Attorney General obtained through the CID. Accordingly, the Attorney General's Action constitutes a single "claim" under the Policy, and Great American has an obligation to provide coverage for the Church's legal costs in defending against the Attorney General's Action. Even if the CID and the Attorney General's Complaint were considered as separate "claims," Great American would still be obligated to provide coverage.

54.    However, in a letter dated January 28, 2005, Great American apparently agreed to provide coverage only for the costs incurred in connection with the filing and dismissal of the Complaint, which would apparently include preparation of and filing of the Consent Judgment. Great American denied coverage of any actions required for the Church to respond to the CID or to comply with the Consent Judgment. A copy of the January 28, 2005 letter is attached hereto at Exhibit O.

55.    Great American's attempt to limit coverage in connection with the Attorney General's Action against the Church is without basis and in bad faith.

### Count I
(Breach of Contract)

56.    Plaintiffs repeat and incorporate the allegations in paragraphs 1-55 as if fully incorporated herein.

57.    Great American had a contractual obligation to provide insurance coverage to the Insureds pursuant to the terms of the Policy.

58.    By the above-referenced acts and omissions, Great American breached its insurance obligations to the Insureds.

59.    As a result of this breach, the Insureds have suffered and continue to suffer significant monetary damages, including, without limitation, the costs to defend all of the claims asserted against them during the effective period of the Policy.

### Count II
(Breach of the Implied Covenant of Good Faith and Fair Dealing)

60.    Plaintiffs repeat and incorporate the allegations in paragraphs 1-59 as if fully incorporated herein.

61.    Great American had a contractual obligation to provide insurance coverage to the Insureds pursuant to the terms of the Policy.

62.    The Policy is a contract and contains an implied covenant of good faith and fair dealing.

63.    By the above-referenced acts and omissions, Great American breached the implied covenant of good faith and fair dealing that it owed the Insureds.

16

64.    As a result of this breach, the Insureds have suffered and continue to suffer significant monetary damages, including, without limitation, the costs to defend all of the claims asserted against them during the effective period of the Policy.

### Count III
(Violation of G.L. c.93A and G.L. c.176D)

65.    Plaintiffs repeat and incorporate the allegations in paragraphs 1-64 as if fully incorporated herein.

66.    Great American had a contractual obligation to provide insurance coverage to the Insureds pursuant to the terms of the Policy.

67.    The Insureds made numerous requests for coverage and served a formal demand letter, return receipt requested, upon Great American on January 12, 2005. A copy of the demand letter, with the signed return receipt, is attached hereto at Exhibit P.

68.    Great American denied coverage with respect to virtually all of the claims asserted against the Insureds, including the Federal Lawsuit and most of the defense costs incurred in connection with the Attorney General's Action. Great American also delayed for an unreasonable period of time in agreeing to provide coverage for the State Lawsuit and has wrongfully withheld payment to date.

69.    Great American's acts and omissions have been unreasonable and advanced in bad faith.

70.    By the above-referenced acts and omissions, Great American breached its insurance obligations to plaintiffs and violated Mass. G.L. c.176D, section 3(9), including, without limitation, the following subsections:

(b) failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies,

(c) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies,

(d) refusing to pay claims without conducting a reasonable investigation based upon all available information,

(f) failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear,

(g) compelling insureds to institute litigation to recover amounts due by offering substantially less than the amounts ultimately recovered in actions brought by such insureds,

(m) failing to settle claims promptly, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy, and

(n) failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or the offer of a compromise settlement.

71.    Great American's acts and omissions were unfair and deceptive in violation of G. L. c.93A, sections 2 and 9.

72.    As a result of Great American's acts and omissions, the Insureds have suffered and continue to suffer significant monetary damages, including, without

18

limitation, the costs to defend all of the claims asserted against them during the effective period of the Policy.

WHEREFORE, Plaintiffs respectfully pray that this Court:

A.    Enter judgment in favor of Plaintiffs and against Defendant as to Counts I through II, in an amount to be determined at trial, and award Plaintiffs their attorneys' fees and costs;

B.    Enter judgment in favor of Plaintiffs and against Defendant as to Count III, in an amount to be determined at trial, said amount to be trebled, and award Plaintiffs their attorneys' fees and costs; and

C.    Award such other and further relief as the Court deems appropriate.

## Request for Jury Trial

Plaintiffs request a jury trial on all claims so triable.

I HEREBY ATTEST AND CERTIFY ON

APRIL 13, 2005, THAT THE

FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____

Dated: February 11, 2005

Respectfully submitted,

BOSTON SOCIETY OF THE NEW JERUSALEM, INC., BOSTONVIEW CORPORATION, EDWARD MACKENZIE, and THOMAS KENNEDY,

By their attorneys,

_____

Howard M. Cooper (BBO #543842)
Nicholas B. Carter (BBO #561147)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA  02109
(617) 720-2626

19

*EX H*

**THIS IS A CLAIMS MADE POLICY, READ IT CAREFULLY.**



# GREATAMERICAN.

### INSURANCE COMPANIES
580 WALNUT STREET, CINCINNATI, OHIO 45202

DECLARATIONS FOR
NON-PROFIT ORGANIZATION
EXECUTIVE PROTECTION AND
EMPLOYMENT PRACTICES LIABILITY
INSURANCE POLICY

Insurance is afforded by the company indicated below: (Each a capital stock corporation)

☒ Great American Insurance Company          ☐ Agricultural Insurance Company

☐ American National Fire Insurance Company          ☐ Other _____

Policy Number:   EPP5796942          Policy Form Number:   D9100

Item 1. Name of Organization:   BOSTON SOCIETY OF NEW JERUSALEM, INC./BOSTONVIEW CORPORATION

Mailing Address:   C/O WINN RESIDENTIAL, L.P., 6 FANEUIL HALL MARKETPLACE

City, State, Zip Code:   BOSTON, MA 02109

Attn:   MICHELLE MORIELLO

Item 2. Policy Period:  From _____11/04/2003_____          To _____11/04/2004_____
                              *(Month, Day, Year)*                    *(Month, Day, Year)*
          (Both dates at 12:01 a.m. Standard Time at the address of the Organization as stated in Item 1)

Item 3. Limit of Liability:
          $ 1,000,000          Aggregate Limit of Liability for Each Policy Year

Item 4. Retention:
          $ 5,000          Each Claim

Item 5. Premium:
          $ 3,615

Item 6. Endorsements Attached:
          D9318      D9709 (1)          D9713          D9714          D9800-1
          D9876

Item 7. Notices: All notices required to be given to the Insurer under this Policy shall be addressed to:
          *Great American Insurance Companies*
          *Executive Liability Division*
          *P.O. Box 66943*
          *Chicago, Illinois 60666*

Item 8. Initial Coverage Date:          11/04/2003

These Declarations along with the completed and signed Proposal Form and Non-Profit Organization Executive Protection and Employment Practices Liability Insurance Policy, shall constitute the contract between the Insureds and the Insurer.

**Countersignature**
**Not Required**

_____          _____
          *(Authorized Representative)*                    *(Countersignature Date)*

D 9102 (3/97)

From



GREATAMERICAN.
INSURANCE COMPANIES
P.O. Box 2575, Cincinnati, OH 45201

NON-PROFIT ORGANIZATION
EXECUTIVE PROTECTION and
EMPLOYMENT PRACTICES Liability
INSURANCE Policy

## DISCLOSURE STATEMENT (MASSACHUSETTS)

### THIS IS A CLAIMS MADE POLICY.
### READ THE ENTIRE POLICY CAREFULLY.

This Policy covers Claims made against the Insured only during the Policy Period (the period from the inception date of the Policy to the Policy expiration date). Claims made after the Policy's expiration are not covered even though the acts giving rise to such Claim occurred during the Policy Period.

In certain instances, the Insured may be entitled to extend coverage (referred to as a Discovery Period) for as much as fifteen (15) months after the Policy expiration date or other termination date. The Insured will receive an Automatic Discovery Period of ninety (90) days at no additional cost if the Insurer cancels or non-renews. The cost of an additional twelve (12) months is forty percent (40%) of the annual premium. An Organization which cancels or non-renews may purchase a Discovery Period for twelve (12) months after the expiration or termination date for forty percent (40%) of the annual premium.

### CERTIFICATION BY INSURED

This is to certify that I have read the above disclosure statement. I understand and accept that this is a Claims Made Policy.

_bostonView Corporation_
Name of Organization

_Michael N L, As Agnt_
Signature of Insured or Authorized Representative

_Property Manager, As Agent_
Title

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Insured:

Policy Period:

Policy Number:

Countersigned by: _____
                _Authorized Representative_

Endorsement Effective Date:

Form D 9318   (01/97)

Endorsement Number:



**GREATAMERICAN.**
INSURANCE COMPANIES
P.O. Box 2575, Cincinnati, OH 45201

NON-PROFIT ORGANIZATION
EXECUTIVE PROTECTION AND
EMPLOYMENT PRACTICES LIABILITY
INSURANCE POLICY

## ADDITION OF INSURED PERSON

It is hereby understood and agreed that the term Insured Person shall include the positions, titles or individuals listed below.

### Additional Insured Persons

The lawful spouses of all Insured Persons provided, however, that the Policy shall not provide coverage for any actual or alleged Wrongful Act(s) of the lawful spouses of the Insured Persons.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Insured: BOSTON SOCIETY OF NEW JERUSALEM, INC./BOSTONVIEW C

Policy Period: 11/04/03 to Policy expiration

Policy Number: EPP5796942

Countersigned by: _____
                        *Authorized Representative*

Endorsement Effective Date: 11/04/03

Form D 9709 (01/97)

Endorsement Number: 2



**GREATAMERICAN.**
INSURANCE COMPANIES
500 Walnut Street, Cincinnati, Ohio 45202

NON-PROFIT ORGANIZATION
EXECUTIVE PROTECTION AND
EMPLOYMENT PRACTICES Liability
INSURANCE Policy

## AMENDMENT TO SECTION III

It is understood and agreed that Section III of the Policy is hereby amended as follows:

Section III.G. is deleted in its entirety and replaced with the following:

G. **Loss** shall mean settlements and judgments, including punitive or exemplary damages or the multiple portion of any multiplied damage award; and subject to the provisions of Section V and VI, **Costs of Defense** incurred by the **Insured**, provided always, however, **Loss** shall not include taxes, criminal or civil fines or penalties imposed by law, or any matter which may be deemed uninsurable under the law pursuant to which this Policy shall be construed. It is understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive or exemplary damages or the multiple portion of any multiplied damage award.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Insured:  BOSTON SOCIETY OF NEW JERUSALEM, INC./BOSTONVIEW C

Policy Period:  11/04/03 to Policy expiration

Policy Number:  EPP5796942

Countersigned by: _____
                    *Authorized Representative*

Endorsement Effective Date:  11/04/03

Form D 9713  (01/97)

Endorsement Number: 3



**GREATAMERICAN.**
INSURANCE COMPANIES
P.O. Box 2575, Cincinnati, OH 45201

Non-Profit Organization
Executive Protection and
Employment Practices Liability
Insurance Policy

## AMENDMENT TO SECTION IV

It is understood and agreed that Section IV of the Policy is hereby amended as follows:

IV. G. is hereby deleted and replaced with the following:

G. based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving actual or alleged seepage, pollution, radiation, emission, contamination or irritant of any kind, including but not limited to smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, asbestos, chemicals or waste.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Insured:  BOSTON SOCIETY OF NEW JERUSALEM, INC./BOSTONVIEW C

Policy Period:  11/04/03 to Policy expiration

Policy Number:  EPP5796942

Countersigned by: _____
*Authorized Representative*

Endorsement Effective Date:  11/04/03

Form D 9714

Endorsement Number: 4



**GREATAMERICAN.**
INSURANCE COMPANIES
P.O. Box 2575, Cincinnati, OH 45201

NON-PROFIT ORGANIZATION
EXECUTIVE PROTECTION AND
EMPLOYMENT PRACTICES LIABILITY
INSURANCE POLICY

## AMENDMENT TO DECLARATIONS PAGE

It is understood and agreed that the Declarations is hereby amended by the addition of the following:

Item 9. Act of Terrorism Premium:      $ 0.00

It is further understood and agreed form TA0001 Policyholder Disclosure Offer of Terrorism Coverage is attached to and is to be considered as incorporated in and constituting a part of this Policy.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Insured:  BOSTON SOCIETY OF NEW JERUSALEM, INC./BOSTONVIEW C

Policy Period:  11/04/03 to Policy expiration

Policy Number:  EPP5796942

Countersigned by: _____
                          *Authorized Representative*

Endorsement Effective Date:  11/04/03

Form D 9800-1 (02/03)

Endorsement Number: 5



**GREAT**AMERICAN.
INSURANCE COMPANIES
P.O. Box 2575, Cincinnati, OH 45201

Non-Profit Organization
Executive Protection and
Employment Practices Liability
Insurance Policy

## COVERAGE FOR ACTS OF TERRORISM

It is understood and agreed that Section VIII. General Conditions of the Policy is hereby amended by the addition of the following:

Section VIII. General Conditions

__K__ .  Act of Terrorism Coverage

Subject to all other terms and conditions of this Policy, coverage is available for Loss caused by an Act of Terrorism as defined below.

"Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States –

   (i)   to be an act of terrorism;
   (ii)  to be a violent act or an act that is dangerous to –
       (I)   human life;
       (II)  property; or
       (III) infrastructure;
   (iii) to have resulted in damage within the United States, or outside of the United States in the case of –
       (I)   an air carrier or vessel described in Section (5)(B) of the Terrorism Risk Insurance Act of 2002; or
       (II)  the premises of a United States mission; and
   (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

With respect to any one or more Acts of Terrorism under the Terrorism Risk Insurance Act of 2002, we will not pay any amounts for which we are not responsible under the terms of that Act (including subsequent action of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Insured:  BOSTON SOCIETY OF NEW JERUSALEM, INC./BOSTONVIEW C

Policy Period:  11/04/03 to Policy expiration

Policy Number:  EPP5796942

Countersigned by: _____
            *Authorized Representative*

Endorsement Effective Date:  11/04/03

Form D 9876  (12/02)

Endorsement Number: 6



**GREAT**A**MERICAN**.
INSURANCE COMPANIES
580 Walnut Street, Cincinnati, Ohio 45202

## POLICYHOLDER DISCLOSURE
## OFFER OF TERRORISM COVERAGE

The Terrorism Risk Insurance Act of 2002 (the Act) establishes a program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an Act of Terrorism. The Act provides that, to be certified, an Act of Terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the government or population of the United States.

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.

In accordance with the Terrorism Risk Insurance Act of 2002, we are required to offer you coverage for losses resulting from an act of terrorism that is certified pursuant to the Terms of the Act as an Act of Terrorism committed by an individual(s) acting on behalf of a foreign person or foreign interest. All other provisions of this policy will still apply to such an act. That is, a loss will not be excluded or covered just because it was caused by an Act of Terrorism.

The portion of the annual premium that is attributable to coverage for Acts of Terrorism that are certified under the Terrorism Risk Insurance Act of 2002 is: $0.00.

All other terms and conditions of the policy remain unchanged.

TA0001  (01/03)

FROM :                    FAX NO.  :                    Sep. 25 2003 01:41PM  P2

**GREATAMERICAN.**
INSURANCE COMPANIES
580 Walnut Street, Cincinnati, Ohio 45202

**Proposal Form For
Non-Profit Organization
Executive Protection and
Employment Practices Liability
Insurance**

1. Name of Organization  Boston Society of New Jerusalem, Inc. / Boston via Corp.

Mailing Address  c/o Winn Residential LP   6 Faneuil Hall Mktplce

City  Boston                    State  MA            Zip Code  02109

2. The officer designated as agent of the Organization and all of the Insureds to receive any and all notices from the Insurer or an authorized representative concerning this insurance:

Michelle Moriello, Agent                 Property Manager
_____Name_____              _____Title_____

3. Describe the Organization's purpose and the nature of operation(s):

Apartment building + Rentals (Board of Directors)

4. a. Date organized _____ b. Tax status ☑ Taxable  or  ☐ Tax Exempt under of IRC Sec. 501(c)_____

5. a. Number of Employees  5      b. Annual Salary/Wages Expense $ Volunteer  c. Total Assets $_____

6. Please attach the following information on all Subsidiaries. If "None", please indicate:  ☑ None
(a) Name; (b) Date of acquisition/creation; (c) Percent of control; (d) Nature of operation; (e) Operated for profit or non-profit and (f) Name of parent organization. Please attach the most recent annual report or annual audit/examination or internal financial statement for each Subsidiary.    None

COVERAGE IS NOT AUTOMATICALLY PROVIDED FOR ALL SUBSIDIARIES. TERMS AND CONDITIONS OF COVERAGE FOR SUBSIDIARIES ARE DETAILED IN SECTION III.D.

7. Provide the following information if a Condo/Homeowners Association: (If not, skip to question 8.)

a. Number of Units/Lots _____  b. Average Unit/Lot Value _____  c. % of Units/Lots Sold _____

d. Has control of the Association been transferred from the Builder/Developer?                    YES  NO
                                                                                                   ☐    ☐

e. If control has been transferred, does the Builder/Developer maintain any representation on the Association's Board   ☐    ☐
of Directors or other governing body? If "Yes", please attach details.

8. Have there been any changes in senior management (Executive Director, President, Executive Vice President, etc.) for   ☒    ☐
reasons other than death, retirement at the normal retirement age or term limitations? If "Yes", please attach details.
Membership voted out prior chairman (president)

9. a. What was the approximate turnover rate for employees in the last twelve months? Volunteers - elected basis 100%
                                                                                                                    turn.
b. Did the turnover rate of employees exceed historical levels of the past five years? If "Yes", please attach details.

10. Is the Organization or any of its Subsidiaries involved in or presently considering any merger, consolidation,        ☐    ☒
acquisition, divestment or sale of a portion of its business or has a similar transaction been considered or completed
within the last three years? If "Yes", please attach details.

11. Does the Organization or any proposed Insured perform any of the following:

a. Promote, sponsor or provide any form of insurance to members or non-members?                                          ☐    ☒

b. Take any disciplinary action or recommend disciplinary action as a result of peer review or standard setting activities?  ☐    ☒

c. Engage in any labor negotiations?                                                                                     ☐    ☒

d. Provide any other professional services?                                                                             ☐    ☒
                                                                                                                        ☐    ☒

D.9210 (5/97)

FROM :                           FAX NO. :

Sep. 25 2003 01:12PM P.

e. Engage in any business transactions with businesses which are controlled by any proposed Insured Persons ?

YES  NO.
☐   ☒

f. Engage in any form of research, development or experimentation? *If "Yes", for any of the above, please attach details.*

☐   ☒

12. Does the Organization or any proposed Insured have knowledge of any Federal, State or local legal proceedings, investigations or claims against the Organization and/or any proposed Insured during the past five years? *If "Yes", please attach details.*

☐   ☒

PERTAINING TO QUESTION 12, IT IS UNDERSTOOD AND AGREED THAT ANY CLAIM ARISING THEREFROM SHALL BE EXCLUDED UNDER THE PROPOSED COVERAGE.

☐   ☒

13. Is the undersigned or any proposed Insured aware of any fact, circumstance or situation involving the Organization or its Subsidiaries or any proposed Insured which he or she has reason to believe might result in a future Claim? *If "Yes", please attach details.*

☐   ☒

IT IS UNDERSTOOD AND AGREED THAT IF KNOWLEDGE OF ANY SUCH FACT, CIRCUMSTANCE OR SITUATION EXISTS, ANY CLAIM SUBSEQUENTLY ARISING THEREFROM SHALL BE EXCLUDED UNDER THE PROPOSED COVERAGE.

☒

14. Current Executive Protection and Employment Practices Liability Insurance, Directors' & Officers' Liability Insurance or similar coverage (answer each Item):

a. Carrier  **Chubb**

c. Retention _____   d. Policy Expiration **9/29/03**   e. Premium **$6200**   b. Limit _____

f. Has any carrier refused, cancelled or non-renewed similar coverage? *If "Yes", please attach details.*

☒   ☐

g. Have any notices been provided to any previous carrier? *If "Yes", please provide details.*

☐   ☒

The undersigned President (or Executive Director) declares that to the best of his/her knowledge the statements set forth herein are true and correct and that reasonable efforts have been made to obtain sufficient information from each and every proposal Insured to facilitate the proper and accurate completion of this Proposal Form. The undersigned further agrees that if any significant adverse change in the condition of the applicant is discovered between the date of this Proposal Form and the effective date of the Policy, which would render this Proposal Form inaccurate or incomplete, notice of such change will be reported in writing to the Insurer immediately. The signing of this Proposal Form does not bind the undersigned to purchase the insurance, but it is agreed that this Proposal Form and any material submitted therewith are the representations of the proposed Insureds and are material. It is further agreed that this Proposal Form and any material submitted shall be the basis of the contract should a Policy be issued, and this Proposal Form and any attachments hereto will be attached to and become a part of the Policy.

It is represented that the particulars and statements contained in this Proposal Form, including all materials submitted herewith, are true and are the basis of the Policy and are to be considered as incorporated in and constituting part of the Policy. However, the Policy shall not be voided or rescinded on the basis of the Policy as a result of any untrue statement in this Proposal Form, except as to the Organization, its Subsidiaries and those Insured Persons making such statement or having knowledge of its untruth.

By _____                    Date **5-23-03**
SIGNATURE OF PRESIDENT OR EXECUTIVE DIRECTOR

Title _____

*A POLICY CANNOT BE ISSUED UNLESS THE PROPOSAL FORM IS PROPERLY SIGNED AND DATED.*

PLEASE NOTE: A copy of the Organization's latest annual report or annual audit/examination or internal financial statement must be provided at the time the completed Proposal Form is submitted. This Proposal Form, including any material submitted therewith, shall be treated in strictest confidence.

Please submit this Proposal Form including documentation to:   GREAT AMERICAN INSURANCE COMPANIES
EXECUTIVE LIABILITY DIVISION
P.O. BOX 66943
CHICAGO, ILLINOIS 60666

D.9210 (8/97)

# Non-Profit Organization Executive Protection and Employment Practices Liability Insurance Policy



**GREATAMERICAN.**

INSURANCE COMPANIES

580 Walnut Street, Cincinnati, Ohio 45202

D.9100 (12/99)

THIS IS A CLAIM
MADE POLICY, R
IT CAREFULLY.

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to the company shown in t Declarations (a stock insurance company, hereinafter called the Insurer), including the statements made in the Proposal Form and subject to t terms, conditions and limitations of this Policy, the Insured and Insurer agree:

## Section I. Insuring Agreement

If during the Policy Period or the Discovery Period any Claim is first made against an Insured for a Wrongful Act, including an Employment Practices Wrongful Act, the Insurer shall pay on their behalf Loss resulting from such Claim. The Insurer has the right and duty to defend any Claim to which this insurance applies, even if the allegations of the Claim are groundless, false or fraudulent.

## Section II. Discovery Period

A. If this Policy is not renewed or is cancelled, either by the Organization or the Insurer, for any reason other than non-payment of premium, the Organization shall be entitled to acquire an additional reporting period for Claims first made against an Insured as set forth below, but only with respect to Wrongful Acts committed prior to the end of the Policy Period. This additional reporting period shall be referred to as the Discovery Period.

B. If this Policy is not renewed or is cancelled by the Insurer for any reason other than non-payment of premium, the Discovery Period shall be the period of ninety (90) days from the end of the Policy Period, and there shall be no charge for this Automatic Discovery Period of ninety (90) days. If prior to the end of the Automatic Discovery Period the Organization pays the Insurer an additional amount equal to forty percent (40%) of the annual premium of this Policy, the term of the Discovery Period shall be extended for an additional twelve (12) months from the end of the Automatic Discovery Period. The Insured shall have no right to purchase this extension of the Discovery Period at any later date.

C. If this Policy is not renewed or cancelled by the Organization, the Organization may purchase a Discovery Period of twelve (12) months from the end of the Policy Period, provided that the Organization pays the Insurer an additional amount equal to forty percent (40%) of the annual premium of this Policy within thirty (30) days of the end of the Policy Period. The Organization shall have no right to purchase this Discovery Period at any later date.

D. A renewal quotation by the Insurer incorporating different terms, conditions, Retention, Limit of Liability or premium with respect to the coverage afforded by this Policy shall not be deemed to constitute a refusal to renew by the Insurer for the purpose of determining the right to the Discovery Period.

E. The fact that this Policy may be extended by virtue of the Discovery Period shall not in any way increase the Limit of Liability stated in Item 3 of the Declarations. For purposes of the Limit of Liability, the Discovery Period is considered to be part of and not in addition to the last Policy Year.

## Section III. Definitions

A. "Organization" shall mean the entity named in Item 1 of the Declarations.

B. "Insured" shall mean the Organization and any Subsidiary and all Insured Persons.

C. "Insured Persons" shall mean all persons who were, now are, or shall be directors, trustees, officers, employees, volunteers or staff members of the Organization or its Subsidiaries, including any executive board members and committee members whether salaried or not.

D. "Subsidiary" shall mean any entity which qualifies as a not-for-profit organization under the Internal Revenue Code, other than a political committee organized pursuant to Section 432 of the Federal Election Campaign Act of 1971 (and amendments thereto), and for which the Organization has or controls the right to elect or appoint more than fifty percent (50%) of the Board of Directors or other governing body of such entity, or any other entity added as a Subsidiary by written endorsement to this Policy. Coverage shall apply to a Subsidiary only for Wrongful Acts committed during the time such entity so qualified as a Subsidiary.

E. "Wrongful Act" shall mean any actual or alleged error, mis-statement, misleading statement, act or omission, neglect or breach of duty, or Employment Practices Wrongful Act by the Organization, and/or a Subsidiary, and/or any Insured Persons acting in their capacity with the Organization or a Subsidiary.

F. "Employment Practices Wrongful Act" shall mean: (1) wrongful dismissal, discharge or termination of employment, whether actual or constructive; (2) employment related misrepresentation; (3) violation of employment laws; (4) sexual or workplace harassment of any kind; (5) discrimination; (6) wrongful failure to employ or promote; (7) wrongful discipline; (8) wrongful deprivation of career opportunity including a wrongful failure to hire or promote; (9) failure to grant tenure; (10) negligent evaluation; (11) retaliation; and/or (12) failure to provide adequate workplace or employment policies or procedures.

G. "Loss" shall mean settlements and judgments, and subject to the provisions of Section V and Section VI, Costs of Defense incurred by the Insured, provided always, however, Loss shall not include taxes, criminal or civil fines or penalties imposed by law, punitive or exemplary damages, or the amount of any multiple damage award which is in excess of the damage award which was so multiplied, or any matter which may be deemed uninsurable under the law pursuant to which this Policy shall be construed.

H. "Costs of Defense" shall mean any reasonable and necessary legal fees and expenses incurred in defense of any Claim and appeals therefrom, and cost of attachment or similar bonds (but without any obligation on the part of the Insurer to apply for or furnish such bonds); provided, however, Costs of Defense shall not include: (1) salaries, wages, overhead or benefit expenses associated with any Insured; and (2) any amounts incurred in defense of any Claim which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty.

I. "Policy Year" shall mean the period of one year following the effective date and hour of this Policy or the period of one year following any anniversary date thereof falling within the Policy Period; or if the time between the effective date or any anniversary date and the termination of this Policy is less than one year, such lesser period. Any Discovery Period shall be considered part of and not in addition to the last Policy Year.

J. "Policy Period" shall mean the period from the inception of this Policy to the Policy expiration date stated in Item 2 of the Declarations or its earlier termination, if any.

K. "Claim" shall mean: (1) any proceeding initiated against an Insured, including any appeals therefrom, before (a) any governmental body which is legally authorized to render an enforceable judgment or order for money damages or other relief against such Insured, or (b) the Equal Employment Opportunity Commission, or any similar governmental body whose purpose is to address employment practices; or (2) any written demand seeking money damages for a Wrongful Act.

L. "Related Wrongful Acts" shall mean Wrongful Acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision.

### Section IV. Exclusions

This Policy does not apply to any Claim made against any Insured:

A. brought about or contributed to in fact by: (1) any Insured gaining any profit, advantage or remuneration to which the Insured was not legally entitled; or (2) the fraudulent, dishonest or criminal acts of any Insured; however, the Wrongful Act of an Insured Person shall not be imputed to any other Insured Person for the purpose of determining the applicability of this exclusion;

B. to the extent it is insured under any other valid policy or policies, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, and regardless of whether or not any Loss in connection with such Claim is recoverable under such other policy or policies; provided, however, this exclusion shall not apply to the amount of Loss which is excess of the amount of any deductible or retention amounts and the limit of liability of such other policy or policies where such Claim is otherwise covered by the terms and conditions of this Policy;

C. based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving:

(1) any Wrongful Act or any fact, circumstance or situation which is the subject of any notice given by any Insured during the policy period or any extension thereof of any prior policy providing coverage similar to that provided herein, or which has been the subject of any Claim made prior to the effective date of this Policy; or

(2) any prior and/or pending civil, criminal, administrative or investigative proceeding initiated against any Insured as of the date stated in Item 8 of the Declarations;

D. based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or any way involving: (1) bodily injury, sickness, disease or death of any person, assault, or battery; or (2) damage to or destruction of any tangible property, including the loss of use thereof; or (3) mental anguish, emotional distress, invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, libel or slander; provided, however, that part (3) of this exclusion shall not apply to any Claim brought by or on behalf of any past, present or prospective Insured Person for an Employment Practices Wrongful Act;

E. based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (or any regulations promulgated thereunder) or similar provision of any statutory or common law;

F. for any wrongful act of an Insured Person in their capacity as a director, officer or employee of any entity other than the Organization or a Subsidiary, even if directed or requested to serve such other entity, except where this Policy has been specifically endorsed to provide such extension of coverage;

G. based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving actual or alleged seepage, pollution, radiation, emission or contamination of any kind;

H. by, or for the benefit of, or at the behest of the Organization or a Subsidiary or any entity which controls, is controlled by, or is under common control with the Organization or a Subsidiary, or any person or entity which succeeds to the interest of the Organization or a Subsidiary;

I. for any actual or alleged liability of any Insured under any contract or agreement, express or implied, written or oral, except for employment related obligations which would have attached absent such contract or agreement;

J. for any obligation of the Organization or a Subsidiary to modify any building or property in order to affect compliance with municipal, state or federal law.

### Section V. Limit of Liability

A. The Insurer shall be liable to pay one hundred percent (100%) of Loss in excess of the Retention stated in Item 4 of the Declarations. The Insurer's maximum Limit of Liability for the aggregate amount of Loss resulting from all Claims deemed to have been made in a Policy Year shall be the amount shown in Item 3 of the Declarations.

B. More than one Claim involving the same Wrongful Act or Related Wrongful Acts of one or more Insureds shall be considered a single Claim, and only one Retention shall be applicable to such single Claim. All such Claims, constituting a single Claim shall be deemed to have been made on the earlier of the following dates: (1) the earliest date on which any such Claim was first made; or (2) the earliest date on which any such Wrongful Act or Related Wrongful Act was reported under this Policy or any other policy providing similar coverage.

C. Costs of Defense incurred by the Insurer shall be in addition to the Limit of Liability, and such Costs of Defense shall not be subject to the Retention amount. If Costs of Defense are incurred by the Insured with the Insurer's consent, such Costs of Defense shall be considered Loss and thus shall be subject to the Limit of Liability and Retention.

D. With respect to all Claims deemed to have been made in a Policy Year, should the Limit of Liability be exhausted by payment of Loss resulting from one or more of such Claims, the Insurer's duty to defend shall cease and any and all obligations of the Insurer hereunder shall be deemed to be completely fulfilled and extinguished and the Insurer shall have no further obligations hereunder of any kind or nature.

### Section VI. Costs of Defense and Settlements

A. No Insured shall admit liability, offer to settle, or incur Costs of Defense in connection with any Claim without the Insurer's prior written consent. Such consent shall not be unreasonably withheld. The Insured shall provide the Insurer with full cooperation and all information which would reasonably be required in order to allow the Insurer to reach a decision as to such consent. Any Costs of Defense incurred and/or settlements agreed to prior to the Insurer's consent thereto shall not be covered hereunder.

B. The Insurer has the right to investigate and settle any Claim, as it deems expedient. In the event the Insurer recommends a settlement and the Insured refuses to consent thereto, the Insurer shall be released from any obligation to further defend such Claim. Subject to the Limit of Liability, the Insurer's liability for such Claim is limited to the amount in excess of the Retention which the Insurer would have contributed to the settlement had the Insured consented to settlement, plus Costs of Defense covered by the Policy incurred prior to the date of such refusal to settle.

### Section VII. Notice of Claim

A. The Insureds shall, as a condition precedent of their rights under this Policy, give the Insurer notice in writing of any Claim made, as soon as practicable.

B. If during the Policy Period or Discovery Period the Insured first becomes aware of a specific Wrongful Act, and if the Insured gives written notice to the Insurer as soon as practicable of (1) the specific Wrongful Act; (2) the injury or damage which has or may result therefrom; and (3) the circumstances by which the Insured first became aware thereof, then any Claim arising out of such Wrongful Act which is subsequently made against the Insured and not otherwise excluded by the terms of the Policy shall be deemed to have been made at the time the Insurer received such written notice from the Insured.

C. In addition to furnishing the notice as provided in Section VII A or B the Insured shall, as soon as practicable, furnish the Insurer with copies of reports, investigations, pleadings and other papers in connection therewith

D. Notice to the Insurer as provided in Section VII A or B shall be given to:

GREAT AMERICAN INSURANCE COMPANIES
EXECUTIVE LIABILITY DIVISION, CLAIMS DEPARTMENT
P.O. BOX 66943
CHICAGO, IL 60666.

## Section VIII. General Conditions

### A. Cancellation or Non-Renewal

(1) This Policy may be cancelled by the Organization at any time by written notice to the Insurer. Upon cancellation, the Insurer shall retain the customary short rate portion of the premium.

(2) This Policy may be cancelled by or on behalf of the Insurer by delivering to the Organization at the address stated in Item 1 of the Declarations, written notice stating when, not less than ninety (90) days thereafter, the cancellation shall be effective. The delivery of such notice shall be sufficient proof of notice and this Policy shall terminate at the date and hour specified in such notice. Upon cancellation, the Insurer shall retain the pro-rata portion of the premium. Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

(3) If the Insurer elects not to renew this Policy, the Insurer shall provide the Organization with not less than ninety (90) days advance notice thereof.

### B. Proposal Form

It is agreed that the particulars and statements contained in Proposal Forms submitted to the Insurer (and any material submitted therewith) are the representations of the Insured, and it is understood that such representations are material and that this Policy is issued in reliance upon such representations, which are to be considered as incorporated in and constituting part of this Policy. However, this Policy shall not be voided or rescinded and coverage shall not be excluded as a result of any untrue statement in the Proposal Form, except as to the Organization, its Subsidiaries and those Insured Persons making such statement or having knowledge of its untruth.

### C. Action Against the Insurer

(1) No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy, and until the Insured's obligation to pay shall have been finally determined by an adjudication against the Insured or by written agreement of the Insured, claimant and the Insurer.

(2) No person or organization shall have any right under this Policy to join the Insurer as a party to any Claim against any Insured nor shall the Insurer be impleaded by any Insured or their legal representative in any such Claim.

### D. Conversion to Run-Off Coverage

If prior to the end of the Policy Period, another organization acquires substantially all of the assets of the Organization, or the Organization merges into another organization, or the Organization ceases to qualify as a not-for-profit organization under the Internal Revenue Code (such events hereinafter referred to as Transaction), then:

(1) the Organization must give written notice of such Transaction to the Insurer within thirty (30) days after the effective date of such Transaction, and provide the Insurer with such information as the Insurer may deem necessary; and

(2) this Policy, including the Discovery Period if elected, shall apply, but only with respect to any Wrongful Act committed prior to the effective date of such Transaction.

### E. Subrogation

In the event of any payment under this Policy, the Insurer shall be subrogated to all of the rights to recovery of the Insured and the Insured shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents as may be necessary to enable the Insurer to effectively bring suit in the name of any Insured.

### F. Assignment

Assignment of interest under this Policy shall not bind the Insurer until its consent is endorsed hereon.

### G. Conformity to Law

Any terms of this Policy which are in conflict with the terms of any applicable laws are hereby amended to conform to such laws.

### H. Entire Agreement

By acceptance of this Policy, the Insured and the Insurer agree that this Policy (including the Proposal Forms submitted to the Insurer and any materials submitted therewith) and any written endorsements attached hereto constitute the entire agreement between the parties.

### I. Organization Represents Insured

By acceptance of this Policy, the Organization shall be designated to act on behalf of the Insureds for all purposes including, but not limited to, giving and receiving of all notices and correspondence, the cancellation or non-renewal of this Policy, the payment of premiums, and the receipt of any return premiums that may be due under this Policy.

### J. Representative of the Insurer

Great American Insurance Companies, Executive Liability Division, Post Office Box 66943, Chicago, Illinois 60666 shall act on behalf of the Insurer for all purposes including, but not limited to, the giving and receiving of all notices and correspondence.

In witness whereof the Insurer has caused this Policy to be signed by its President and Secretary and countersigned, if required, on the Declarations page by a duly authorized agent of the Insurer.

GREAT AMERICAN INSURANCE COMPANIES

_Secretary_

_President_

COPY

EX B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THE GENERAL CONVENTION OF THE NEW
JERUSALEM IN THE UNITED STATES OF
AMERICA, INC., THE MASSACHUSETTS
ASSOCIATION OF THE NEW JERUSALEM
(SWEDENBORGIAN), and GEORGE CHAPIN,

Plaintiffs,

v.

EDWARD MACKENZIE, THOMAS KENNEDY,
BOSTON SOCIETY OF THE NEW JERUSALEM,
INCORPORATED (SWEDENBORGIAN), and
BOSTONVIEW CORPORATION,

Defendants.

04  10419 WGY

C.A. No.

MAGISTRATE JUDGE

RECEIPT # _____ 54908
AMOUNT $ 150
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE

## COMPLAINT

## INTRODUCTION

1.   Defendant, Edward ("Eddy") MacKenzie, a convicted felon and former enforcer for Whitey Bulger, and Thomas Kennedy, who allegedly engaged in fraudulent loan transactions, have utilized a pattern of racketeering activity to wrongfully take control of a one hundred eighty-five year old church to obtain dominion over its $30 million apartment house which now generates more than $1.2 million in annual income.

2.   MacKenzie joined the Church in November, 2002.  He teamed with Kennedy to obtain control over the Church's mentally-disabled minister.  They then began to misappropriate money from the Church.

3.   In February and May, 2003, they then forced the Church into admitting new "straw" church members, who would vote as MacKenzie and Kennedy directed.  In May, 2003, MacKenzie and Kennedy utilized the votes of these new members and extorted the votes of other

# 1745161_v1

members to become elected as trustees of the Church. MacKenzie also became elected as Treasurer.

4.    In September, 2003, when they believed their positions had become effective, they then used extortion and other means to become elected as directors of Bostonview Corporation, the company which is owned by the Church and which owns the $30 million apartment house. They also began to misappropriate more money from the Church for their personal benefit.

5.    In October, 2003, MacKenzie and Kennedy then used extortion, mail fraud and other means to force the Church to disaffiliate itself from the Denomination. They did so to avoid the ramifications of an investigation which found that the minister, through his affiliation with MacKenzie and Kennedy, had not acted appropriately. After the disaffiliation, Kennedy and MacKenzie moved businesses in which they have an interest into the offices of the Church. They did so to utilize Church copiers, telephones and other equipment and to avoid the incurrence of similar expenses by their businesses.

6.    MacKenzie and Kennedy are now preparing to convert the apartments into condominiums. They will profit personally through the sale of those assets. They also wrongfully continue to receive cash and other benefits from the Church.

7.    MacKenzie's and Kennedy's actions constitute violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962. In furtherance of their scheme, they have breached the Church's by-laws, perpetrated extortion and mail fraud, breached fiduciary duties, engaged in common law fraud, and violated Mass. Gen. Laws ch. 93A.

8. The Church's by-laws also provide that the Denomination, Plaintiff, General Convention of the New Jerusalem in the United States of America, Inc., is entitled to hold the Church's assets in escrow based on the Church's recent disaffiliation from the Denomination.

## THE PARTIES

9. Plaintiff, The General Convention of the New Jerusalem in the United States of America, Inc. (the "Denomination"), is the denomination associated with churches that follow principles and teachings of Emanuel Swedenborg. Such principles include, without limitation, acting for the benefit of others. The Denomination's principal executive office is located in Newtonville, Massachusetts.

10. Plaintiff, The Massachusetts Association of the New Jerusalem (Swedenborgian) (the "Association"), is comprised of five active churches, which previously included the Church. The Association's principal executive office is located in Newton, Massachusetts.

11. Plaintiff, George Chapin, is a member of the Boston Society of the New Jerusalem, Inc. (Swedenborgian). He resides in Everett, Massachusetts.

12. Defendant, Edward ("Eddy") MacKenzie ("MacKenzie"), is an individual who, upon information and belief, resides in Boston, Massachusetts.

13. Defendant, Thomas Kennedy ("Kennedy"), is an individual who, upon information and belief, resides in Boston, Massachusetts.

14. Defendant, Boston Society of the New Jerusalem, Inc. (Swedenborgian) (now named Church of the Hill) (the "Church"), is a church located at 140 Bowdoin Street, Boston, Massachusetts.

15. Defendant, Bostonview Corporation ("Bostonview"), is a corporation which is located at, and owns the building located at 140 Bowdoin Street, Boston, Massachusetts. The building contains the Church Chapel, Church offices and approximately thirty (30) residential

# 1745161_v1                                      - 3 -

apartments. The Church is the sole stockholder of Bostonview. The apartments' value exceeds $30 million. The apartments now generate more than $1.2 million in annual revenue to the Church.

## JURISDICTION AND VENUE

16.    Jurisdiction over this matter exists pursuant to 18 U.S.C. § 1964.

17.    Venue is appropriate pursuant to 18 U.S.C. § 1964(a), (b).

## THE ALLEGATIONS

18.    Individuals who resided in and near Boston created the Church in 1818. The Church had become affiliated with the Denomination at or before the date of its creation.

19.    Members of the Church are to follow the principles set forth by Emanuel Swedenborg. Such principles include, without limitation, dedicating ones life and resources toward the betterment of others, helping others to reach their full potential, and assisting one's neighbor. Swedenborgian churches work for the good of all.

20.    These individuals and subsequent Members have maintained the Church and followed the Swedenborgian principles since its creation nearly one hundred eighty-five (185) years ago.

21.    The Members attend chapel services, sponsor free ecumenical clergy breakfasts, offer free dinners, assist with the payment of college tuition of Members' children, and provide money and services for city relief projects. They also maintained an emergency relief fund which the Church accessed to assist needy people. They also engage in other charitable activities.

22.    During its nearly 185-year existence, the Church has received the services of numerous Pastors. Such Pastors conduct all religious services and handle many administrative tasks of the Church.

23.    The Church also has officers who include a President, Vice President, Secretary and Treasurer.

24.    The Church also has a Board of Trustees. The Members of the Church elect the Trustees. The Trustees are ultimately responsible for decisions regarding the Church's finances, governing the action of the treasurer, the collection and distribution of all funds for the support of public worship or special programs, the maintenance of financial records, and the preparation of a budget.

25.    The Church also has a Church Council. Its members include the Pastor, the President, Vice President, Secretary, Treasurer, Chair of the Board of Trustees and several at-large members. The duties of the Church Council address, without limitation, whether new members should be admitted to the Church.

### Reverend G. Steven Ellis Becomes Minister of the Church

26.    In 1982, Reverend G. Steven Ellis ("Reverend Ellis") became Pastor of the Church. He had graduated from the New Church Theological School, the Denomination's post-graduate seminary, which is located in Newton, Massachusetts.

27.    Reverend Ellis guided the Church in its religious activities. He also served on the local clergy council, maintained regular office hours to be available for counsel and advice, served on city service committees, held occasional Bible study sessions after church services, and did work for and with senior citizens within and without the congregation.

28.    During the course of his ministry, however, Reverend Ellis began to suffer mental illness. Upon information and belief, he suffers as a manic depressive. He became mentally unstable.

29.    Reverend Ellis's behavior changed significantly because of his mental illness. At services he would cry. He became difficult to reach by telephone and otherwise. At services, his sermons oddly focused on issues relating only to himself and not on Swedenborgian principles. He frequently yelled and screamed. He no longer dedicated time toward certain charitable activities. He also left the Church for extended periods to visit his family in Kentucky.

### Thomas Kennedy Joins the Church

30.    Thomas Kennedy joined the Church just prior to May, 2002.

31.    Upon information and belief, Kennedy misrepresented his background to Reverend Ellis. He misrepresented that the MBTA had employed him as an accountant and that he had left this position. Upon information and belief, the MBTA had fired Kennedy. Upon information and belief, Kennedy had also engaged in fraudulent loan transactions.

32.    Kennedy observed Reverend Ellis's mental instability. He believed that this instability would permit him to take actions designed to exploit the relationship with Reverend Ellis. Accordingly, Kennedy befriended Reverend Ellis.

### Thomas Kennedy Joins But Then Leaves the Massachusetts New Church Union Because, Among Other Reasons, He Attempted to Transfer Union Funds to an Account From Which Only He Had the Power of Withdrawal

33.    To benefit personally and financially, Kennedy advised Reverend Ellis to nominate him as President of the Massachusetts New Church Union (the "Union"). The Union is a non-profit corporation which holds the properties and funds of the Association and responds to the request of the Association for money to conduct programs. The Association then included Swedenborgian congregations located in Cambridge, Yarmouthport, Bridgewater, Elmwood, Brockton, Newtonville and the Church, which is located in Boston. The Church left the Association in 2003.

# 1745161_v1                    - 6 -

34.     The Union holds funds for the Association. It also owned a library located at 79 Newbury Street and a Blairhaven Retreat and Conference Center in South Duxbury, Massachusetts.

35.     The Union has a General Secretary, who oversees the activities of the Union. The Union also has other officers, such as President, Treasurer and Clerk.

36.     As Kennedy planned, in May, 2002, Reverend Ellis, then President of the Association, proposed at an annual meeting of the Association and Union that Kennedy should serve as President of the Union.  Reverend Ellis spoke in strong support of Kennedy.  The membership elected Kennedy as President of the Union.

37.     After being elected as President, Kennedy attempted to use that position for his personal benefit. These actions demonstrate the nature of the activities that he would later take as to the Church and Bostonview.

38.     Kennedy grossly abused his position as President. He made hundreds of personal long-distance telephone calls using the Union's telephone.  A true and accurate copy of an invoice evidencing these calls is attached as Exhibit A. He also verbally and otherwise abused and belittled Union employees, some of whom had worked for the Association for more than twenty years.

39.     In July or August, 2002, Kennedy tried to transfer more than $1 million in Union funds to a Wachovia account from which only Kennedy had the power of withdrawal.  A true and accurate copy of the transfer application is attached as Exhibit B. No justification for that transfer existed. Kennedy made this transfer only to obtain personal access to the Union's funds.

40.    The Bank resisted Kennedy's efforts concerning the transfer.  It notified the Association  The Association found that Kennedy's attempt to transfer the funds was wrongful. The transfer did not occur.

41.    Kennedy also conducted a meeting in September, 2002, only to discredit the General Secretary.  Kennedy invited Alfred Nugent, the lawyer who defended MacKenzie as to his earlier crimes, to the meeting to indicate falsely that the General Secretary had been fiscally irresponsible and to suggest that he had embezzled funds.  Kennedy believed that these statements would cause Union representatives to lose faith in the General Secretary.

42.    Kennedy also misrepresented that a small group of Church Members had paid for Mr. Nugent's appearance when in fact Kennedy paid him with Union funds.

43.    Thereafter, Kennedy obtained the assistance of MacKenzie in connection with actions he was taking at the Union.

44.    MacKenzie and Kennedy moved into the Union facility at 79 Newbury Street.

45.    Kennedy hired his children to do decorating and painting work at 79 Newbury Street.  Upon information and belief, Kennedy used Union funds to pay them more than the value of the work they performed.

46.    MacKenzie and Kennedy used Union funds to purchase furniture, computers and telephones for their own use.

47.    They later utilized another $13,000 of Union funds to purchase equipment, which, upon information and belief, was also for their personal use.

48.    By November and December, 2002, Union members had decided that they would no longer tolerate Kennedy's behavior.  In December, 2002, they called a special Union membership meeting, scheduled for January 5, 2003 to hold new elections for the Officers and

Directors of the Union. The intent was to remove Kennedy as President of the Union, and to bring the Union Standing Committee back under the control of the full Union membership. Through negotiations, Kennedy resigned beforehand to avoid the need for him to disclose all the wrongful activities that he and MacKenzie had committed.

49.     Following Kennedy's resignation, the Church paid the Union $14,000 to replace some of the funds expended without authorization by Kennedy and MacKenzie.

50.     Although Kennedy resigned in December, 2003, MacKenzie and Kennedy refused to return the Union's checkbook until February or March, 2003.

## Edward MacKenzie Joins the Church

51.     In or about November of December, 2002, MacKenzie and Kennedy agreed to take actions necessary to obtain control of the Church and its major physical asset, an apartment house worth approximately $30 million.

52.     Kennedy introduced Reverend Ellis to MacKenzie. Kennedy did not disclose the nature of MacKenzie's past.

53.     MacKenzie became a member of the Church in November, 2002. MacKenzie had fraudulently represented that he wished to become a member of the Church to follow the principles set forth by Emanuel Swedenborg. MacKenzie knew this statement to be false. In fact, MacKenzie stated during a July, 2003, televised promotion of his book "Street Soldier" in July, 2003 (a full eight (8) months after joining the Church) that he was, at that time, a Roman Catholic. This statement violates Article IV, Section 1(b) of the Church's by-laws which states that no Members of the Church shall retain active membership in any other church communion. A true and accurate copy of the by-laws is attached as Exhibit C.

54.     MacKenzie had served as an enforcer for Whitey Bulger in the late 1980s. His published book, "Street Soldier," documents his criminal past.

55.    MacKenzie's duties to Mr. Bulger included the use of brute physical force. For example, MacKenzie, a former Golden Gloves boxer, had broken individuals' arms and legs, bitten off an individual's finger and then ate it, and defecated in individuals' beds. He had also beaten people mercilessly. He also served as a drug dealer.

56.    In or about 1990, MacKenzie had also been convicted of cocaine trafficking. He entered prison but later received immunity based on his agreement to assist in the apprehension of Columbian drug dealers.

57.    MacKenzie's criminal activities continue. In 2001, he reportedly defrauded an elderly women. He indicated that he would locate her lost son. He reported the he located the son in a Cuban prison. That representation was false and MacKenzie knew it to be false at the time he made it. A true and accurate copy of an article concerning these activities is attached as Exhibit D.

58.    Upon information and belief, in and before 2001, MacKenzie had also received more than $30,000 in worker's compensation payments based on a fabricated disability. Upon information and belief, he has been required to refund this amount. A true and accurate copy of an article concerning these activities is attached as Exhibit E.

59.    MacKenzie also observed that Reverend Ellis was mentally unstable. Accordingly, he took actions to obtain control of Reverend Ellis. MacKenzie believed that such control would permit him and Kennedy to obtain dominion over the Church and its apartment house worth more than $30 million.

60.    Because MacKenzie also did not work, he spent most of his time at the Church. He drove Reverend Ellis wherever he needed to go. He spent time at the Church assisting Reverend Ellis in connection with whatever tasks he needed completed. MacKenzie remained in

Reverend Ellis's presence. MacKenzie and Kennedy ate three meals a day with him. They helped Reverend Ellis make all of his decisions. As a result, MacKenzie's and Kennedy's plan succeeded. MacKenzie obtained control of Reverend Ellis.

61.    As a result, MacKenzie and Kennedy also began to request and receive checks from Reverend Ellis from the Church's discretionary fund. Those funds existed only to support the charitable actions of the Church. Upon information and belief, Kennedy and MacKenzie received as much as $25,000 from the fund. No justification existed for these payments.

62.    MacKenzie also forced the Church to pay the tuition of his daughter to attend a private secondary school. Previously, payments on behalf of Members' children had been made by the Church only as to reimbursement of college tuition. Payments as to secondary school had never been permitted.

63.    MacKenzie used extortion to force the Board to approve the expenditure. At the vote concerning the payment of amounts regarding MacKenzie's daughter's attendance at a secondary school, he stood directly behind the Board Chairman. MacKenzie indicated that the expenditure should be approved. He took these actions only to create fear in the members of the Board. That fear caused the Board to approve the expenditure.

### New Individuals Attempt to Join the Church In Breach of Its By-Laws

64.    Many actions of the Church require a majority vote of the Church members. Such actions include, without limitation, voting for individuals to become Trustees within the Church.

65.    To assist in controlling a majority of the members, MacKenzie and Kennedy asked that their friends and numerous members of their families be admitted as Church Members. MacKenzie and Kennedy misrepresented to Reverend Ellis and the Board of Trustees that these individuals wished to join the Church to follow the Swedenborgian principles.

66.    These new members had no intention of following the principles of the Swedenborgian faith.    They possessed no interest in becoming members of the Church. MacKenzie and Kennedy caused these individuals to join only so MacKenzie and Kennedy could direct how they would vote.

67.    In February and May, 2003, MacKenzie and Kennedy presented these individuals for admission into the Church. True and accurate copies of agendas concerning these votes are attached as Exhibits F & G.

68.    MacKenzie and Kennedy used their control of Reverend Ellis to obtain his assistance in getting these new members admitted to the Church. Reverend Ellis repeated the fraudulent reasons why these members should be permitted to join the Church. He also recommended that these individuals join the Church.    Based on these fraudulent misrepresentations, the Church allowed these individuals to join.

69.    Moreover, the church admitted these individuals in breach of its own by-laws. Most, if not all, of the individuals recommended by MacKenzie and Kennedy for admission had never even visited the Church. Many also did not attend the meeting at which the church decided whether to admit them.

70.    Never had potential new members failed to attend the meeting at which their membership would be decided. Potential new members also had never failed to visit or participate in Church-related activities before being admitted.

71.    Article IV, Section 3 of the Church's by-laws also specifically specified that "[a]ll candidates for membership . . . shall participate in sessions of doctrinal study leading toward confirmation under the guidance of the Pastor . . . . Confirmations must be recorded in the Church permanent records." A true and accurate copy of the by-laws is attached as Exhibit C.

72.    The process of confirmation required Reverend Ellis to instruct each potential new member as to principles of the Swedenborgian faith. Only after that process is completed may the individual be considered for admission to the Church.

73.    Reverend Ellis did not confirm any of the new members who the Church admitted at the requests of MacKenzie and Kennedy. Reverend Ellis, however, had confirmed all other Members of the Church who had previously joined during his ministry.

74.    The ability to control votes of these newly-admitted members and the Church membership provided MacKenzie and Kennedy with dominion over the Church's greatest physical asset: the $30 million apartment complex which it owns. That complex now generates more than $1.2 million dollars in net revenue on an annual basis.

### MacKenzie and Kennedy Coerce the Church Into Electing Them As Officers and Trustees of the Church

75.    As a result of gaining control of the Church Membership, MacKenzie and Kennedy then forced the Church to conduct votes concerning their election as Trustees and Officers of the Church. MacKenzie and Kennedy also sought the removal of current Trustees and Officers. Such Trustees included Bobby Buchanan and John Perry.

76.    MacKenzie and Kennedy directed newly-admitted members, who were family and friends, how to vote. They voted as directed.

77.    MacKenzie and Kennedy also extorted the votes of numerous elderly Members. MacKenzie and Kennedy did so by standing and walking through the crowd of elderly Members during the vote, which was by hand. Upon information and belief, these Members included, for example, Anna Brown, David Dorcey, Sandy Flaherty, Andrew McClaine, Ralph Schwartz, and others. MacKenzie and Kennedy again indicated to these Members that failing to vote in favor of their election and the removal of current Trustees or Officers would not be beneficial to them.

For example, and without limitation, MacKenzie indicated that these individuals would lose Church benefits if they did not vote as directed. MacKenzie and Kennedy intended that such actions would create fear in the elderly Members. As a result of this fear, these Members voted as directed.

78.    During those votes, MacKenzie also wrongfully prevented individuals who supported the current Trustees from speaking. For example, one individual wished to make comments supporting the then present Trustees and officers. MacKenzie prevented him from doing so.

79.    As a result, MacKenzie, Kennedy and others became elected as Trustees. Various existing members were replaced as Officers and/or Trustees. As a result of their election, MacKenzie and Kennedy then obtained control of the Board of Trustees.

80.    MacKenzie also forced the members to vote to remove Joan Buchanan as Treasurer. MacKenzie sought to replace her. The newly elected members voted in favor of electing MacKenzie. MacKenzie and Kennedy also extorted the votes of the same elderly Members in the same fashion that they had previously used. The position as Treasurer provided MacKenzie with unfettered access to the Church's funds.

81.    In June, 2003, MacKenzie and Kennedy instructed Reverend Ellis to tell Bob Buchanan to resign or that Big Brother would visit him. Reverend Ellis did so. MacKenzie and Kennedy caused this statement to occur to create fear in Mr. Buchanan. As a result of this fear, Mr. Buchanan no longer acted as President.

82.    Upon information and belief, in July, 2003, MacKenzie and Kennedy stole financial records of the Church and three cancelled checks. They did so to prevent the disclosure of their wrongful acquisition of Church funds.

83. Any election of MacKenzie as Treasurer of the Church could not have become effective until September 1, 2003. On September 2, 2003, he and Kennedy appeared at the Church's bank, Mellon, to cash Church checks payable to each of them.

84. The Bank refused to cash the checks. A true and accurate copy of a letter from the Bank to that effect is attached as Exhibit H. Thereafter, however, MacKenzie and Kennedy obtained from the Church, which they then controlled, the amounts they sought from Mellon.

85. On September 21, 2003, MacKenzie and Kennedy conducted a meeting to expel Bobby and Joan Buchanan as Members of the Church. They did not notice the meeting appropriately. Accordingly, the results of the votes taken at the meeting are void. A true and accurate copy of a memorandum concerning the meeting is attached as Exhibit I.

86. MacKenzie moved at the meeting to expel Bobby and Joan Buchanan. He had instructed his and Kennedy's family and friends to vote in favor of the motion. He had also extorted the elderly Members into voting that way as well.

87. As directed by MacKenzie and Kennedy, the newly-admitted members voted to expel Joan and Bobby Buchanan, who had been Members of the Church more than thirty years. As a result of the fear created in the elderly Members, many also voted in favor of expulsion.

### MacKenzie and Kennedy Also Become Directors of Bostonview

88. At the September 21, 2003 meeting, MacKenzie and Kennedy obtained positions as directors of Bostonview by misrepresenting to the Membership that they would act for the benefit of the Church. They won this election by directing the new-admitted members how to vote and by extorting the votes of the same elderly Members in the manner they had utilized as to previous votes.

89.    With the intent to further their scheme, they directed Edwards & Angell, LLP to forward a letter to the property's real estate manager evidencing the result of the election. This mailing constituted mail fraud in violation of 18 U.S.C. § 1341. A true and accurate copy of a letter from Edwards & Angell, LLP evidencing that fact is attached as Exhibit J.

90.    Obtaining positions as directors of Bostonview enabled them to further control the $30 million apartment house and the expenditure of more than $1.2 million in net revenue earned by that corporation each year.

### The Church Leaves the Denomination

91.    As a result of Reverend Ellis's behavior as to these elections and otherwise, some of the former Trustees had asked the Denomination in May, 2003 to conduct an investigation as to Reverend Ellis. The Denomination agreed to do so. A true and accurate copy of the request is attached as Exhibit K. The Denomination's President presented the former Trustees' request to its Committee on Inquiry. The Committee then began an investigation as to Reverend Ellis.

92.    In accordance with the Committee's policies, Reverend Ellis was invited for an Interview. He asked if he could have supporters with him. The Committee is able to allow one or two supporters to be present, but the dialogue is only with the minister.

93.    When the Committee met with Revered Ellis, MacKenzie and Kennedy were the primary spokesmen for him. They controlled Reverend Ellis's responses. MacKenzie and Kennedy acted in this way because they did not want Reverend Ellis to admit what had actually occurred at the Church.

94.     After completing its investigation, in accordance with its duly authorized procedures, the Committee on Inquiry turned its findings over to the Council of Ministers' Board of Denomination for action. This Board offered Reverend Ellis three options: (1) he could be closely supervised for six months, (2) he could be suspended for one year, or (3) he could have his credentials as a Swedenborgian minister revoked.

95.     MacKenzie and Kennedy could not accept any of these options. They controlled Reverend Ellis and needed him to help with their plan to obtain the Church's assets.

96.     At or about this time, the Association Executive Committee also had passed a resolution stating its non-recognition of the Boston Church's expulsions from its membership. The Committee had also prepared and was about to pass a resolution stating its non-recognition of all of the new members that had been lately brought into the Church in contravention of its own by-laws. A true and accurate copy of the resolution is attached as Exhibit L.

97.     In response to a letter received from the Association's Executive Committee concerning a request for information, MacKenzie and Kennedy directed Edwards & Angell, LLP to forward a response on September 29, 2003, to avoid the production of information by the Church. A true and accurate copy of the letter is attached as Exhibit M.

98.     MacKenzie and Kennedy also directed Edwards & Angell, LLP to forward a second letter on September 29, 2003. That letter confirmed the removal of Robert and Joan Buchanan as members of the Association. A true and accurate copy of that letter is attached as Exhibit N. MacKenzie and Kennedy sent the letter in an attempt to comply with the language of the Association's resolution and to frustrate any investigation into their expulsion of Church members.

99.    MacKenzie and Kennedy sent the letters on September 29, 2003, in furtherance of their fraudulent scheme to control the Church and its assets.    The mailing of the letters constitutes mail fraud in violation of 18 U.S.C. § 1341.

100.    Shortly thereafter, MacKenzie and Kennedy forced the Church to become disaffiliated with the Denomination. They misrepresented the reason for the vote. They did not disclose that affiliation would foil their plan to continue to control the Church and its apartment house. They also did not address Reverend Ellis's mental incapacity. Instead, they portrayed the vote as one needed to save Reverend Ellis from what they asserted were wrongful actions of the Denomination.

101.    To obtain the vote, MacKenzie and Kennedy again directed and obtained the votes of the family and friends that they had fraudulently caused to become members.  They also continued to extort the votes of elderly Members using the methods previously set forth above.

102.    After 185 years of affiliation, the Membership voted in favor of disaffiliation.

103.    In furtherance their scheme, MacKenzie and Kennedy also directed the Church to forward letters on October 26, 2003 to the Denomination and Association stating that the Church had disaffiliated itself from the Denomination.  These actions constituted mail fraud in violation of 18 U.S.C. § 1341.  True and accurate copies of those letters are attached as Exhibits O & P.

104.    MacKenzie and Kennedy continue to control the operations of the Church.

### MacKenzie and Kennedy Fail to Amend the Church's By-Laws Prior to the Date of Disaffiliation from the Denomination

105.    Prior to becoming disaffiliated from the Denomination, the Church had not amended its by-laws. They then provided:

> In the event that the religious body known as the Boston Society of the New Jerusalem, Inc. shall cease to exist, all funds and holdings shall be transferred to the General Convention of the New Jerusalem in the United States of America.

These assets shall be held in escrow for the establishment of another General Convention of the New Jerusalem (Swedneborgian) Church within the City of Boston, Massachusetts. After a period of twenty (20) years, should no such Church exist, the capital and income therefrom shall revert to the General Convention of the New Jerusalem (Swedenborgian) with any restrictions of uses which may have been voted by the Society members at the time of dissolution.

Ex. C, Article X, Section 3 (emphasis added).

106.    Accordingly, as a result of the disaffiliation, all Church assets, including the $30 million apartment house, should have been transferred to the Denomination.

## MacKenzie, Kennedy and Others Now
## Operate Businesses From the Church Offices

107.    Because of their control, MacKenzie and Kennedy have moved businesses in which they have an interest into the offices of the Church. These businesses are not affiliated with the Church.

108.    Operating the business from the Church's offices simply permits MacKenzie and Kennedy to avoid the costs associated with the salary of a secretary, office expenses, telephone and fax charges and other costs. The move is intended only to serve the personal and financial benefit of MacKenzie and Kennedy.

109.    MacKenzie and Kennedy have also caused John Doyle to join the Church. He is a real estate "broker" who, upon information and belief, had previously worked for Whitey Bulger. Upon information and belief, he will assist MacKenzie and Kennedy in connection with the sale of the apartments as condominiums.

110.    MacKenzie and Kennedy continue to receive wrongful payments from the Church.

## COUNT I
### (RICO 18 U.S.C. § 1962(b);
### Against MacKenzie and Kennedy)

111.    Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 110 as if fully set forth herein.

112.    This count is brought by Plaintiff, George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock in Bostonview.

113.    Plaintiff, George Chapin, fairly and adequately represents, respectively, the interests of the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations at issue in this case.

114.    Plaintiff, George Chapin, has made no effort to secure action from, respectively, the trustees and directors of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy herein control the majority of the trustees and directors of both boards through tactics of extortion and coercion. As such, the majority of the trustees and directors on the boards of the Church and Bostonview are interested parties. Thus, any demand on the boards that they bring an action in the name of the Church or Bostonview would have been futile.

115.    The Plaintiffs further allege as follows:

116.    MacKenzie and Kennedy are persons who knowingly or recklessly acted through a pattern of racketeering activity to obtain control of the Church, which is an enterprise.

117.    The pattern of racketeering activity includes, without limitation, MacKenzie's and Kennedy's use of extortion to obtain the votes of elderly Church Members in or about May, 2003 and September, 2003 and as to their election as Trustees of the Church, Directors of Bostonview, and Officers of the Church.

118.    The pattern also includes at least five instances of mail fraud.  On September 23, 2003, MacKenzie and Kennedy directed Edwards & Angell, LLP to mail correspondence concerning the election of new directors of Bostonview.  On September 29, 2003, they directed Edwards & Angell, LLP to mail correspondence to the Association in response to a letter seeking information relevant to a resolution to not recognize newly-admitted or expelled members.  On October 26, 2003, they also directed the Church to send letters to the Denomination and Association concerning disaffiliation.

119.    These actions have been committed in a continuous pattern.  They are related to the efforts needed to obtain control of the enterprise.

120.    MacKenzie's and Kennedy's pattern of racketeering activity has caused injury to the Church, the Church Members who have been discharged from the Church, current Members of the Church, and Bostonview.

### COUNT II
### (RICO 18 U.S.C. § 1962(c);
### Against MacKenzie and Kennedy)

121.    Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 120 as if fully set forth herein.

122.    This count is brought by Plaintiff, George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock in Bostonview.

123.    Plaintiff, George Chapin, fairly and adequately represents, respectively, the interests of the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations in issue in this case.

124.    Plaintiff, George Chapin, has made no effort to secure action from, respectively, the trustees and directors of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy herein control the majority of the trustees and directors of both boards through tactics of extortion and coercion. As such, the majority of the trustees and directors on the boards of the Church and Bostonview are interested parties. Thus, any demand on the boards that they bring an action in the name of the Church or Bostonview would have been futile.

125.    The Plaintiffs further allege as follows:

126.    MacKenzie and Kennedy are persons who knowingly or recklessly acted through a pattern of racketeering activity to control and conduct the activities of the Church, which is an enterprise.

127.    The pattern of racketeering activity includes, without limitation, MacKenzie's and Kennedy's use of extortion to obtain the votes of elderly Church Members in or about May, 2003 and September, 2003 and as to their election as Trustees of the Church, Directors of Bostonview, and Officers of the Church.

128.    The pattern also includes at least five instances of mail fraud. On September 23, 2003, MacKenzie and Kennedy directed Edwards & Angell, LLP to mail correspondence concerning the election of new directors of Bostonview. On September 29, 2003, they directed Edwards & Angell, LLP to mail correspondence to the Association in response to a letter seeking information relevant to a resolution to not recognize newly-admitted or expelled members. On October 26, 2003, they also directed the Church to send letters to the Denomination and Association concerning disaffiliation.

129.    These actions have been committed in a continuous pattern.  They are related to the efforts needed to obtain control of the enterprise and to conduct the activities of the Church for MacKenzie and Kennedy's personal gain.

130.    MacKenzie's and Kennedy's pattern of racketeering activity has caused injury to the Church, the Church Members who have been discharged from the Church, current Members of the Church, and Bostonview.

**COUNT III**
**(RICO 18 U.S.C. § 1962(d);**
**Against MacKenzie and Kennedy)**

131.    Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 130 as if fully set forth herein.

132.    This count is brought by Plaintiff, George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock in Bostonview.

133.    Plaintiff, George Chapin, fairly and adequately represents, respectively, the interests of the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations in issue in this case.

134.    Plaintiff, George Chapin, has made no effort to secure action from, respectively, the trustees and directors of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy herein control the majority of the trustees and directors of both boards through tactics of extortion and coercion.  As such, the majority of the trustees and directors on the boards of the Church and Bostonview are interested parties.  Thus, any demand on the boards that they bring an action in the name of the Church or Bostonview would have been futile.

135.    The Plaintiffs further allege as follows:

136.    MacKenzie and Kennedy are persons who conspired to knowingly or recklessly acted through a pattern of racketeering activity to obtain control of the Church, which is an enterprise.

137.    The pattern of racketeering activity includes, without limitation, MacKenzie's and Kennedy's use of extortion to obtain the votes of elderly Church Members in or about May, 2003, and September, 2003, and as to their election as Trustees of the Church, Directors of Bostonview, and Officers of the Church.

138.    The pattern also includes at least five instances of mail fraud. On September 23, 2003, MacKenzie and Kennedy directed Edwards & Angell, LLP to mail correspondence concerning the election of new directors of Bostonview. On September 29, 2003, they directed Edwards & Angell, LLP to mail correspondence to the Association in response to a letter seeking information relevant to a resolution to not recognize newly-admitted or expelled members. On October 26, 2003, they also directed the Church to send letters to the Denomination and Association concerning disaffiliation.

139.    This conspiracy has caused actions which have been committed in a continuous pattern. They are related to the efforts needed to obtain control of the enterprise.

140.    MacKenzie's and Kennedy's conspiracy has caused injury to the Church, the Church Members who have been discharged from the Church, current Members of the Church, and Bostonview.

## COUNT IV
### (Declaratory Judgment Against Church and Bostonview; Breach of By-Laws: The Denomination Is Entitled To Hold The Apartment House and Other Church Assets In Escrow)

141.   Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 140 as if fully set forth herein.[1]

142.   The Parties dispute whether the Denomination is entitled to obtain title to the apartment house and possession of other assets of the Church.

143.   The Church disaffiliated itself from the Denomination.

144.   The Church's by-laws provided that such disaffiliation required the Church to transfer its assets to the Denomination to be held in escrow until a new church, which is affiliated with the Denomination, is formed in Boston.

145.   As a result, the Church's assets must be transferred to the Denomination.

146.   Thus, the Denomination asks that the Court declare that it is entitled to hold the assets of the Church.  Those assets include, without limitation, the apartment house and its revenue.

## COUNT V
### (Declaratory Judgment Against the Church; Breach of By-Laws As to Membership)

147.   Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 146 as if fully set forth herein.

148.   The Parties dispute whether the memberships as to the newly-admitted individuals are valid and whether the expulsion of Members is valid is well.

---

[1] As to this Count, Plaintiffs do not dispute that the Church disaffiliated itself from the Denomination.  If successful on this Count, Plaintiffs will not seek in this, or other Counts, to prove that membership votes that relate in any way to disaffiliation are void.  If unsuccessful on this Count, the Plaintiffs will seek to demonstrate that such votes are void.

149. The by-laws provide that all new members must be confirmed before joining the Church.

150. The new members who joined the Church in 2002 and 2003 had not been confirmed prior to joining.

151. Those memberships are void and without effect.

152. The by-laws also do not condone the expulsion of members. Thus, the expulsion of any member is without effect.

153. Thus, the Plaintiffs ask that the Court declare that the memberships of the newly-admitted individuals are void, that any votes taken in which they participated are void and without effect and that the expulsion of Members is also void and without effect.

## COUNT VI
### (Derivative Breach of Fiduciary Duty as to the Church; Against MacKenzie and Kennedy)

154. Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 153 as if fully set forth herein.

155. This count is brought by Plaintiff, George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock in Bostonview.

156. Plaintiff, George Chapin, fairly and adequately represents, respectively, the interests of the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations in issue in this case.

157. Plaintiff, George Chapin, has made no effort to secure action from, respectively, the trustees and directors of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy herein control the majority of the trustees and directors of both boards through tactics of extortion and coercion. As such, the majority of the trustees and directors on

the boards of the Church and Bostonview are interested parties. Thus, any demand on the boards that they bring an action in the name of the Church or Bostonview would have been futile.

158.    The Plaintiffs further allege as follows:

159.    As Officers and Trustees of the Church, MacKenzie and Kennedy possess fiduciary duties.

160.    MacKenzie's and Kennedy's actions have breached those duties.

161.    As a result, the Church has lost thousands of dollars, become unaffiliated with the Denomination and suffered other harm as well.

## COUNT VII
### (Derivative Breach of Fiduciary Duty as to Bostonview; Against MacKenzie and Kennedy)

162.    Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 161 as if fully set forth herein.

163.    This count is brought by Plaintiff, George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock of Bostonview.

164.    Plaintiff, George Chapin, fairly and adequately represents, respectively, the interests of the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations in issue in this case.

165.    Plaintiff, George Chapin, has made no effort to secure action from, respectively, the trustees and directors of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy control the majority of the trustees and directors of both boards through tactics of extortion and coercion. As such, the majority of the trustees and directors on the boards of the Church and Bostonview are interested parties. Thus, any demand on the boards that they bring an action in the name of the Church or Bostonview would have been futile.

166.    The Plaintiffs further allege as follows:

167.    As Officers and Trustees of Bostonview, MacKenzie and Kennedy possess fiduciary duties.

168.    MacKenzie and Kennedy have engaged in activities which have breached those duties.

169.    As a result, Bostonview has suffered damages in an amount to be determined at trial.

## COUNT VIII
### (Fraud;
### Derivative Claim Against MacKenzie and Kennedy)

170.    Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 169 as if fully set forth herein.

171.    This count is brought by Plaintiff, George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock in Bostonview.

172.    Plaintiff, George Chapin, fairly and adequately represents, respectively, the interests of the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations in issue in this case.

173.    Plaintiff, George Chapin, has made no effort to secure action from, respectively, the trustees and directors of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy control the majority of the trustees and directors of both boards through tactics of extortion and coercion. As such, the majority of the trustees and directors on the boards of the Church and Bostonview are interested parties. Thus, any demand on the boards that they bring an action in the name of the Church or Bostonview would have been futile.

174.    The Plaintiffs further allege as follows:

# 1745161_v1

- 28 -

175.   MacKenzie and Kennedy misrepresented to the Church and its members numerous issues which include, without limitation, that new members wished to join the Church to follow the Swedenborgian principles, that the by-laws needed to be amended to benefit the Church, that Trustees needed to be removed for the betterment of the Church, and that leaving the Denomination was needed to prevent the loss of Reverend Ellis as a Pastor.

176.   MacKenzie and Kennedy knew, or should have known, that each of these statements is false.

177.   The Church, through its Members, relied on these misrepresentations.

178.   As a result, present and former Members of the Church have been damaged.

## COUNT IX
### (Chapter 93A;
### Derivative Claim Against MacKenzie and Kennedy)

179.   Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 178 as if fully set forth herein.

180.   This count is brought by Plaintiff, George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as members of the Church and beneficial holders of stock in Bostonview.

181.   Plaintiff, George Chapin, fairly and adequately represents the interests of, respectively, the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations in issue in this case.

182.   Plaintiff, George Chapin, has made no effort to secure action from the trustees and directors, respectively, of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy control the majority of, respectively, the trustees and directors of both boards through tactics of extortion and coercion. As such, the majority of, respectively, trustees and the directors of the Church and Bostonview are interested parties. Thus, any demand on the

# 1745161_v1

- 29 -

boards that they bring an action in the name of the Church or Bostonview would have been futile.

183.   The Plaintiffs further allege as follows:

184.   MacKenzie and Kennedy have committed unfair and deceptive acts as defined in Section 2 of Mass. Gen. Laws ch. 93A.

185.   MacKenzie's and Kennedy's actions were willful.

186.   As a result of those actions, the Church and its present and expelled Members have been damaged.

WHEREFORE, Plaintiffs pray that the Court:

1.   Enter judgment in favor of Plaintiffs and against the Defendants as to Counts I through III, in an amount to be determined at trial, said amount to be trebled, and award Plaintiffs their attorneys' fees and costs;

2.   As to Count IV, declare that the Denomination is entitled to hold the assets of the Church;

3.   As to Count V, declare that the memberships of the newly-admitted individuals are void and without effect, that all votes taken in which they participated are void and without effect, and that the expulsion of Church Members is void and without effect;

4.   Enter judgment in favor of the Plaintiffs and against Kennedy and MacKenzie as to Counts VI through VIII and award the Plaintiffs damages in an amount to be determined at trial;

5.   Enter judgment in favor of Plaintiffs and against the Defendants as to Count IX in an amount to be determined at trial, said amount to be trebled, and award Plaintiffs their attorneys' fees and costs;

# 1745161_v1

- 30 -

6.  Award the Plaintiffs their costs, including their attorneys' fees; and

7.  Award such other and further relief as the Court deems appropriate.

## JURY DEMAND

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.

THE GENERAL CONVENTION OF THE NEW JERUSALEM IN THE UNITED STATES OF AMERICA, INC., THE MASSACHUSETTS ASSOCIATION OF THE NEW JERUSALEM (SWEDENBORGIAN) and GEORGE CHAPIN,

By their attorneys,

HOLLAND & KNIGHT LLP

Geoffrey E. Hobart (BBO No. 547499)
Christopher J. Trombetta (BBO No. 556923)
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: March 2, 2004

*EX 2*

# Edwards & Angell LLP

101 Federal Street   Boston, MA 02110   617.439.4444   *fax* 617.439.4170   Richard J. McCarthy

617.951.2230
rmccarthy@EdwardsAngell.com

March 1, 2004

### NOTICE OF CLAIM

**VIA FACSIMILE AND
OVERNIGHT MAIL**

Hastings-Tapley
12 Gill Street, Suite 5500
P.O. Box 4043
Woburn, MA  01888-4043

          Re:    **Policy No.:**    **EPP5796942**
                  **Policy Description:**  **Directors and Officers**
                  **Insurance Company:**    **Great American Insurance Co.**
                  **Effective Date:**    11/4/03
                  **Expiration Date:**    11/4/04

Gentlemen:

This is to notify you that an action has been commenced against Bostonview Corporation, The Boston Society of the New Jerusalem, Inc., Edward MacKenzie and Thomas Kennedy, who are Officers or Directors.  A copy of the Complaint with Exhibits is being sent by overnight mail, together with other papers that have been filed in this action.

Please notify the undersigned if there are any other parties or addressees to which these documents should be sent.

Very truly yours,

Richard J. McCarthy

Encl.
RJM:kon
cc:    Bostonview Corporation
        The Boston Society of the New Jerusalem, Inc.
        Mr. Edward MacKenzie
        Mr. Thomas Kennedy

EX D

Executive Liability Division
1515 Woodfield Road
Claims Department
Suite 500
Schaumburg, IL 60173-5409
847.330.6750 ph
847.330.3750 fax

PO Box 66843
Chicago, IL 60666-0943



**GREATAMERICAN.**
INSURANCE GROUP

March 25, 2004

Ms. Jennifer Dempster
Claims Representative
USI/Hastings-Tapley Insurance Agency, Inc.
121 Gill Street, Suite 5500
Woburn, MA 01888-4043

RE:     Insurer:          Great American Insurance Company
        Insured:          Boston Society of New Jerusalem, Inc./Bostonview Corporation
        Policy No.:       EPP5796942
        Claim No.:        965-584-213-01-1
        The General Convention of the New Jerusalem, et al. v. Edward MacKenzie, et al.

Dear Ms. Dempster:

On behalf of Great American Insurance Company, I acknowledge receipt of your Acord notice and accompanying documents sent on March 2, 2004, giving us notice of the above-referenced lawsuit.

As you know, Great American provides Executive Protection and Employment Practices Liability Insurance to the Boston Society of New Jerusalem pursuant to the terms, conditions, provisions of and endorsements to policy number EPP5796942. The policy provides coverage for Wrongful Acts, including Employment Practices Wrongful Acts, committed or allegedly committed by an Insured or Insured Persons, as those terms are defined in the policy. The policy provides a $1 million aggregate limit of liability subject to a retention of $5,000 for each Claim.

The above lawsuit has been brought by George Chapin, as a member of the Insured Organization, along with the General Convention of the New Jerusalem in the United States, and the Massachusetts Association of the New Jerusalem. The named defendants are Edward MacKenzie, and Thomas Kennedy, Trustees and Officers of the Organization, and the Organization itself. The complaint, filed on or about February 27, 2004, in the U.S. District Court of the District of Massachusetts, accuses MacKenzie and Kennedy of racketeering, common law fraud, extortion and mail fraud in their scheme to infiltrate and eventually take over the operations of the 185-year old Church to obtain control over a $30 million piece of property. The complaint brings counts for violations of RICO, breach of fiduciary duties, common law fraud and the Massachusetts Deceptive Practices Act.

Ms. Jennifer Dempster
March 25, 2004
Page 2

After a review of the complaint, we regret to inform you that Great American insurance is denying coverage for this claim because it is specifically excluded by the Insured v. Insured clause of the Great American policy. In that regard, I direct you to Section IV. H. of the policy which states:

This policy does not apply to any Claim made against any Insured:

H.   by, or for the benefit of, or at the behest of the Organization or a Subsidiary or any entity which controls, is controlled by, or is under common control with the Organization or a Subsidiary, or any person or entity which succeeds to the interest of the Organization or Subsidiary; (emphasis added)

Clearly, this Claim is being brought on behalf of and in the name of the Organization, by a member, in conjunction with related national and state entities. Each and every count of the complaint states that it is being brought by the plaintiff, George Chapin, on behalf of himself, the Church, (our Insured), Bostonview, (an Insured entity of the Church), and all others similarly situated, as members of the Church and beneficial stockholders of Bostonview. This action is being brought in the name of Mr. Chapin by and for the benefit of the Church, which has allegedly been the victim of the individuals named as defendants herein. In light of the foregoing, we assume no duty to defend any Insured in this litigation.

Our denial of coverage is based upon the issues set forth herein and is not intended and should not be construed to limit, waive or restrict our right to raise other coverage issues that become apparent. Our position regarding coverage is based solely on the information that has been provided to date. If you believe that our position is in error, please submit any information on which you base your conclusion and we will be happy to review it and determine how and if it impacts on this issue.

Should you have any questions or comments, please do not hesitate to contact me.

Very truly yours,
GREAT AMERICAN INSURANCE COMPANY

Judith M. Pietrucha
Managing Claims Attorney
Executive Liability Division
(847) 330-3753

JMP/cak

cc:   Michelle Moriello
      Boston Society of New Jerusalem, Inc.
      c/o Winn Residential, LP
      6 Faneuil Hall Marketplace
      Boston, MA 02109

received EXE
6/4/04

Executive Liability Division
1515 Woodfield Road
Claims Department
Suite 500
Schaumburg, IL 60173-5499
847.330.6750 ph
847.330.6890 fax

PO Box 66943
Chicago, IL 60666-0943

**GREATAMERICAN.**
INSURANCE GROUP

May 28, 2004

William J. McCarthy
Edwards & Angell, LLP
101 Federal Street
Boston, MA 02110

RE:     Insurer:          Great American Insurance Company
        Insured:          Boston Society of New Jerusalem, Inc./Bostonview Corporation
        Policy No.:       EPP5796942
        Claim No.:        965-584-213-01-1
        The General Convention of the New Jerusalem, et al. v. Edward MacKenzie, et al.

Dear Mr. McCarthy:

Great American Insurance acknowledges receipt of your letter dated May 13, 2004, enclosing invoices for your firm as well as the firm of Todd & Weld in the above referenced lawsuit. Please be advised that Great American Insurance has declined coverage for the above-referenced lawsuit as explained more fully in our March 25, 2004 letter addressed to Ms. Jennifer Dempster of USI/Hastings-Tapley Insurance and the Insured. Consequently we will not be providing reimbursement for these expenses. Further, by responding to your inquiry, Great American Insurance is not waiving any of its previous positions on coverage.

Should you have any questions or comments, please do not hesitate to contact me.

Very truly yours,
GREAT AMERICAN INSURANCE COMPANY

Judith M. Pietrucha
Managing Claims Attorney
Executive Liability Division
(847) 330-3753

JMP/me
cc:     Michelle Moriello
        Boston Society of New Jerusalem, Inc.
        c/o Winn Residential, LP
        6 Faneuil Hall Marketplace
        Boston, MA 02109

Great American Insurance Companies • American Empire Group • Mid-Continent Group • Republic Indemnity Group

# Edwards & Angell LLP

101 Federal Street   Boston, MA 02110   617.439.4444   fax 617.439.4170

Richard J. McCarthy
617.951.2230
fax 617.439.4170
rmccarthy@edwardsangell.com

June 9, 2004

Ms. Jennifer Pietrucha
Managing Claims Attorney
Executive Liability Division
Great American Insurance Companies
1515 East Woodfield Road
Suite 500
Schaumburg, IL 60173

Re:    Insurer:    Great American Insurance Company
       Insured:    Boston Society of New Jerusalem, Inc./Bostonview Corporation
       Policy No.: EPP5796942
       Claim No.:  965-584-213-01-1
       The General Convention of the New Jerusalem, et al. v. Edward MacKenzie, et al.

Dear Ms. Pietrucha:

Thank you for your letter dated May 28, 2004, which I received on June 4, 2004. Your letter references a March 25, 2004 letter addressed to Ms. Jennifer Dempster of USI/Hastings-Tapley Insurance and the Insured. I had not previously received a copy of such a letter, but have since obtained a copy of a letter dated March 25, 2004 addressed to Ms. Jennifer Dempster of USI/Hastings-Tapley Insurance, which I assume is the letter to which you refer.

All Insureds and Insured Persons vigorously dispute your disclaimer of coverage, and reserve all rights with respect thereto. This letter, however, is limited to explaining to you that your assumptions and reasoning are mistaken with respect to the Boston Society of the New Jerusalem, Inc./Bostonview Corporation (the "Insureds"). It is our hope that you will promptly agree and reimburse the Insureds for their expenses.

BOS_448345_1/RMCCARTHY

Edwards & Angell LLP

Ms. Jennifer Pietrucha
June 5, 2004
Page 2

The Complaint asserts only two claims against the Insureds, namely Count IV and Count V. Both claims are asserted on behalf of the General Convention of the New Jerusalem in the United States of America, Inc. (the "General Convention") and the Massachusetts Association of the New Jerusalem, Swedenborgian (the "Association"). Unlike all of the other claims in the Complaint, which are derivative claims asserted by "plaintiff, George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock in Bostonview" (see paragraphs 112, 122, 132, 155, 163, 171, and 180), Counts IV and V are not derivative claims and do not contain this assertion. Moreover, the relief requested against the Insureds are specifically for the benefit of the Convention or the Association. For example, Count IV, ¶ 145, states as to the relief requested: "As a result, the Church's assets must be transferred to the Denomination [General Convention]." Further, as the headings for each of the Counts makes clear, co-defendants Edward MacKenzie and Thomas Kennedy (the "Insured Persons") are the sole defendants for Counts I, II, III, VI, VII, VIII, IX, and the Insureds are the sole defendants with respect to Counts IV and V.

Thus, the coverage question raised is whether the General Convention and the Association control, are controlled by, or are under common control with the Church and Bostonview. Neither the Association nor the General Convention is entity which controls, is controlled by, or is under common control with the Insureds. This is unquestionably true as a matter of fact and of law. We are not aware of any documentation or case law that establishes any such control. If

Edwards & Angell LLP

Ms. Jennifer Pietrucha
June 5, 2004
Page 3

you have any such documentation, please provide us with a copy. The General Convention and the Association are entities which function as no more than voluntary associations of similarly-minded institutions whose members come and go as they see fit. Neither the Church nor Bostonview belongs to either the General Convention or the Association.

It is my hope that, with a better understanding of the claims that are asserted against the Insureds, you will conclude that your initial decision with respect to the Insureds is incorrect and, therefore, will reimburse the Insureds for their expenses. The expenses previously submitted which are solely the Insureds' expenses are the invoices for legal fees due Edwards & Angell, LLP, counsel to the Insureds. The invoices for legal fees due Todd & Weld are not expenses of the Insureds because Todd & Weld is separate counsel for the Insured Persons, who continue to reserve all their rights under the policy.

Very truly yours,

Richard J. McCarthy

# TODD & WELD LLP

ATTORNEYS AT LAW
28 STATE STREET
BOSTON, MASSACHUSETTS 02109

HOWARD M. COOPER
Email: hcooper@toddweld.com

TELEPHONE: (617) 720-2626
FACSIMILE: (617) 227-5777
www.toddweld.com

September 10, 2004

**OVERNIGHT MAIL**

Judith M. Pietrucha
Great American Insurance Company
Executive Liability Division
1515 Woodfield Road
Claims Department
Suite 500
Schaumburg, IL 60173-5499

Re:    Insurer:        Great American Insurance Company
       Insureds:       Thomas Kennedy/Edward MacKenzie
       Policy No.:     EPP5796942
       Claim No.:      965-584-213-01-1
       The General Convention of the New Jerusalem, et al. v. Edward MacKenzie, et al.

Dear M. Pietrucha:

Please be informed that this office represents Thomas Kennedy ("Mr. Kennedy") and Edward MacKenzie ("Mr. MacKenzie"), both of whom are insureds under Great American Insurance Company ("GAIC") Policy No. EPP5796942.

I enclose a copy of an Amended Complaint filed against Messrs. Kennedy and MacKenzie now pending in state Superior Court in Suffolk County, Massachusetts. This Amended Complaint filed in state court follows the successful dismissal (with prejudice with regard to the RICO claim) of the plaintiffs' original Complaint filed in the United States District Court in Boston (a copy of which I understand is already in your possession). Messrs. Kennedy and MacKenzie hereby demand coverage, including for their costs of defense, for all matters.

It is my understanding from counsel at Edwards & Angell LLP that GAIC previously has attempted to disclaim coverage for the Boston Society of New Jerusalem, Inc. and Bostonview Corporation based upon the "insured versus insured" exclusion in its policy. As the enclosed Amended Complaint demonstrates, however, there is no basis for GAIC to assert this exclusion where The General Convention of the New Jerusalem in the United States of America, Inc. is bringing claims against Messrs. Kennedy and MacKenzie. As previously explained by Edwards & Angell LLP, the Convention is an independent entity and not an insured.

Judith M. Pietrucha
September 10 2004
Page 2

Litigation activity to date in this matter has been very intense. Prior to our successfully obtaining the dismissal of the case from federal court on jurisdictional grounds and the dismissal with prejudice of the RICO claim, United States District Court Judge William Young had set the matter down for trial this September with an expedited discovery schedule. As a result, your insureds have incurred to date substantial attorneys fees and costs for which they are entitled to timely reimbursement. Further, as the case is now pending in our state Superior Court and a status conference date of September 22, 2004 has been set, it is important that GAIC now confirm coverage and timely reimburse litigation costs.

Accordingly, I respectfully request that GAIC forthwith confirm coverage for Messrs. Kennedy and MacKenzie and reimburse their bills incurred to date. I am enclosing Todd & Weld LLP's bills to Messrs. Kennedy and MacKenzie to date incurred in connection with the pending lawsuit totaling $154,526.81.

I look forward to hearing from you.

Very truly yours,

Howard M. Cooper

HMC/mt
Encls.

cc:     Thomas Kennedy (w/o encls.)
        Edward MacKenzie (w/o encls.)

**BSWB** | Boundas, Skarzynski, Walsh & Black, LLC
--- | ---
ATTORNEYS AT LAW | 200 East Randolph Drive  Suite 7200  Chicago, Illinois 60601
 | **P:** 312 946 4200  **F:** 312 946 4272  **W:** www.bswb.com

**CHICAGO**
**NEW YORK**
**LONDON**

Thomas M. Sheffield

Direct Dial:  312 946 4274
tsheffield@bswb.com

December 15, 2004

**VIA FACSIMILE    (617) 227-5777**
**AND U.S. MAIL**

Nicholas Carter, Esq.
Todd & Weld, LLP
28 State Street
Boston, Massachusetts  02109

> Re:  **Non Profit Organization Executive Protection and Employment Practices Liability Insurance**
>
> | | |
> | --- | --- |
> | **Policy No.:** | **EPP5796942** |
> | **Insured:** | **BOSTON SOCIETY OF NEW JERUSALEM, INC./BOSTONVIEW CORPORATION** |
> | **Location:** | **BOSTON, MASSACHUSETTS** |
> | **Claimants:** | **THE GENERAL CONVENTION OF THE NEW JERUSALEM IN THE U.S.A., ET AL.** |
> | **GAIC Claim No.** | **965-584-213-01-1** |
> | **Our File No.:** | **13215** |

Dear Nick:

As you know, this firm was retained by Great American Insurance Company ("Great American") to represent it interests and to assist with the investigation and evaluation of coverage under the above-referenced Policy issued to Boston Society of New Jerusalem, Inc. We have your letter of September 10, 2004 and wish to respond.

Briefly, based upon the information we have received, and upon consideration of various issues involved in the underlying matter, Great American agrees to provide a defense to the state court litigation described below and subject to Great American's full reservation of rights, also outlined below.  This letter will provide a brief description of the Policy provisions and will identify certain preliminary coverage issues that appear to us at this time.  Given   the   issues presented by this matter, we do believe it would be helpful to meet with you in Boston sometime in the next few weeks.

It is our understanding that the current state court litigation arises from earlier litigation filed on or around February 27, 2004, when the General Convention of the New Jerusalem in the United States of America (the "National Organization"), the Massachusetts Association of the New Jerusalem (the "State Organization") and George Chapin (a local member), sought a

**BSWB**

preliminary injunction to enjoin the dissipation of assets (an apartment building) belonging to the Boston Society of the New Jerusalem (the "Local Congregation").

The federal complaint, which was formally styled *The General Convention of the New Jerusalem in the United States of America, Inc., the Massachusetts Association of the New Jerusalem (Swedenborgian), and George Chapin v. Edward MacKenzie, Thomas Kennedy, The Boston Society of the New Jerusalem, Incorporated (Swedenborgian), and Bostonview Corporation,* set forth nine different causes of action, as follow:

1.  RICO violations § 18 USC §1962(b) against MacKenzie and Kennedy;

2.  RICO violations § 18 USC §1962(c) against MacKenzie and Kennedy;

3.  RICO violations § 18 USC §1962(d) against MacKenzie and Kennedy;

4.  Declaratory Judgment against the Local Congregation and Bostonview for breach of By-Laws: the Denomination is entitled to hold the apartment house and other church assets in escrow;

5.  Declaratory Judgment against the Local Congregation for breach of By-Laws as to membership;

6.  Derivative breach of fiduciary duty as to the Local Congregation against MacKenzie and Kennedy;

7.  Derivative breach of fiduciary duty as to Bostonview against MacKenzie and Kennedy;

8.  Derivative claim against MacKenzie and Kennedy; and

9.  Derivative claim against MacKenzie and Kennedy.

The federal complaint alleged a pattern of racketeering activity by MacKenzie and defendant Thomas Kennedy by the use of extortion and other means. These efforts, the federal complaint alleged, were designed by MacKenzie and Kennedy to obtain the votes of Local Congregation members in order to convert the assets of Bostonview, primarily the apartment building owned by Bostonview and the Local Congregation. Each count in the federal complaint was also brought by plaintiff George Chapin, on behalf of himself, the Local Congregation (an Insured entity), Bostonview (an Insured entity), and all other persons similarly situated, as a member of the Local Congregation and beneficial holder in stock of Bostonview.

It is our understanding that on July 27, 2004, the federal court dismissed all of the RICO counts with prejudice. The court also dismissed the other counts, but allowed the plaintiffs to bring those counts in state court. It is our further understanding that the plaintiffs almost immediately filed a complaint in the Superior Court for Suffolk County, Massachusetts. This matter is now formally styled *The General Convention of the New Jerusalem in the United States of American, Inc., the Massachusetts Association of the New Jerusalem (Sweden Borgian), and*

**BSWB**

Nicholas Carter, Esq.
Todd & Weld, LLP
December 15, 2004]
Page 3

*George Chapin v. Edward MacKenzie, Thomas Kennedy, The Boston Society of the New Jerusalem, Inc. (Sweden Borgian), and Bostonview Corporation,* case no. 04-3432H. The State Court Complaint was amended in August 2004; following amendment, we understand that the State Court Complaint sets forth the following causes of action:

1.   Declaratory judgment against the Local Congregation and Bostonview for breach of by-laws and for a declaration that the denomination is entitled to hold the apartment house and other church assets in escrow;

2.   Conversion against MacKenzie and Kennedy;

3.   Unjust enrichment/restitution against MacKenzie and Kennedy;

4.   Declaratory judgment against the Local Congregation for breach of by-laws as to membership;

5.   Derivative claim for breach of fiduciary duty to Local Congregation against MacKenzie and Kennedy;

6.   Derivative claim for breach of fiduciary duty to Bostonview against MacKenzie and Kennedy;

7.   Derivative claim for fraud against MacKenzie and Kennedy;

8.   Derivative claim against MacKenzie and Kennedy for unfair and deceptive acts under Massachusetts General Laws Chapter 93A;

9.   RICO violations § 18 USC §1962(b) against MacKenzie and Kennedy;

10.  RICO violations § 18 USC §1962(c) against MacKenzie and Kennedy;

11.  RICO violations § 18 USC §1962(d) against MacKenzie and Kennedy;

We have received the various motions to dismiss as well as the plaintiffs' response. It is our understanding that a hearing on defendants' motions to dismiss is likely to be held in early December. Please let us know when the hearing is scheduled and whether you will be available to meet following the hearing.

To the extent that this correspondence addresses coverage under the Policy, it does so only within the context of the matters described herein. This correspondence is not intended to provide an exhaustive analysis of all potentially applicable overage issues. Additionally, coverage under the Policy is also subject to certain exclusions and other provisions of the Policy, the applicability of which cannot be finally ascertained until the conclusion of the underlying proceedings or further investigation into this matter. Therefore, Great American expressly reserves all of its rights, remedies, and defenses in connection with this matter. Our enumeration of various coverage positions in this correspondence shall not serve to waive any rights, remedies or defenses that Great American may not have or may obtain in the future.

**BSWB**

As you are aware, Great American issued the Non-Profit Organization Executive Protection and Employment Practices Liability Insurance Policy number EPP5796942 for the Policy Period November 4, 2003 to November 4, 2004. The Policy provides a $1 million limit of liability and is subject to a per claim retention of $5,000. The Policy includes a duty to defend.

Coverage for this or any other matter under the Policy as invoked by operation of Section I. Insuring Agreement. This Section states:

> If during the **Policy Period** or the **Discovery Period** any **Claim** is first made against an **Insured** for a **Wrongful Act**, including an **Employment Practices Wrongful Act**, the **Insurer** shall pay on their behalf **Loss** resulting from such **Claim**. The **Insurer** has the right and duty to defend any **Claim** to which this insurance applies, even if the allegations of the **Claim** are groundless, false of fraudulent.

As you know, Great American denied coverage for this matter on March 25, 2004 based on the application of the "Insured vs. Insured" Exclusion contained in Section IV.H. of the Policy. That section excludes coverage for claims made against any Insured:

> by, or for the benefit of, or at the behest of the **Organization** or a **Subsidiary** or any entity which controls, is controlled by, or is under common control with the **Organization** or a **Subsidiary**, or any person or entity which succeeds to the interest of the **Organization** or a **Subsidiary**;

Based on the materials we have reviewed, it appears that the amended state court complaint does not contain the same language as the federal complaint and, specifically, does not premise each and every count upon George Chapin's membership within the Local Congregation.

Moreover, it appears that some of the counts set forth in the amended state court complaint appear to now have been brought exclusively by the National and State organizations. In particular, the National and State organizations seek to obtain a declaration that they are entitled to hold the assets of the Local Congregation as a result of its disaffiliation from the denomination. In Counts II., and III., in particular, the plaintiffs argue that the "assets and funds of the [Local Congregation] are the rightful property of the [plaintiffs] . . ." and that, "justice and equity demand that the [National and State Organizations] have an immediate right of restitution regarding these assets and funds."

Taking the pleadings as a whole, it appears that the Local Congregation is not controlled by the National and/or State organizations. Rather, the Local Congregation is (was) merely *affiliated* with those larger organizations. If our understanding of this relationship is incorrect, please advise immediately. For that reason, it appears that the allegations brought by the

**BSWB**

National and State organizations, as amended in the state complaint, may no longer fall within the parameters of the Policy's Insured vs. Insured exclusion.

Importantly, however, these new allegations do not alter the fact that the litigation previously fell outside the Policy's coverage due to the allegations contained in the federal complaint. For that reason, Great American reserves all its rights, remedies and defenses, with respect to this matter, including the right to deny coverage for Costs of Defense incurred in responding to the federal complaint.

We note that the Policy defines the term Loss, at Section III.G., as:

> settlements and judgments, and subject to the provisions of Section V and Section VI, **Costs of Defense** incurred by the **Insured**, provided always, however, **Loss** shall not include taxes, criminal or civil fines or penalties imposed by law, punitive or exemplary damages, or the amount of any multiple damage award which is in excess of the damage aware which was so multiplied, or any matter which may deemed uninsurable under the law pursuant to which this Policy shall be construed.

Given this definition, liability, if any, as alleged in the amended state court complaint may or may not trigger coverage and/or constitute Loss under the Policy. For that reason, Great American further reserves its rights regarding this matter, including the right to decline coverage for matters not included in the definition of "Loss" under the Policy.

The Policy states that, "[Great American] has the right and duty to defend any **Claim** to which this insurance applies, even if the allegations of the **Claim** are groundless, false or fraudulent." Great American acknowledges that Thomas Kennedy and Edward MacKenzie have retained the law firm of Todd & Weld of Boston as their counsel in this matter. Great American consents to the representation and we ask that you forward copies of your defense fee invoices on a monthly basis to our attention. Additionally, we have been advised that the law firm of Edwards and Angell is no longer representing any of the Insureds in this matter, and that that Joseph R. Nolan is now representing one or more of the defendants. Currently, we have little information about Mr. Nolan's qualifications with respect to this matter and request information regarding his representation, including, but not limited to his curriculum vitae, billable rates, and other information regarding his qualifications. We would appreciate it if you would share with us your understanding of the defense arrangements for the individual defendants and the corporate entities.

It should be noted that Great American normally ordinarily requests the engagement of separate counsel, especially in situations, like this, where the defendants may have divergent opportunities to extricate themselves from the litigation. For example, based on the materials we have received to date, it may well be that the Local Congregation and Bostonview may have

**BSWB**

Nicholas Carter, Esq.
Todd & Weld, LLP
December 15, 2004]
Page 6

defenses which may not be available to Mr. MacKenzie and Mr. Kennedy. With this in mind, we seek to learn more about the roles being served by the various counsel in this matter.

To address the defense costs and coverage issues raised by the representation of the insureds, Great American will ask that each of the Insured defendants enter into an interim funding agreement. We are developing a draft agreement and will forward that to you shortly.

Importantly, the Policy Section VI. Costs of Defense and Settlements, Subsection A., provides:

> No **Insured** shall admit liability, offer to settle, or incur **Costs of Defense** in connection with any **Claim** without the **Insurer's** prior written consent. Such consent shall not be unreasonably withheld. The **Insured** shall provide the **Insurer** with full cooperation and all information which would reasonably be required in order to allow the **Insurer** to reach a decision as to such consent. Any **Costs of Defense** incurred and/settlements agreed to prior to the **Insurer's** consent, thereto shall not be covered hereunder.

Although we appreciate that it may at some point appear reasonable to settle this matter, we remind you that this Policy requires Great American's consent to any settlement. In the event that you should consider settling this matter, you must consult with us before any offer is made. Moreover, we ask that you promptly share with us any compromise proposals made by the plaintiffs.

Great American expressly reserves all its rights, remedies, and defenses in connection with this matter. We thank you for your cooperation and assistance with this matter. As stated above, we would like to meet regarding this matter. Please do let us know about the court's calendar for upcoming hearings. In the meantime, should you have any questions or need any additional information, or should you wish to discuss this matter at any time, please do not hesitate to contact me at the number listed above. We look forward to working with you and the Insureds toward the resolution of this matter.

Very truly yours,

BOUNDAS, SKARZYNSKI WALSH & BLACK, LLC

By:_____
Thomas M. Sheffield

TMS/pmf
cc:    David T. Burrowes, Esq.
P\GREA01\13215\Letters\Carter-Nicholas-01-tms.doc

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
GENERAL CONVENTION OF THE           )
NEW JERUSALEM IN THE UNITED         )
STATES OF AMERICA, INC.,            )
MASSACHUSETTS ASSOCIATION OF        )
THE NEW JERUSALEM                   )
(SWEDENBORGIAN), and GEORGE         )
CHAPIN,                             )
                                    )
          Plaintiffs,               )     CIVIL ACTION
                                    )     No. 04-10419-WGY
     v.                             )
                                    )
EDWARD MACKENZIE, THOMAS            )
KENNEDY, BOSTON SOCIETY OF          )
THE NEW JERUSALEM, INC.             )
(SWEDENBORGIAN), and                )
BOSTONVIEW CORPORATION,             )
                                    )
          Defendants.               )
                                    )
```

ORDER

YOUNG, C.J.                                      July 20, 2004

## I.    INTRODUCTION

The General Convention of the New Jerusalem in the United
States of America, Inc., the Massachusetts Association of the New
Jerusalem (Swedenborgian), and George Chapin (collectively, the
"Plaintiffs"), bring this action alleging that individual
defendants Edward MacKenzie and Thomas Kennedy wrongfully assumed
control of the Boston Society of the New Jerusalem, Inc.
(Swedenborgian) (the "Boston Church") and the Bostonview

Corporation (collectively with the individual defendants, the
"Defendants") and exploited their charitable assets for personal
gain.  On March 22, 2004, the Defendants moved to dismiss,
challenging, <u>inter alia</u>, the adequacy of the Plaintiffs' claims
under the Racketeer Influenced and Corrupt Organizations Act
("RICO"), 18 U.S.C. §§ 1961-1968.  [Doc. Nos. 2, 3].  The Court
denied the motions on April 28, 2004 without prejudice to their
renewal.  A parallel action brought against the Boston Church by
the Massachusetts Attorney General has since been resolved by
entry of a consent judgment.  <u>See</u> <u>Commonwealth</u> v. <u>Boston Society</u>
<u>of the New Jerusalem, Inc.</u>, Civ. A. No. 04-2597 (Ma. Super. Ct.
June 16, 2004).[1]  The Defendants accordingly renew their motions
to dismiss.  [Doc. Nos. 29, 30].

## II.  DISCUSSION

To state a claim under 18 U.S.C. § 1962, plaintiffs must at
a minimum allege related predicate acts that "amount to or pose a
threat of continued criminal activity."  <u>H.J. Inc.</u> v.
<u>Northwestern Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989).  Here, the
Plaintiffs allege predicate acts spanning a "relatively modest"
period of fourteen months.  <u>Efron</u> v. <u>Embassy Suites (P.R.), Inc.</u>,
223 F.3d 12, 19 (1st Cir. 2000); <u>accord</u> <u>Divot Golf Corp.</u> v.

---

[1] Although the consent judgment arises "outside the
pleading," Fed. R. Civ. P. 12(b), the Court considers it here as
a public record "susceptible to judicial notice."  <u>See</u> <u>In re</u>
<u>Colonial Mortgage Bankers Corp.</u>, 324 F.3d 12, 15-16 (1st Cir.
2003).

2

Citizens Bank, No. 02-CV-10654, 2002 WL 31741472, at *5 (D. Mass. Nov. 26, 2002) (Saris, J.) ("[C]ourts, including the First Circuit, have taken a jaundiced view of alleged patterns lasting less than two years."). Further, in light of the consent judgment entered by the Superior Court -- which provides for continued oversight by the Massachusetts Attorney General -- the Court need not credit bald assertions that the Defendants nevertheless pose a threat of repeated mismanagement. Cf. Frew ex rel. Frew v. Hawkins, 124 S. Ct. 899, 906 (2004) ("As public servants, the officials of the State must be presumed to have a high degree of competence in deciding how best to discharge their governmental responsibilities."). The Plaintiffs' allegations of continuity thus fall short, and their RICO claims must be dismissed.

Where, as here, the plaintiff's only federal claims are dismissed before trial, "the balance of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over state law claims." Camelio v. American Fed., 137 F.3d 666, 672 (1st Cir. 1998). Here, the balance of factors is further tilted both by the continuing involvement of the Massachusetts Attorney General and by the states' traditional concern with the proper administration of charitable trusts. See Synanon Found., Inc. v. California, 444 U.S. 1307, 1307 (1979). The Court

3

therefore declines to exercise jurisdiction over the Plaintiffs'
supplemental claims.    28 U.S.C. § 1367(c).

**III. CONCLUSION**

For the foregoing reasons, the Defendants' Renewed Motions
to Dismiss [Doc. Nos. 29, 30] are ALLOWED with prejudice as to
the Plaintiffs' RICO claims.   The Plaintiffs may pursue their
supplementary state law claims in the Massachusetts Superior
Court sitting in and for the County of Suffolk, to which court
these claims are remanded.


SO ORDERED.


WILLIAM G. YOUNG
CHIEF JUDGE


4

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss:

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

THE GENERAL CONVENTION OF THE NEW
JERUSALEM IN THE UNITED STATES OF
AMERICA, INC., THE MASSACHUSETTS
ASSOCIATION OF THE NEW JERUSALEM
(SWEDENBORGIAN), and GEORGE CHAPIN,

Plaintiffs,

v.

EDWARD MACKENZIE, THOMAS KENNEDY,
BOSTON SOCIETY OF THE NEW JERUSALEM,
INCORPORATED (SWEDENBORGIAN), and
BOSTONVIEW CORPORATION,

Defendants.

Civil Action No.

## AMENDED COMPLAINT

### INTRODUCTION

In an effort to further their acts of fraud and misappropriation of the assets of the Boston

Society of the New Jerusalem, Incorporated (Swedenborgian) (the "Church"), Defendants,

Edward MacKenzie and Thomas Kennedy caused the Church to disaffiliate itself from The

General Convention of the New Jerusalem in the United States of America, Inc. (the

"Denomination"). Such a disaffiliation requires the Church's assets to be transferred to the

Denomination.

### THE PARTIES

1.    Plaintiff, The General Convention of the New Jerusalem in the United States of

America, Inc. (the "Denomination"), is the denomination associated with churches that follow

principles and teachings of Emanuel Swedenborg. Such principles include, without limitation,

acting for the benefit of others. The Denomination's principal executive office is located in Newtonville, Massachusetts.

2.      Plaintiff, The Massachusetts Association of the New Jerusalem (Swedenborgian) (the "Association"), is comprised of five active churches, which previously included the Church. The Association's principal executive office is located in Newton, Massachusetts.

3.      Plaintiff, George Chapin, is a member of the Boston Society of the New Jerusalem, Inc. (Swedenborgian). He resides in Everett, Massachusetts.

4.      Defendant, Edward ("Eddy") MacKenzie ("MacKenzie"), is an individual who, upon information and belief, resides in Boston, Massachusetts.

5.      Defendant, Thomas Kennedy ("Kennedy"), is an individual who, upon information and belief, resides in Boston, Massachusetts.

6.      Defendant, Boston Society of the New Jerusalem, Inc. (Swedenborgian) (now named Church of the Hill) (the "Church"), is a church located at 140 Bowdoin Street, Boston, Massachusetts.

7.      Defendant, Bostonview Corporation ("Bostonview"), is a corporation which is located at, and owns the building located at 140 Bowdoin Street, Boston, Massachusetts. The building contains the Church Chapel, Church offices and approximately thirty (30) residential apartments. The Church is the sole stockholder of Bostonview. The apartments' value exceeds $30 million. The apartments now generate more than $1.2 million in annual revenue to the Church.

## THE ALLEGATIONS

8.      Individuals who resided in and near Boston created the Church in 1818. The Church had become affiliated with the Denomination at or before the date of its creation.

9.    Members of the Church are to follow the principles set forth by Emanuel Swedenborg. Such principles include, without limitation, dedicating ones life and resources toward the betterment of others, helping others to reach their full potential, and assisting one's neighbor. Swedenborgian churches work for the good of all.

10.    These individuals and subsequent Members have maintained the Church and followed the Swedenborgian principles since its creation nearly one hundred eighty-five (185) years ago.

11.    The Members attend chapel services, sponsor free ecumenical clergy breakfasts, offer free dinners, assist with the payment of college tuition of Members' children, and provide money and services for city relief projects. They also maintained an emergency relief fund which the Church accessed to assist needy people. They also engage in other charitable activities.

12.    During its nearly 185-year existence, the Church has received the services of numerous Pastors. Such Pastors conduct all religious services and handle many administrative tasks of the Church.

13.    The Church also has officers who include a President, Vice President, Secretary and Treasurer.

14.    The Church also has a Board of Trustees. The Members of the Church elect the Trustees. The Trustees are ultimately responsible for decisions regarding the Church's finances, governing the action of the treasurer, the collection and distribution of all funds for the support of public worship or special programs, the maintenance of financial records, and the preparation of a budget.

15.    The Church also has a Church Council. Its members include the Pastor, the President, Vice President, Secretary, Treasurer, Chair of the Board of Trustees and several at-large members. The duties of the Church Council address, without limitation, whether new members should be admitted to the Church.

### Reverend G. Steven Ellis Becomes Minister of the Church

16.    In 1982, Reverend G. Steven Ellis ("Reverend Ellis") became Pastor of the Church. He had graduated from the New Church Theological School, the Denomination's post-graduate seminary, which is located in Newton, Massachusetts.

17.    Reverend Ellis guided the Church in its religious activities. He also served on the local clergy council, maintained regular office hours to be available for counsel and advice, served on city service committees, held occasional Bible study sessions after church services, and did work for and with senior citizens within and without the congregation.

18.    During the course of his ministry, however, Reverend Ellis began to suffer mental illness. Upon information and belief, he suffers as a manic depressive. He became mentally unstable.

19.    Reverend Ellis's behavior changed significantly because of his mental illness. At services he would cry. He became difficult to reach by telephone and otherwise. At services, his sermons oddly focused on issues relating only to himself and not on Swedenborgian principles. He frequently yelled and screamed. He no longer dedicated time toward certain charitable activities. He also left the Church for extended periods to visit his family in Kentucky.

### Thomas Kennedy Joins the Church

20.    Thomas Kennedy joined the Church just prior to May, 2002.

21.    Upon information and belief, Kennedy misrepresented his background to Reverend Ellis. He misrepresented that the MBTA had employed him as an accountant and that

he had left this position. Upon information and belief, the MBTA had fired Kennedy. Upon information and belief, Kennedy had also engaged in fraudulent loan transactions.

22.    Kennedy observed Reverend Ellis's mental instability. He believed that this instability would permit him to take actions designed to exploit the relationship with Reverend Ellis. Accordingly, Kennedy befriended Reverend Ellis.

### Thomas Kennedy Joins But Then Leaves the Massachusetts New Church Union Because, Among Other Reasons, He Attempted to Transfer Union Funds to an Account From Which Only He Had the Power of Withdrawal

23.    To benefit personally and financially, Kennedy advised Reverend Ellis to nominate him as President of the Massachusetts New Church Union (the "Union"). The Union is a non-profit corporation which holds the properties and funds of the Association and responds to the request of the Association for money to conduct programs. The Association then included Swedenborgian congregations located in Cambridge, Yarmouthport, Bridgewater, Elmwood, Brockton, Newtonville and the Church, which is located in Boston. The Church left the Association in 2003.

24.    The Union holds funds for the Association. It also owned a library located at 79 Newbury Street and a Blairhaven Retreat and Conference Center in South Duxbury, Massachusetts.

25.    The Union has a General Secretary, who oversees the activities of the Union. The Union also has other officers, such as President, Treasurer and Clerk.

26.    As Kennedy planned, in May, 2002, Reverend Ellis, then President of the Association, proposed at an annual meeting of the Association and Union that Kennedy should serve as President of the Union. Reverend Ellis spoke in strong support of Kennedy. The membership elected Kennedy as President of the Union.

27.    After being elected as President, Kennedy attempted to use that position for his personal benefit. These actions demonstrate the nature of the activities that he would later take as to the Church and Bostonview.

28.    Kennedy grossly abused his position as President. He made hundreds of personal long-distance telephone calls using the Union's telephone. A true and accurate copy of an invoice evidencing these calls is attached as Exhibit 1. He also verbally and otherwise abused and belittled Union employees, some of whom had worked for the Association for more than twenty years.

29.    In July or August, 2002, Kennedy tried to transfer more than $1 million in Union funds to a Wachovia account from which only Kennedy had the power of withdrawal. A true and accurate copy of the transfer application is attached as Exhibit 2. No justification for that transfer existed. Kennedy made this transfer only to obtain personal access to the Union's funds.

30.    The Bank resisted Kennedy's efforts concerning the transfer. It notified the Association. The Association found that Kennedy's attempt to transfer the funds was wrongful. The transfer did not occur.

31.    In or about August 2002, MacKenzie initiated his contact with Reverend Ellis. An August 2, 2002 e-mail is attached as Exhibit 3 in which MacKenzie fraudulently states his reasons to support Reverend Ellis. Accordingly, MacKenzie observed that Reverend Ellis was mentally unstable. MacKenzie continued this contact in an attempt to falsely befriend and then take advantage of Reverend Ellis.

32.    Because MacKenzie also did not work, he spent most of his time at the Church. He drove Reverend Ellis wherever he needed to go. He spent time at the Church assisting Reverend Ellis in connection with whatever tasks he needed completed. MacKenzie remained in

Reverend Ellis's presence. MacKenzie and Kennedy ate three meals a day with him. They helped Reverend Ellis make all of his decisions. As a result, MacKenzie's and Kennedy's plan succeeded. MacKenzie obtained control of Reverend Ellis.

33.     Thereafter, Mackenzie joined Kennedy in connection with actions he was taking at the Union. The Union's Board of Directors never voted to allow MacKenzie to work for the Union.

34.     MacKenzie and Kennedy moved into the Union facility at 79 Newbury Street.

35.     Kennedy hired his children to do decorating and painting work at 79 Newbury Street. The work they completed was haphazard, sloppy and embarrassingly inadequate. Upon information and belief, Kennedy, without approval of the Union's Board of Directors, used Union funds to pay them for the inadequate work that they performed.

36.     MacKenzie and Kennedy used more than $13,000 in Union funds to purchase furniture, computers and telephones for their own use. None of these purchases had been approved by the Union's Board of Directors.

37.     By November and December, 2002, the Union's Board of Directors had decided it would no longer tolerate Kennedy's behavior. In December, 2002, they called a special Union membership meeting, scheduled for January 5, 2003 to hold new elections for the Officers and Directors of the Union. The intent was to remove Kennedy as President of the Union, and to bring the Union Standing Committee back under the control of the full Union membership. Through negotiations, Kennedy resigned beforehand to avoid the need for him to disclose all the wrongful activities that he and MacKenzie had committed.

38.     Following Kennedy's resignation, the Church paid the Union $14,000 to replace some of the funds expended without authorization by Kennedy and MacKenzie.

39.    Although Kennedy resigned in December, 2003, MacKenzie and Kennedy refused to return the Union's checkbook until February or March, 2003. They demanded payment of $20,000 for work they never performed before they would relinquish possession. The Union never agreed to pay them any amounts.

## Edward MacKenzie Joins the Church

40.    MacKenzie became a member of the Church in November, 2002. MacKenzie had fraudulently represented that he wished to become a member of the Church to follow the principles set forth by Emanuel Swedenborg. MacKenzie knew this statement to be false. In fact, MacKenzie stated during a July, 2003, televised promotion of his book "Street Soldier" in July, 2003 (a full eight (8) months after joining the Church) that he was, at that time, a Roman Catholic. This statement violates Article IV, Section 1(b) of the Church's by-laws which states that no Members of the Church shall retain active membership in any other church communion. A true and accurate copy of the by-laws is attached as Exhibit 4.

41.    MacKenzie had served as an enforcer for Whitey Bulger in the late 1980s. His published book, "Street Soldier," documents his criminal past.

42.    MacKenzie's duties to Mr. Bulger included the use of brute physical force. For example, MacKenzie, a former Golden Gloves boxer, had broken individuals' arms and legs, bitten off an individual's finger and then ate it, and defecated in individuals' beds. He had also beaten people mercilessly. He also served as a drug dealer.

43.    In or about 1990, MacKenzie had also been convicted of cocaine trafficking. He entered prison but later received immunity based on his agreement to assist in the apprehension of Columbian drug dealers.

44.    MacKenzie's criminal activities continue. In 2001, he reportedly defrauded an elderly women. He indicated that he would locate her lost son. He reported the he located the

son in a Cuban prison. That representation was false and MacKenzie knew it to be false at the time he made it. A true and accurate copy of an article concerning these activities is attached as Exhibit 5.

45.    In 2003, MacKenzie became convicted of fraudulently acquiring more than $30,000 in worker's compensation payments based on a fabricated disability. The Court ordered MacKenzie to refund that amount and to be placed on probation. A true and accurate copy of an article concerning these activities is attached as Exhibit 6.

### MacKenzie and Kennedy Continue Their Wrongful Actions at the Church

46.    MacKenzie and Kennedy used their influence over Reverend Ellis to cause him to wrongfully issue them checks from the Church's discretionary fund. Those funds existed only to support the charitable actions of the Church. Upon information and belief, Kennedy and MacKenzie received more than $20,000 from the fund. No justification existed for these payments.

47.    MacKenzie also forced the Church to pay the tuition of his daughter to attend a private secondary school. Previously, payments on behalf of Members' children had been made by the Church only as to reimbursement of college tuition. Payments as to secondary school had never been permitted.

48.    MacKenzie used extortion to force the Board to approve the expenditure. At the vote concerning the payment of amounts regarding MacKenzie's daughter's attendance at a secondary school, he stood directly behind the Board Chairman. MacKenzie indicated that the expenditure should be approved. He took these actions only to create fear in the members of the Board. That fear caused the Board to approve the expenditure.

## New Individuals Attempt to Join the Church In Breach of Its By-Laws

49.    Many actions of the Church require a majority vote of the Church members. Such actions include, without limitation, voting for individuals to become Trustees within the Church.

50.    To assist in controlling a majority of the members, MacKenzie and Kennedy asked that their friends and numerous members of their families be admitted as Church Members. MacKenzie and Kennedy misrepresented to Reverend Ellis and the Board of Trustees that these individuals wished to join the Church to follow the Swedenborgian principles.

51.    These new members had no intention of following the principles of the Swedenborgian faith. They possessed no interest in becoming members of the Church. MacKenzie and Kennedy caused these individuals to join only so MacKenzie and Kennedy could direct how they would vote.

52.    In February and May, 2003, MacKenzie and Kennedy presented these individuals for admission into the Church. True and accurate copies of agendas concerning these votes are attached as Exhibits 7 & 8.

53.    MacKenzie and Kennedy used their control of Reverend Ellis to obtain his assistance in getting these new members admitted to the Church. Reverend Ellis repeated the fraudulent reasons why these members should be permitted to join the Church. He also recommended that these individuals join the Church. Based on these fraudulent misrepresentations, the Church allowed these individuals to join.

54.    Moreover, the church admitted these individuals in breach of its own by-laws. Most, if not all, of the individuals recommended by MacKenzie and Kennedy for admission had never even visited the Church. Many also did not attend the meeting at which the church decided whether to admit them.

55.    Never had potential new members failed to attend the meeting at which their membership would be decided.  Potential new members also had never failed to visit or participate in Church-related activities before being admitted.

56.    Article IV, Section 3 of the Church's by-laws also specifically specified that "[a]ll candidates for membership ... shall participate in sessions of doctrinal study leading toward confirmation under the guidance of the Pastor .... Confirmations must be recorded in the Church permanent records." A true and accurate copy of the by-laws is attached as Exhibit 4.

57.    The process of confirmation required Reverend Ellis to instruct each potential new member as to principles of the Swedenborgian faith. Only after that process is completed may the individual be considered for admission to the Church.

58.    Reverend Ellis did not confirm any of the new members who the Church admitted at the requests of MacKenzie and Kennedy. Reverend Ellis, however, had confirmed all other Members of the Church who had previously joined during his ministry.

59.    The ability to control votes of these newly-admitted members and the Church membership provided MacKenzie and Kennedy with dominion over the Church's greatest physical asset: the $30 million apartment complex which it owns. That complex now generates more than $1.2 million dollars in net revenue on an annual basis.

### MacKenzie and Kennedy Coerce the Church Into Electing Them As Officers and Trustees of the Church

60.    As a result of gaining control of the Church Membership, MacKenzie and Kennedy then forced the Church to conduct votes concerning their election as Trustees and Officers of the Church. MacKenzie and Kennedy also sought the removal of current Trustees and Officers. Such Trustees included Bobby Buchanan and John Perry.

61.    MacKenzie and Kennedy directed newly-admitted members, who were family and friends, how to vote. They voted as directed.

62.    MacKenzie and Kennedy also extorted the votes of numerous elderly Members. MacKenzie and Kennedy did so by standing and walking through the crowd of elderly Members during the vote, which was by hand. Upon information and belief, these Members included, for example, Anna Brown, David Dorcey, Sandy Flaherty, Andrew McClaine, Ralph Schwartz, and others. MacKenzie used these strong-arm tactics to indicate to these Members that failing to vote in favor of their election and the removal of current Trustees or Officers would not be beneficial to them. For example, and without limitation, MacKenzie indicated that these individuals would lose Church benefits if they did not vote as directed. MacKenzie and Kennedy intended that such actions would create fear in the elderly Members. As a result of this fear, these Members voted as directed.

63.    During those votes, MacKenzie also wrongfully prevented individuals who supported the current Trustees from speaking. For example, one individual wished to make comments supporting the then present Trustees and officers. MacKenzie prevented him from doing so.

64.    As a result, MacKenzie, Kennedy and others became elected as Trustees. Various existing members were replaced as Officers and/or Trustees. As a result of their election, MacKenzie and Kennedy then obtained control of the Board of Trustees.

65.    MacKenzie also forced the members to vote to remove Joan Buchanan as Treasurer. MacKenzie sought to replace her. The newly elected members voted in favor of electing MacKenzie. MacKenzie and Kennedy also extorted the votes of the same elderly

Members in the same fashion that they had previously used. The position as Treasurer provided MacKenzie with unfettered access to the Church's funds.

66.    In June, 2003, MacKenzie and Kennedy instructed Reverend Ellis to tell Bob Buchanan to resign or that Big Brother would visit him. Reverend Ellis did so. MacKenzie and Kennedy caused this statement to occur to create fear in Mr. Buchanan. As a result of this fear, Mr. Buchanan no longer acted as President.

67.    Upon information and belief, in July, 2003, MacKenzie and Kennedy stole financial records of the Church and three cancelled checks. They did so to prevent the disclosure of their wrongful acquisition of Church funds.

68.    Any election of MacKenzie as Treasurer of the Church could not have become effective until September 1, 2003. On September 2, 2003, he and Kennedy appeared at the Church's bank, Mellon, to cash $10,000 in Church checks payable to each of them.

69.    The Bank refused to cash the checks. A true and accurate copy of a letter from the Bank to that effect is attached as Exhibit 9. Thereafter, however, MacKenzie and Kennedy obtained from the Church, which they then controlled, the amounts they sought from Mellon.

70.    On September 21, 2003, MacKenzie and Kennedy conducted a meeting to expel Bobby and Joan Buchanan as Members of the Church. They did not notice the meeting appropriately. Accordingly, the results of the votes taken at the meeting are void. A true and accurate copy of a memorandum concerning the meeting is attached as Exhibit 10.

71.    MacKenzie moved at the meeting to expel Bobby and Joan Buchanan. He had instructed his and Kennedy's family and friends to vote in favor of the motion. He had also extorted the elderly Members into voting that way as well.

72.     As directed by MacKenzie and Kennedy, the newly-admitted members voted to expel Joan and Bobby Buchanan, who had been Members of the Church for more than thirty years.  As a result of the fear created in the elderly Members, many also voted in favor of expulsion.

### MacKenzie and Kennedy Also Become Directors of Bostonview

73.     At the September 21, 2003 meeting, MacKenzie and Kennedy obtained positions as directors of Bostonview by misrepresenting to the Membership that they would act for the benefit of the Church.  They won this election by directing the new-admitted members how to vote and by extorting the votes of the same elderly Members in the manner they had utilized as to previous votes.

74.     With the intent to further their scheme, they directed Edwards & Angell, LLP to forward a letter to the property's real estate manager evidencing the result of the election.  This mailing constituted mail fraud in violation of 18 U.S.C. § 1341.  A true and accurate copy of a letter from Edwards & Angell, LLP evidencing that fact is attached as Exhibit 11.

75.     Obtaining positions as directors of Bostonview enabled them to further control the $30 million apartment house and the expenditure of more than $1.2 million in net revenue earned by that corporation each year.

### Once MacKenzie and Kennedy Obtained Control Over the Church, Its Assets and Bostonview, They Began to Liquidate the Church's Assets for Their Own Personal Benefit

76.     With the Church under their control, MacKenzie and Kennedy began to use its assets for their own benefit.  For instance, MacKenzie wrote and cashed for his own personal benefit Church checks in the amount of $22,600.  See Exhibit 12.  MacKenzie also received a $50,000 personal loan from the Church and paid $50,000 which was used to repay the workers'

compensation restitution due pursuant to his conviction and outstanding attorneys' fees. <u>See</u> Exhibits 13 & 14.

77.    MacKenzie also exploited Church resources for the benefit of his family members. For example he paid $5,000 to his daughter, Courtney MacKenzie from Church funds <u>See</u> Exhibit 15. MacKenzie also used $18,390 in Church funds to purchase a Jeep for his brother, Rodney MacKenzie and used $34,875 in Church funds to purchase a Chrysler Pacifica for his daughter, Carolyn MacKenzie. <u>See</u> Exhibits 16 & 17.

78.    MacKenzie authorized funding of annuities payable to MacKenzie and others. <u>See</u> Exhibit 18.

79.    Kennedy also used his position with the Church to gain benefits for himself and his family including but not limited to obtaining a loan for $350,000 for the purchase of a home. <u>See</u> Exhibit 19. Later, Kennedy also received $10,175, which is the amount of a deposit that he lost by failing to purchase a particular residence. <u>See</u> Exhibit 20. Moreover, Thomas Kennedy received at least $18,300 in other Church funds for his own personal benefit. <u>See</u> Exhibit 21.

80.    MacKenzie has also wrongfully caused the salary of Juliett Cunningham to increase, and caused the Church to pay for improvements to her home. The salary increase and home improvements occurred shortly before her deposition.

### John Burke Joins the Church
### and Is Immediately Elected Treasurer

81.    When MacKenzie relinquished his position as Treasurer he and Kennedy arranged for the appointment of a MacKenzie associate, John Burke ("Burke"), to act as Treasurer. Burked joined the Church only to take this position.

82.    After assuming the position of Treasurer, Burke abused it in favor of making payments to himself, MacKenzie and others.

83.     Burke issued more than $11,000 in checks to Renee Meldon, his girlfriend. <u>See</u> Exhibit 22.

84.     He wrote Bostonview checks to pay the rent as to his home, professional dues, which he had paid personally for numerous years, and work on the septic system at his home.

85.     He also received thousands of dollars in checks from the Church, now receives a $40,000 salary, and is entitled to an automobile that will be paid for by the Church.

## The Church Leaves the Denomination

86.     As a result of Reverend Ellis's behavior as to these elections and otherwise, some of the former Trustees had asked the Denomination in May, 2003 to conduct an investigation as to Reverend Ellis. The Denomination agreed to do so. A true and accurate copy of the request is attached as Exhibit 23. The Denomination's President presented the former Trustees' request to its Committee on Inquiry. The Committee then began an investigation as to Reverend Ellis.

87.     In accordance with the Committee's policies, Reverend Ellis was invited for an Interview. He asked if he could have supporters with him. The Committee is able to allow one or two supporters to be present, but the dialogue is only with the minister.

88.     When the Committee met with Revered Ellis, MacKenzie and Kennedy attended. They assisted as to Reverend Ellis's responses. MacKenzie and Kennedy did not want Reverend Ellis to admit what had actually occurred at the Church.

89.     After completing its investigation, in accordance with its duly authorized procedures, the Committee on Inquiry turned its findings over to the Council of Ministers' Board of Denomination for action. This Board offered Reverend Ellis three options: (1) he could be closely supervised for six months, (2) he could be suspended for one year, or (3) he could have his credentials as a Swedenborgian minister revoked.

90.    MacKenzie and Kennedy could not accept any of these options. They controlled Reverend Ellis and needed him to help with their plan to obtain the Church's assets.

91.    At or about this time, the Association Executive Committee also had passed a resolution stating its non-recognition of the Boston Church's expulsions from its membership. The Committee had also prepared and was about to pass a resolution stating its non-recognition of all of the new members that had been lately brought into the Church in contravention of its own by-laws. A true and accurate copy of the resolution is attached as Exhibit 24.

92.    In response to a letter received from the Association's Executive Committee concerning a request for information. MacKenzie and Kennedy directed Edwards & Angell, LLP to forward a response on September 29, 2003, to avoid the production of information by the Church. A true and accurate copy of the letter is attached as Exhibit 25.

93.    MacKenzie and Kennedy also directed Edwards & Angell, LLP to forward a second letter on September 29, 2003. That letter confirmed the removal of Robert and Joan Buchanan as members of the Association. A true and accurate copy of that letter is attached as Exhibit 26. MacKenzie and Kennedy sent the letter in an attempt to comply with the language of the Association's resolution and to frustrate any investigation into their expulsion of Church members.

94.    MacKenzie and Kennedy sent the letters on September 29, 2003, in furtherance of their fraudulent scheme to control the Church and its assets.  The mailing of the letters constitutes mail fraud in violation of 18 U.S.C. § 1341.

95.    Shortly thereafter, MacKenzie and Kennedy forced the Church to become disaffiliated with the Denomination. They misrepresented the reason for the vote. They did not disclose that affiliation would foil their plan to continue to control the finances of the Church and

its apartment house. They also did not address Reverend Ellis's mental incapacity. Instead, they portrayed the vote as one needed to save Reverend Ellis from what they asserted were wrongful actions of the Denomination.

96.    To obtain the vote, MacKenzie and Kennedy again directed and obtained the votes of the family and friends that they had fraudulently caused to become members. They also continued to extort the votes of elderly Members using the methods previously set forth above.

97.    After 185 years of affiliation, the Membership voted in favor of disaffiliation.

98.    In furtherance their scheme, MacKenzie and Kennedy also directed the Church to forward letters on October 26, 2003 to the Denomination and Association stating that the Church had disaffiliated itself from the Denomination. These actions constituted mail fraud in violation of 18 U.S.C. § 1341. True and accurate copies of those letters are attached as Exhibits 27 & 28.

99.    MacKenzie and Kennedy continue to control the operations of the Church.

### The Church's By-Laws Provide that Its Assets Be Passed to the Disaffiliation on the Date of Disaffiliation

100.    Prior to becoming disaffiliated from the Denomination, the Church had not amended its by-laws. They then provided:

> In the event that the religious body known as the Boston Society of the New Jerusalem, Inc. shall cease to exist, all funds and holdings shall be transferred to the General Convention of the New Jerusalem in the United States of America.
>
> These assets shall be held in escrow for the establishment of another General Convention of the New Jerusalem (Swedneborgian) Church within the City of Boston, Massachusetts. After a period of twenty (20) years, should no such Church exist, the capital and income therefrom shall revert to the General Convention of the New Jerusalem (Swedenborgian) with any restrictions of uses which may have been voted by the Society members at the time of dissolution.

Exhibit 4, Article X, Section 3 (emphasis added).

This provision was added to the Church bylaws at a time when the Denomination feared that the Church and its assets could be the subject of a takeover from a rival denomination

known as the General Church. The Church added this provision to ensure that the Church's assets would remain with the General Convention for the establishment of a new affiliated church should disaffiliation ever occur.

101.   Accordingly, as a result of the disaffiliation, all Church assets, including the $30 million apartment house, should have been transferred to the Denomination.

**MacKenzie, Kennedy and Others Now**
**Operate Businesses From the Church Offices**

102.   Because of their control, MacKenzie and Kennedy have moved businesses in which they have an interest into the offices of the Church. These businesses are not affiliated with the Church.

103.   Operating the business from the Church's offices simply permits MacKenzie and Kennedy to avoid the costs associated with the salary of a secretary, office expenses, telephone and fax charges and other costs. The move is intended only to serve the personal and financial benefit of MacKenzie and Kennedy.

104.   MacKenzie and Kennedy continue to receive wrongful payments from the Church.

**MacKenzie and Kennedy Have Also Used Intimidation and**
**Threats to Maintain Control and for Their Own Personal Gain**

105.   In May 2004, MacKenzie threatened to make John Daley a target of the Federal Bureau of Investigations unless he stopped assisting the plaintiffs in this case.

106.   MacKenzie also intimidated Philip Burke by causing him to make untrue statements to the Church Membership about Church member John Daley only to obtain payment for photography services that Burke had rendered to the Church.

107.  MacKenzie has also attempted to use Church property to extort money for his own personal benefit.  Specifically, in or about May 2004, MacKenzie refused to produce Church documents to John Meldon unless he paid $10,000 to MacKenzie.

108.  MacKenzie and Kennedy's extortionate activities continue as, upon information and belief, in mid-July, 2004, John Meldon was involved in an argument with one of his daughters, Renee Meldon, and John Burke regarding a cell phone which was, upon information and belief,  provided and paid for by the Church.  Mr. Meldon was wrongfully arrested as a result of this altercation.

109.  Thomas Kennedy's son, Michael Kennedy, later contacted Mr. Meldon and told him words to the effect that the whole matter would go away if Meldon paid Kennedy the sum of $5,000.

110.  During the course of settlement negotiations regarding an unrelated employment dispute in which former Church secretary Joan McGaw alleged that she was not paid adequate wages, MacKenzie and Kennedy agreed to pay the wages but only if Ms. McGaw agrees not to assist the Plaintiffs in this action.  The agreement has not been executed.

## COUNT I
### (Declaratory Judgment Against Church and Bostonview; Breach of By-Laws: The Denomination Is Entitled To Hold The Apartment House and Other Church Assets In Escrow)

111.  Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 110 as if fully set forth herein.[1]

112.  The Parties dispute whether the Denomination is entitled to obtain title to the apartment house and possession of other assets of the Church.

---

[1] As to this Count, Plaintiffs do not dispute that the Church disaffiliated itself from the Denomination.  If successful on this Count, Plaintiffs will not seek in this, or other Counts, to prove that membership votes that relate in any way to disaffiliation are void.  If unsuccessful on this Count, the Plaintiffs will seek to demonstrate that such votes are void.

113.    The Church disaffiliated itself from the Denomination.

114.    The Church's by-laws provided that such disaffiliation required the Church to transfer its assets to the Denomination to be held in escrow until a new church, which is affiliated with the Denomination, is formed in Boston.

115.    As a result, the Church's assets must be transferred to the Denomination.

116.    Thus, the Denomination asks that the Court declare that it is entitled to hold the assets of the Church.  Those assets include, without limitation, the apartment house and its revenue.

## COUNT II
### (Conversion Against MacKenzie and Kennedy)

117.    Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 116 as if fully set forth herein.

118.    The assets and funds of the Church are the rightful property of the Denomination as a result of the disaffiliation.

119.    MacKenzie and Kennedy knew or should have known that he had no right of possession to these assets and funds.

120.    MacKenzie and Kennedy have intentionally and wrongfully exercised acts of ownership, control and dominion over these assets and funds for their own personal gain.

121.    The Denomination has an immediate right of possession to these assets and funds.

## COUNT III
### (Unjust Enrichment/Restitution Against MacKenzie and Kennedy)

122.    Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 121 as if fully set forth herein.

123.    MacKenzie and Kennedy have spent thousands of dollars from Church and Bostonview accounts to which they are not entitled.

124.    MacKenzie and Kennedy knew or should have known that they were not entitled to these monies.

125.    MacKenzie and Kennedy have retained these monies without a right to do so, resulting in their unjust enrichment.

126.    Justice and equity demand that the Denomination have an immediate right of restitution regarding these assets and funds.

## COUNT IV
### (Declaratory Judgment Against the Church;
### Breach of By-Laws As to Membership)

127.    Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 126 as if fully set forth herein.

128.    The Parties dispute whether the memberships as to the newly-admitted individuals are valid and whether the expulsion of Members is valid is well.

129.    The by-laws provide that all new members must be confirmed before joining the Church.

130.    The new members who joined the Church in 2002 and 2003 had not been confirmed prior to joining.

131.    Those memberships are void and without effect.

132.    The by-laws also do not condone the expulsion of members. Thus, the expulsion of any member is without effect.

133.    Thus, the Plaintiffs ask that the Court declare that the memberships of the newly-admitted individuals are void, that any votes taken in which they participated are void and without effect and that the expulsion of Members is also void and without effect.

**COUNT V**
**(Derivative Breach of Fiduciary Duty as to the Church;**
**Against MacKenzie and Kennedy)**

134.    Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 133 as if fully set forth herein.

135.    This count is brought by Plaintiffs the Denomination and George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock in Bostonview.

136.    Plaintiffs fairly and adequately represent, respectively, the interests of the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations in issue in this case.

137.    Plaintiff, George Chapin, has made no effort to secure action from, respectively, the trustees and directors of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy herein control the majority of the trustees and directors of both boards through tactics of extortion and coercion. As such, the majority of the trustees and directors on the boards of the Church and Bostonview are interested parties. Thus, any demand on the boards that they bring an action in the name of the Church or Bostonview would have been futile.

138.    The Plaintiffs further allege as follows:

139.    As Officers and Trustees of the Church, MacKenzie and Kennedy possess fiduciary duties.

140.    MacKenzie's and Kennedy's actions have breached those duties.

141.    As a result, the Church has lost thousands of dollars, become unaffiliated with the Denomination and suffered other harm as well.

## COUNT VI
### (Derivative Breach of Fiduciary Duty as to Bostonview; Against MacKenzie and Kennedy)

142.    Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 141 as if fully set forth herein.

143.    This count is brought by Plaintiffs the Denomination and George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock of Bostonview.

144.    Plaintiffs fairly and adequately represent, respectively, the interests of the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations in issue in this case.

145.    Plaintiff, George Chapin, has made no effort to secure action from, respectively, the trustees and directors of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy control the majority of the trustees and directors of both boards through tactics of extortion and coercion. As such, the majority of the trustees and directors on the boards of the Church and Bostonview are interested parties. Thus, any demand on the boards that they bring an action in the name of the Church or Bostonview would have been futile.

146.    The Plaintiffs further allege as follows:

147.    As Officers and Trustees of Bostonview, MacKenzie and Kennedy possess fiduciary duties.

148.    MacKenzie and Kennedy have engaged in activities which have breached those duties.

149.    As a result, Bostonview has suffered damages in an amount to be determined at trial.

## COUNT VII
### (Fraud;
### Derivative Claim Against MacKenzie and Kennedy)

150.  Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 149 as if fully set forth herein.

151.  This count is brought by Plaintiffs the Denomination and George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock in Bostonview.

152.  Plaintiffs fairly and adequately represent, respectively, the interests of the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations in issue in this case.

153.  Plaintiff, George Chapin, has made no effort to secure action from, respectively, the trustees and directors of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy control the majority of the trustees and directors of both boards through tactics of extortion and coercion. As such, the majority of the trustees and directors on the boards of the Church and Bostonview are interested parties. Thus, any demand on the boards that they bring an action in the name of the Church or Bostonview would have been futile.

154.  The Plaintiffs further allege as follows:

155.  MacKenzie and Kennedy misrepresented to the Church and its members numerous issues which include, without limitation, that new members wished to join the Church to follow the Swedenborgian principles, that the by-laws needed to be amended to benefit the Church, that Trustees needed to be removed for the betterment of the Church, and that leaving the Denomination was needed to prevent the loss of Reverend Ellis as a Pastor.

156.  MacKenzie and Kennedy knew, or should have known, that each of these statements is false.

157.    The Church, through its Members, relied on these misrepresentations.

158.    As a result, present and former Members of the Church have been damaged.

**COUNT VIII**
**(Chapter 93A;**
**Derivative Claim Against MacKenzie and Kennedy)**

159.    Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 158 as if fully set forth herein.

160.    This count is brought by Plaintiffs the Denomination and George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as members of the Church and beneficial holders of stock in Bostonview.

161.    Plaintiffs fairly and adequately represent the interests of, respectively, the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations in issue in this case.

162.    Plaintiff, George Chapin, has made no effort to secure action from the trustees and directors, respectively, of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy control the majority of, respectively, the trustees and directors of both boards through tactics of extortion and coercion. As such, the majority of, respectively, trustees and the directors of the Church and Bostonview are interested parties. Thus, any demand on the boards that they bring an action in the name of the Church or Bostonview would have been futile.

163.    The Plaintiffs further allege as follows:

164.    MacKenzie and Kennedy have committed unfair and deceptive acts as defined in Section 2 of Mass. Gen. Laws ch. 93A.

165.    MacKenzie's and Kennedy's actions were willful.

166.    As a result of those actions, the Denomination, the Church and its present and expelled Members have been damaged.

### COUNT IX
### (RICO 18 U.S.C. § 1962(b);
### Against MacKenzie and Kennedy)

167.    Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 166 as if fully set forth herein.

168.    This count is brought by Plaintiffs the Denomination and George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock in Bostonview.

169.    Plaintiffs fairly and adequately represent, respectively, the interests of the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations at issue in this case.

170.    Plaintiff, George Chapin, has made no effort to secure action from, respectively, the trustees and directors of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy herein control the majority of the trustees and directors of both boards through tactics of extortion and coercion. As such, the majority of the trustees and directors on the boards of the Church and Bostonview are interested parties. Thus, any demand on the boards that they bring an action in the name of the Church or Bostonview would have been futile.

171.    The Plaintiffs further allege as follows:

172.    MacKenzie and Kennedy are persons who knowingly or recklessly acted through a pattern of racketeering activity to obtain control of the Church, which is an enterprise.

173.    The pattern of racketeering activity includes, without limitation, MacKenzie's and Kennedy's use of extortion to obtain the votes of elderly Church Members in or about May,

2003, September, 2003, and on other occasions, and as to their election as Trustees of the Church, Directors of Bostonview, and Officers of the Church.

174.    In May 2004, MacKenzie threatened to make John Daley a target of the Federal Bureau of Investigations unless he stopped assisting the plaintiffs in this case.

175.    MacKenzie also intimidated Philip Burke by causing him to make untrue statements to the Church Membership about Church member John Daley only to obtain payment for photography services that Burke had rendered to the Church.

176.    MacKenzie has also attempted to use Church property to extort money for his own personal benefit.  Specifically, in or about May 2004, MacKenzie refused to produce Church documents to John Meldon unless he paid $10,000 to MacKenzie.

177.    MacKenzie and Kennedy's extortionate activities continue as, upon information and belief, in mid-July, 2004, John Meldon was involved in an argument with one of his daughters, Renee Meldon, and John Burke regarding a cell phone which was, upon information and belief, provided and paid for by the Church. Mr. Meldon was wrongfully arrested as a result of this altercation.

178.    Thomas Kennedy's son, Michael Kennedy, later contacted Mr. Meldon and told him words to the effect that the whole matter would go away if Meldon paid Kennedy the sum of $5,000.

179.    During the course of settlement negotiations regarding an unrelated employment dispute in which former Church secretary Joan McGaw alleged that she was not paid adequate wages, MacKenzie and Kennedy agreed to pay the wages but only if Ms. McGaw agrees not to assist the Plaintiffs in this action.  The agreement has not been executed.

180.    The pattern also includes at least five (5) instances of mail fraud. [August 2002]. On September 23, 2003, MacKenzie and Kennedy directed Edwards & Angell, LLP to mail correspondence concerning the election of new directors of Bostonview. On September 29, 2003, they directed Edwards & Angell, LLP to mail correspondence to the Association in response to a letter seeking information relevant to a resolution to not recognize newly-admitted or expelled members. On October 26, 2003, they also directed the Church to send letters to the Denomination and Association concerning disaffiliation.

181.    These actions have been committed in a continuous pattern. They are related to the efforts needed to obtain control of the enterprise. These efforts are a regular way of conducting the acts of the enterprise. These actions will continue.

182.    MacKenzie's and Kennedy's pattern of racketeering activity has caused injury to the Denomination, the Church, the Church Members who have been discharged from the Church, current Members of the Church, and Bostonview.

### COUNT X
### (RICO 18 U.S.C. § 1962(c);
### Against MacKenzie and Kennedy)

183.    Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 182 as if fully set forth herein.

184.    This count is brought by Plaintiffs the Denomination and George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock in Bostonview.

185.    Plaintiffs fairly and adequately represents, respectively, the interests of the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations in issue in this case.

186.    Plaintiff, George Chapin, has made no effort to secure action from, respectively, the trustees and directors of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy herein control the majority of the trustees and directors of both boards through tactics of extortion and coercion. As such, the majority of the trustees and directors on the boards of the Church and Bostonview are interested parties. Thus, any demand on the boards that they bring an action in the name of the Church or Bostonview would have been futile.

187.    The Plaintiffs further allege as follows:

188.    MacKenzie and Kennedy are persons who knowingly or recklessly acted through a pattern of racketeering activity to control and conduct the activities of the Church, which is an enterprise.

189.    The pattern of racketeering activity includes, without limitation, MacKenzie's and Kennedy's use of extortion to obtain the votes of elderly Church Members in or about May, 2003 and September, 2003 and as to their election as Trustees of the Church, Directors of Bostonview, and Officers of the Church.

190.    The pattern also includes at least five instances of mail fraud. On September 23, 2003, MacKenzie and Kennedy directed Edwards & Angell, LLP to mail correspondence concerning the election of new directors of Bostonview. On September 29, 2003, they directed Edwards & Angell, LLP to mail correspondence to the Association in response to a letter seeking information relevant to a resolution to not recognize newly-admitted or expelled members. On October 26, 2003, they also directed the Church to send letters to the Denomination and Association concerning disaffiliation.

191.    These actions have been committed in a continuous pattern. They are related to the efforts needed to obtain control of the enterprise and to conduct the activities of the Church

for MacKenzie and Kennedy's personal gain. These efforts are a regular way of conducting the acts of the enterprise. These actions will continue.

192. MacKenzie's and Kennedy's pattern of racketeering activity has caused injury to the Denomination, the Church, the Church Members who have been discharged from the Church, current Members of the Church, and Bostonview.

## COUNT XI
## (RICO 18 U.S.C. § 1962(d);
## Against MacKenzie and Kennedy)

193. Plaintiffs restate and incorporate by reference the allegations of Paragraphs 1 through 192 as if fully set forth herein.

194. This count is brought by Plaintiffs the Denomination and George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock in Bostonview.

195. Plaintiffs fairly and adequately represent, respectively, the interests of the members and shareholders of the Church and Bostonview similarly situated in enforcing the rights of the corporations in issue in this case.

196. Plaintiff, George Chapin, has made no effort to secure action from, respectively, the trustees and directors of the Church and Bostonview corporations for the reason that MacKenzie and Kennedy herein control the majority of the trustees and directors of both boards through tactics of extortion and coercion. As such, the majority of the trustees and directors on the boards of the Church and Bostonview are interested parties. Thus, any demand on the boards that they bring an action in the name of the Church or Bostonview would have been futile.

197.    The Plaintiffs further allege as follows:

198.    MacKenzie and Kennedy are persons who conspired to knowingly or recklessly acted through a pattern of racketeering activity to obtain control of the Church, which is an enterprise.

199.    The pattern of racketeering activity includes, without limitation, MacKenzie's and Kennedy's use of extortion to obtain the votes of elderly Church Members in or about May, 2003, and September, 2003, and as to their election as Trustees of the Church, Directors of Bostonview, and Officers of the Church.

200.    The pattern also includes at least five instances of mail fraud. On September 23, 2003, MacKenzie and Kennedy directed Edwards & Angell, LLP to mail correspondence concerning the election of new directors of Bostonview. On September 29, 2003, they directed Edwards & Angell, LLP to mail correspondence to the Association in response to a letter seeking information relevant to a resolution to not recognize newly-admitted or expelled members. On October 26, 2003, they also directed the Church to send letters to the Denomination and Association concerning disaffiliation.

201.    This conspiracy has caused actions which have been committed in a continuous pattern. They are related to the efforts needed to obtain control of the enterprise.

202.    MacKenzie's and Kennedy's conspiracy has caused injury to the Denomination, the Church, the Church Members who have been discharged from the Church, current Members of the Church, and Bostonview.

WHEREFORE, Plaintiffs pray that the Court:

1.    Enter judgment in favor of Plaintiffs and against the Defendants as to Counts I through III, in an amount to be determined at trial, said amount to be trebled, and award Plaintiffs their attorneys' fees and costs;

2.    As to Count IV, declare that the Denomination is entitled to hold the assets of the Church;

3.    As to Count V, declare that the memberships of the newly-admitted individuals are void and without effect, that all votes taken in which they participated are void and without effect, and that the expulsion of Church Members is void and without effect;

4.    Enter judgment in favor of the Plaintiffs and against Kennedy and MacKenzie as to Counts VI through VIII and award the Plaintiffs damages in an amount to be determined at trial;

5.    Enter judgment in favor of Plaintiffs and against the Defendants as to Count IX in an amount to be determined at trial, said amount to be trebled, and award Plaintiffs their attorneys' fees and costs;

6.    Award the Plaintiffs their costs, including their attorneys' fees; and

7.    Award such other and further relief as the Court deems appropriate.

## JURY DEMAND

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.

THE GENERAL CONVENTION OF THE NEW JERUSALEM IN THE UNITED STATES OF AMERICA, INC., THE MASSACHUSETTS ASSOCIATION OF THE NEW JERUSALEM (SWEDENBORGIAN) and GEORGE CHAPIN,

By their attorneys,

**HOLLAND & KNIGHT LLP**

Geoffrey E. Hobart (BBO No. 547499)
Christopher J. Trombetta (BBO No. 556923)
Damon P. Hart (BBO No. 644586)
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

Dated: August 2, 2004

EX K

# COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, SS**
                                                    **SUPERIOR COURT**
                                                    **NO. 04-3432H**

### THE GENERAL CONVENTION OF THE NEW JERUSALEM IN THE UNITED STATES OF AMERICA, INC. ET AL., PLAINTIFFS
### v.

### EDWARD MACKENZIE, ET AL., DEFENDANTS

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTIONS TO DISMISS

This lawsuit alleges that two master defrauders, MacKenzie and Kennedy, have gained control over the Boston Society Of the New Jerusalem, Inc. (the Church) through manipulation of its mentally ill minister, Rev. Stephen Ellis, and the admission of new members not truly committed to Swedenbogian principals, and consequently have and will continue to milk the Church of its substantial assets. Following an investigation, the plaintiff General Convention of the New Jerusalem (General Convention), the mother organization of the congregational Swedenbogian churches, proposed certain disciplinary actions against the minister which apparently were not acceptable to him and the majority of church members. Thereafter the Church voted to disaffiliate with the General Convention. The attorney general, pursuant to his oversight responsibilities concerning public charities, instituted a separate action against the Church which resulted in a consent judgment in June, 2004 providing substantial financial controls and reporting responsibilities on the Church to the attorney general.[1]

```
NOTICE SENT:  12/09/2004    (ah)
G.E.H. -C.J.T.            H.M.C.,N.C., J.H.F
H.&K.                     T.&W.
```

---

[1] <u>Commonwealth v. Boston Society of the New Jerusalem, Inc.</u>, Suffolk Superior Court No. 04-2597.

1

The defendants now move to dismiss this multi-count amended complaint for a variety of reasons. After hearing and review, I am persuaded that defendants' motions must be allowed for the following reasons.

First, the General Convention's claim that the Church's assets passed to it once the Church disaffiliated pursuant to article X, section 3, of the Church bylaws, is not correct. That section, headed "Dissolution" provides:

> In the event that the religious body known as the Boston Society of the New Jerusalem, Inc. shall cease to exist, all funds and holdings shall be transferred to the General Convention of the New Jerusalem in the United States of America.

> These assets shall be held in escrow for the establishment of another General Convention of the New Jerusalem (Swedenborgian) church within the city of Boston, Massachusetts. After a period of twenty (20) years, should no such church exist, the capital and income therefrom shall revert to the General Convention of the New Jerusalem (Swedenbogian) with any restrictions of uses which may have been voted by the Society members at the time of dissolution.

By the terms of the bylaw, the assets only pass to the General Convention if the Church "shall cease to exist". That has not occurred. We are dealing with a congregational rather than a hierarchical religious organization. Nothing compels Swedenborgian churches to affiliate with the mother organization. If the Church had wished to enact a bylaw providing that assets would be transferred to the General Convention upon disaffiliation, it could have done so. "Cease to exist", in plain English; does not mean "disaffiliation".

Second, none of the plaintiffs have standing to pursue the numerous claims of mismanagement and misappropriation of assets. Such authority rests exclusively with the attorney general. <u>Weaver v. Wood</u>, 425 Mass. 270 (1997). So far as it appears, the attorney general has been carrying out his statutory responsibilities.

2

Third, those claims that assert fraud or other wrongdoing in the admission of new members must be dismissed because to hear such claims would necessarily intrude into matters of religious doctrine. The First Amendment of United States Constitution prohibits judicial encroachment into church decisions involving "matters of doctrine, canon law, polity, discipline and ministerial relationships." Callahan v. First Congregational Church of Haverhill, 441 Mass. 699, 708-709 (2004).

Fourth, the chapter 93A claim must be dismissed because the dispute involves the internal operations of the Church rather than trade or commerce. Chapter 93A does not apply to such intra-organizational disputes. See Szalla v. Locke 421 Mass. 448, 452 (1995).

Fifth, the RICO counts must be dismissed because they are barred by the doctrine of res judicata. Chief Justice Young previously dismissed these claims when the case was in the United States District Court. The plaintiffs are not entitled to a second bite at the apple in this court.

## ORDER

Defendants' motions to dismiss are **allowed**.

Patrick F. Brady
Justice, Superior Court

7 Dec. 04

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

SUPERIOR COURT DEPT.
OF THE TRIAL COURT

COMMONWEALTH OF MASSACHUSETTS,

Plaintiff,

v.

BOSTON SOCIETY OF THE NEW
JERUSALEM, INC.,

Defendant.

Civil Action No.    04-2597

## CONSENT JUDGMENT

This matter having come before the Court first through Civil Investigative Demands

issued by the Department of the Attorney General pursuant to Mass. Gen. Laws, Chapter 12,

Section 8H and served upon the defendants and others in Suffolk Civil Action No. 03-5408A

(the "CIDs"); and

The Defendants having produced the requested documents, including financial records,

and all parties having conferred as to the matters reflected in those documents; and

All parties having agreed to finally resolve the matters covered by the CIDs and the

Complaint in this action to avoid the expense, delay, and uncertainties of further investigation

and/or litigation by taking the corrective action, and confirming or adopting certain practices and

procedures, as set forth in this Consent Judgment, without trial or adjudication of any issue of

fact or law, and without an admission of any liability, which Defendants expressly deny.

IT IS HEREBY AGREED THAT:

1.    The Board of Trustees of the Boston Society of the New Jerusalem, Inc. (the

"Church") shall adopt policies and procedures for addressing conflict of interest issues, meeting

notice procedures, and related party transactions, and shall implement substantially the Financial

Policies and Procedures adopted by unanimous consent of the Board of Trustees on January 25, 2004, within sixty (60) days of the date of this Judgment. The policies and procedures shall be consistent with the terms of this Consent Judgment and the Church shall submit the proposed policies and procedures to the Office of the Attorney General for review and approval before their adoption.

2.    The Church controls certain real estate located at 140 Bowdoin Street, Boston, Massachusetts, through its ownership of Bostonview Corporation ("Bostonview"); Bostonview controls funds for potential investment through its ownership of the stock of Harborview Corporation ("Harborview"); and the Church, Bostonview and/or Harborview (collectively, the "Church Group") may come to control other assets for investment through the establishment of other entities, a substantial portion of whose equity the Church owns.

3.    Except as provided below, the Church Group shall not transfer or substantially encumber any capital assets valued at over $10,000 without first delivering written notice of the terms of the contemplated transaction to the Attorney General at least thirty (30) days in advance of the transaction. If such a transaction occurs, the Church shall provide the Attorney General with a complete accounting of the disbursement of any proceeds within sixty (60) days after the transaction is complete. These restrictions shall not apply to any ordinary operating expenditures; any customary and usual Bostonview capital expenditures; or any transfers or sales in the ordinary course of the Church Group's businesses, including transfers within an investment fund or stock portfolio managed for the Church by a professional manager. None of the Bostonview or Harborview net earnings shall inure, in whole or in part, to the benefit of any private stockholders or individuals.

4.    The Board of Trustees and Officers of the Church shall not convey any assets of the Church to any individual or to any for-profit entity unless (a) the Board of Trustees has

- 2 -

reviewed and approved the transaction; (b) the Voting Members have approved the transaction, if required pursuant to the Church's By-Laws; (c) the transaction is for full, fair-market value; and (d) the transaction, or the use of proceeds from the transaction, is in furtherance of the Church's mission as defined by the Board of Trustees and approved by the Voting Members pursuant to the By-Laws. A list of the Church's Voting Members as of December, 2003, has been previously supplied to the Attorney General as documents numbered BC 18623 through BC 18626. Assets over $10,000 can be conveyed only if the Board of Trustees approves the transaction by a two-thirds majority vote. Nothing in this paragraph shall affect the Church's ability to convey funds to individuals through regular Church programs and for charitable purposes consistent with the Church's mission, such as through the Pastor's Discretionary/Relief Fund or to pay for education related expenses.

5.      The Board of Trustees and officers of the Church shall operate in conformance with the Church's By-Laws, as amended from time to time, except that the Church shall adhere to the provisions of this Consent Judgment, if there is a conflict between this Consent Judgment and the By-Laws.

6.      The Church shall operate in conformance with the requirements of the Internal Revenue Code for organizations that are exempt from taxation under Section 501(c)(3), including the provision that an organization is so exempt only if "no part of the net earnings of [such organization] inures to the benefit of any private shareholders or individuals", and the requirement set forth in the regulations under Section 501(c)(3) that the organization be organized and operated exclusively to further tax-exempt purposes. In addition, the Church shall report all payments and any other benefits given to individuals who work for the Church in any capacity, including, but not limited to, members, the Church's officers and Board of Trustees,

- 3 -

Bostonview officers and Harborview officers, as income to the Internal Revenue Service in W-2 or 1099 filings, as required.

7.    The Church shall, within thirty (30) days of the date of this Judgment, hire an Interim Chief Financial Officer with responsibility for monitoring and controlling all financial and accounting transactions required for the Church, Bostonview, and Harborview, including the day-to-day financial operations of the Church; reporting to the Board of Trustees and the Attorney General on financial matters; reviewing and adjusting in consultation with the Church's Compensation Committee, salaries and other forms of compensation, to make sure that any compensation paid is reasonable and appropriate; ensuring that the Church fully complies with its legal obligations and the requirements of this Consent Judgment; ensuring that all expenditures are appropriate and consistent with the Church's mission; and taking any and all other actions to ensure financial responsibility and accountability for the Church.

8.    The Interim Chief Financial Officer must be approved by the Office of the Attorney General in writing. The Interim Chief Financial Officer shall hold this position for one (1) year, but the Attorney General and the Church may extend the term prior to the end of the year. The Interim Chief Financial Officer shall provide the Attorney General with a quarterly report as described in paragraph 9 below concerning the finances of the Church, including any financial issues or concerns that may exist and any recommendations for improving the financial operation of the Church.

9.    The Interim Chief Financial Officer shall provide the Attorney General with summary financial statements in a form acceptable to the Attorney General each quarter, beginning with the quarter ending June 30 or August 31 (depending on the fiscal year adopted by the Church and then in effect), through the term of this Judgment. The Interim Chief Financial Officer shall submit the report within thirty (30) days after the end of each quarter. With the

- 4 -

quarterly reports, the Interim Chief Financial Officer will provide to the Attorney General a record of all votes and minutes relating to financial matters by the Voting Members and the Board of Trustees. Upon ten (10) business days notice, the Church shall make available to the Attorney General any of its financial records that the Attorney General may request in writing and any other information requested in writing consistent with Mass. G. L. c.12, §§8F and 8L.

10.    Nothing in this Consent Judgment shall limit the Attorney General's right to exercise all of his authority under law in the event that the Attorney General becomes aware of dissipation of charitable assets or use of charitable assets for other than appropriate Church related expenses, or limit the Attorney General's and the Church's ability to enter into further agreements with each other or to seek further orders of the Court.

11.    The parties consent to entry of this Judgment solely for purposes of compromise and settlement, and to avoid the risks and expenses associated with further investigation. This Consent Judgment does not constitute evidence of, or an admission of, any liability or wrongful act.

12.    The provisions of this Consent Judgment and Order shall expire and be of no further force and effect on and after June 15, 2007, or at such earlier date as the parties shall agree upon. No sooner than eighteen (18) months after the date of the entry of this Consent Judgment the parties may give consideration to an expiration date which is earlier than June 15, 2007.

OFFICE OF THE ATTORNEY GENERAL,
        Plaintiff,


_____
Jamie W. Katz (BBO #261200)
Assistant Attorney General
Chief, Public Protection Division
Office of the Attorney General
Commonwealth of Massachusetts
One Ashburton Place
Boston, MA  02108
(617) 727-2200


I HEREBY ATTEST AND CERTIFY ON
_6/16/04_____, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY_____

BOSTON SOCIETY OF THE NEW
JERUSALEM, INC.
        Defendant,


_____
Rex Ellis, Chair, Board of Trustees


_____
Thelma E. Hawkins, Secretary, Trustee


_____
John Burke, Treasurer, Trustee


_____
Matthew Oliva, Trustee


_____
Michael Latkowitch, Trustee


_____
Sandra Flaherty, Trustee

Thomas J. Kennedy, Trustee

APPROVED AS TO FORM:

Richard J. McCarthy (BBO #328600)
EDWARDS & ANGELL, LLP
101 Federal Street
Boston, MA  02110
(617) 439-4444

SO ORDERED:

Justice, Superior Court

Dated:  June ___, 2004

- 7 -

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT
CIVIL ACTION

THOMAS F. REILLY, as he is                )
ATTORNEY GENERAL of the              )
COMMONWEALTH OF                     )
MASSACHUSETTS,                           )
                              Plaintiff,       )
                                               )
         v.                                    )
                                               )
BOSTON SOCIETY OF                      )
THE NEW JERUSALEM, INC.,            )
                              Defendant.     )

## COMPLAINT

1. The Attorney General brings this action to ensure that the defendant takes action to control excessive spending of charitable assets that has resulted in substantial and, on occasion, excessive payments and other benefits to certain officers, directors, and their relatives.

## JURISDICTION AND VENUE

2. The Court has jurisdiction over these claims pursuant to G.L. c. 214, §1. The Court is authorized to declare the respective rights of the parties pursuant to G.L. c. 231A, §1 et seq. This action is brought in the Superior Court of Suffolk County pursuant to G.L. c. 223, §5.

## PARTIES

3. The plaintiff is Thomas F. Reilly, who is Attorney General of the Commonwealth of Massachusetts, and who brings this action in the public interest pursuant to G.L. c. 12, §8 et seq.

4. The Defendant is Boston Society of the New Jerusalem, Inc., a religious organization located at 140 Bowdoin Street, Boston, Massachusetts.

## FACTS

### Boston Society of the New Jerusalem

5. Boston Society of the New Jerusalem, Inc. ("Church" or "charity") was organized on August 15, 1818 and incorporated on February 11, 1823 by an act of the legislature.

6. In 2003, the Church underwent significant transformation, changing its bylaws and removing itself from its previous affiliations with The Swedenborgian Church United States and Canada, The General Convention of the New Jerusalem in the United States of America, The Massachusetts Association of the New Jerusalem Church, and Massachusetts New Church Union.

7. In 2003 and 2004, certain Church officers, directors, and their relatives received substantial and, on occasion, excessive compensation payments and/or other benefits from the Church.

### Bostonview Corporation

8. The Church incorporated Bostonview Corporation ("Bostonview"), a nonprofit corporation, in Delaware on August 22, 1963.

9. Bostonview is organized "exclusively for religious, charitable, scientific, and education purposes with the specific object of holding title to properties and collecting the income therefrom and turning over the entire amount thereof, less expenses, to Boston Society of the New Jerusalem, Inc. . . . ."

10. The Church registered Bostonview in Massachusetts as a foreign corporation on June 8, 1977.

11. Bostonview's principal office location is 140 Bowdoin Street, Boston,

2

Massachusetts.

12. In 2004, certain Bostonview officers and directors received substantial and, on occasion, excessive compensation payments and/or other benefits from the Church.

### Harborview Corporation

13. The Church incorporated Harborview Corporation ("Harborview"), a for-profit corporation, in Massachusetts on November 12, 2003.

14. Harborview is organized inter alia, "[t]o carry on and conduct a general real estate development business including designing, constructing, enlarging, extending, repairing, completing, renovating, removing, or otherwise engaging in any work on residential, commercial, or industrial structures . . . ."

15. Harborview's principal office location is 54 Snow Lane, Chatham, Massachusetts.

16. In 2003 and 2004, certain Harborview officers and their relatives received substantial and, on occasion, excessive compensation payments and/or other benefits from the Church.

### COUNT I

### Dissipation of Charitable Assets

17. In 2003 and 2004, Church Officers and Trustees failed to ensure the due application of charitable assets, in accordance with G.L. c. 12, §8.

18. In 2003 and 2004, Church Officers and Trustees failed to ensure that Church proceeds were used solely to further the Church's mission.

19. In 2003 and 2004, Church Officers and Trustees approved distributions of the charity's assets for the benefit of certain private individuals.

20. As a result of the actions of the Church Officers and Trustees, the charity suffered

harm.

## RELIEF REQUESTED

Wherefore, the Commonwealth requests that this Court:

1.    Enter a Consent Judgment and Order, as agreed upon by the Boston Society of the New Jerusalem, Inc. and the Attorney General.

2.    Grant such other and further relief as this Court may deem just.

Respectfully submitted,

THOMAS F. REILLY
ATTORNEY GENERAL

Jamie W. Katz, BBO #261200
Leslie E. Bennett, BBO #644403
Assistant Attorney General
One Ashburton Place, Rm. 1813
Boston, MA 02108
(617) 727-2200 ext. 2110

Dated: June 17, 2004

4

COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL

CIVIL INVESTIGATIVE
DEMAND
C.A. No.  03-5408 A
Demand No.: 03-001
Date Issued: November 13, 2003

TO:    Thomas J. Kennedy
       Chair, Board of Trustees
       Boston Church of the New Jerusalem
       140 Bowdoin St.
       Boston, MA 02108-2799

       Thomas J. Kennedy
       Chair, Board of Trustees
       Boston Society of the New Jerusalem, Inc.
       140 Bowdoin St.
       Boston, MA 02108-2799

You are hereby required to produce and deliver to the members of the Massachusetts

Attorney General's staff named below, for examination and copying, the documentary material

in your possession, custody or control as described in Section C (attached hereto), on or before

December 13, 2003.

This Civil Investigative Demand ("CID") is issued pursuant to Massachusetts General

Laws, chapter 12, section 8H, as part of an investigation by the Department of the Attorney

General into alleged violations of those statutes by Boston Church of the New Jerusalem and/or

Boston Society of the New Jerusalem, Inc.. The documentary material identified in Section C

below shall be provided to, and reviewed by, the director and staff members of the Public

Charities Division of the Attorney General's Office, and such other employees, agents, and

experts of the Office of Attorney General as needed as part of this investigation.

Under Massachusetts General Laws chapter 12, Section 8H(7), which is set forth in full at Enclosure 1, you may at any time prior to the date specified in this CID, or within twenty-one days after the CID has been served, whichever period is shorter, upon motion for good cause shown, extend such reporting date or modify or set aside the notice provided for in this section.

Your attention is directed to the provisions of Section 8I of M.G.L. chapter 12, set forth in full at Enclosure 2, which makes obstruction of this investigation punishable by a fine of up to five thousand dollars ($5,000.00). Furthermore, the attorney general may file in the superior court of the appropriate county a petition for an order of such court for the enforcement of this section and section eight H. Any disobedience of any final order entered under this section by any court shall be punished as a contempt thereof.

## SECTION A: INSTRUCTIONS

1.    Each document submitted in compliance with this CID shall be numbered consecutively on the face of the document and shall clearly identify the paragraph of Section C to which the document is responsive. Copies of original documents shall be legible in their entirety and shall be reproduced on standard white paper.

2.    Each request for a document requires production of the document in its entirety, without abbreviation or expurgation.

3.    If any responsive document is available in electronic format, the document shall be provided in electronic format in addition to hard copy. The document shall be provided in the same electronic format in which you maintain it in the regular course of business, together with any directions for retrieval of the information using an IBM-compatible personal computer.

4.    If any document is withheld from production on the ground that the document contains materials for which a claim of privilege is asserted, you must identify the document.

The identification should include the name, address, position, and organization of the author, each recipient of the document, a brief description of the subject matter of the document, the request to which the document is responsive and the specific grounds for the claim that the document is privileged.

5.    If any document requested was, but is no longer, in your possession or control or is no longer in existence, state whether it is: (a) missing or lost; (b) destroyed; (c) transferred voluntarily or involuntarily to others and if so, to whom; (d) otherwise disposed. In each instance, explain the circumstances surrounding and the authorization for such disposition and state the approximate date thereof. Identify all persons having knowledge of the contents of the document.

6.    Unless otherwise indicated, this CID is limited to documents prepared or used after January 1, 2001.

7.    If your company has a document retention/destruction program, you are asked to suspend it immediately with regard to any document that may be responsive to this CID. Regardless of whether your company has a document retention/destruction program, take precautions to ensure that no documents called for by this document production request are inadvertently or purposely destroyed.

8.    The scope of this CID encompasses all the documents of either/or the Boston Church of the New Jerusalem or the Boston Society of the New Jerusalem, Inc.("Boston Church") wherever the documents may be situated. The scope of this CID includes those documents in the possession, custody, or control of Boston Church's general partners, officers, directors, parents, subsidiaries, employees, agents, representatives, or any other person or entity acting in concert with or on behalf of Boston Church, regardless of whether such person or entity

is located at the place of business of Boston Church.

9.      The responses to this CID shall be accompanied by a document identifying the person(s) responsible for preparing each response to this CID and a copy of any instructions prepared by the company relating to the steps taken to respond to this CID. The person(s) preparing each response to this CID shall submit a sworn statement that the information provided is accurate, true, and complete.

10.     If any document requested herein is unobtainable or nonexistent, but the requested information is known to you, a certified sworn statement providing the requested information should accompany the statement given pursuant to paragraph 9 above.

11.     If you wish to discuss possible clarification or amendment of the CID, please contact the following persons within five (5) days of the receipt of the CID. This contact, if made, shall not act as an automatic extension of the production deadline.

> Jamie Katz
> Chief, Public Charities Division
> Office of the Attorney General
> Public Protection Bureau
> One Ashburton Place Rm 1413
> Boston MA 02108

## SECTION B: DEFINITIONS

Whenever used in this Civil Investigative Demand, the following terms shall have the following meanings:

(a)     "Document" means all writings of any kind, including originals and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise (including without limitation correspondence, memoranda, notes, diaries, statistics, letters, telegrams, minutes, newsletters, circulars, agenda, contracts, reports, evaluations, studies, checks, statements, receipts, returns, summaries, pamphlets, books,

prospectuses, interoffice and intra-office communications, offers, proposals, notations of any sort of conversations, telephone calls, meetings or other oral communications, bulletins, printed matter, computer printouts, teletype, telefax, invoices, worksheets (and all drafts, alterations, modifications, changes and amendments of any of the foregoing), graphic or aural records or representations of any kind (including without limitation photographs, charges, graphs, microfiche, microfilm, videotape, records, motion pictures) and electronic mechanical or electric records and representations, of any kind (including without limitation tapes, cassettes, disks and recordings). The term "documents" shall include both hard copies ( on paper) as well as computer generated or stored data in the form of hard drives, disks, and so forth.

(b)    "Boston Church" means Boston Church of the New Jerusalem and/or the Boston Society of the New Jerusalem, Inc. and any their parent corporations, affiliates, subdivisions or subsidiaries, any present or former officer, director, agent, employee, or any other person acting or purporting to act in concert with or on behalf of Boston Church of the New Jerusalem or the Boston Society of the New Jerusalem, Inc., including, but not limited to, independent contractors, sales representatives, consultants, or any other person exercising or purporting to exercise discretion, or making or implementing policy decisions concerning any of the matters covered by the CID.

(c)    "Person" or "persons" includes natural persons, sole proprietorships, firms, partnerships, associations, joint ventures and corporations, and all present and former directors, officers, employees, agents, consultants or other persons acting in concert with, or on behalf of, any of them.

(d)    The term "relate" means embody, refer or relate, in any manner, to the subject of the document request.

(e)    The term "refer or relate to" shall mean to make a statement about, embody, discuss, describe, reflect, identify, deal with, consist of, establish, comprise, list, or in any way pertain, in whole or in part, to the subject of the document request.

(f)    "You" and "your" and "the corporation" means Boston Church as defined above in (b).

## SECTION C : DEMAND

1.  Any and all board minutes, records, memoranda, notes, summaries, correspondence, or other documents relating to decisions, deliberations, conversations, meetings, communications, of any Boston Church board meetings, committee meetings, meetings of leaders, or meetings (whether special or regular) of the Boston Church membership.

2.  Any and all membership lists, records of votes, memoranda, or other documents of the Boston Church relating to the membership of the Boston Church.

3.  Any and all lists, records of votes, memoranda, or other documents relating to the election of officers of the Boston Church.

4.  Any and all financial records, including all checks, check registers, financial logs, bank account records, cancelled checks, bank statements, bank account records, records of accounts payable, records of payments, records of donations, income statements, financial statements, audits, receipts, or other documents relating to the accounts, assets, or financial operation of the Boston Church.

5.  Any and all internal memoranda, notes, records, or other documents relating to any Boston Church funds, accounts, or assets.

6.  Any and all phone records of any telephones, or cell or digital phones, paid for by, or in the possession of, Boston Church.

Issued at Boston, Massachusetts, this 13th day of November, 2003.

THOMAS F. REILLY
ATTORNEY GENERAL

By: _Jamie Katz_

Jamie Katz
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Phone: (617) 727-2200

*Service By Hand and by Certified Mail*
*Return Receipt Requested*

# TODD & WELD LLP

ATTORNEYS AT LAW
28 STATE STREET
BOSTON, MASSACHUSETTS 02109

NICHOLAS B. CARTER
Email:  ncarter@toddweld.com

TELEPHONE: (617) 720-2626
FACSIMILE. (617) 227-5777
www.toddweld.com

December 9, 2004

<u>BY FIRST CLASS MAIL</u>

Judith M. Pietrucha
Great American Insurance Company
Executive Liability Division
1515 Woodfield Road
Claims Department, Suite 500
Schaumburg, IL 60173-5499

Thomas M. Sheffield
Boundas, Skarzynski, Walsh & Black, LLC
200 East Randolph Drive, Suite 7200
Chicago, IL 60601

Re:   Insurer:      Great American Insurance Company
      Insured:      Boston Society of the New Jerusalem, Inc.
      Policy No.:   EPP5796942

Dear Ms. Pietrucha and Mr. Sheffield:

Please be advised that this office represents the Boston Society of the New Jerusalem, Inc. ("BSNJ"), which is an Insured under the above-referenced insurance policy with Great American Insurance Company ("Great American").

I am writing to provide notice to Great American that the Attorney General for the Commonwealth of Massachusetts ("Attorney General") initiated two separate proceedings against BSNJ in Suffolk Superior Court, Commonwealth of Massachusetts. The first proceeding (Civil Action No. 03-5408A) was a Civil Investigative Demand ("CID"), commenced on November 13, 2003, in which the Attorney General sought the production of documents and other information concerning the governance and financial operations of the Church.  A copy of the CID is attached hereto at <u>Exhibit A</u>.

After conducting its investigation, the Attorney General filed a Complaint against BSNJ on or about June 14, 2004 for alleged dissipation of Church assets (Civil Action No. 04-2597) (the "Attorney General's Action").  A copy of the Complaint is attached hereto at <u>Exhibit B</u>.

The Attorney General and BSNJ entered into a Consent Judgment on or about June 15, 2004.  That Consent Judgment was filed and entered by the Court on or about the same day.  A copy of the Consent Judgment is attached hereto as <u>Exhibit C</u>.

The Insured hereby requests coverage under the above-referenced insurance policy in connection with the Attorney General's Claims, including, without limitation, coverage for its Costs of Defense.

Judith M. Pietrucha
Thomas M. Sheffield
December 9, 2004
Page 2


Please let this office know if Great American will agree to provide coverage for the Claims asserted in the CID and the Attorney General's Action.

Thank you for prompt attention and response to this matter.

Very truly yours,

Nicholas B. Carter

NBC/mjm
cc:    Rex Ellis
       Howard M. Cooper, Esq.

**BSWB**

ATTORNEYS AT LAW

CHICAGO
NEW YORK
LONDON

Boundas, Skarzynski, Walsh & Black, LLC

200 East Randolph Drive  Suite 7200  Chicago, Illinois 60601
P: 312 946 4200  F: 312 946 4272  W: www.bswb.com

Thomas M. Sheffield

Direct Dial: 312 946 4274
tsheffield@bswb.com

January 28, 2005

**VIA FACSIMILE    (617) 227-5777
AND U.S. MAIL**

Nicholas Carter, Esq.
Todd & Weld, LLP
28 State Street
Boston, Massachusetts 02109

| Re: | Non Profit Organization Executive Protection and Employment Practices Liability Insurance |
|---|---|
| Policy No.: | EPP5796942 |
| Insured: | BOSTON SOCIETY OF NEW JERUSALEM, INC./BOSTONVIEW CORPORATION |
| Location: | BOSTON, MASSACHUSETTS |
| Claimants: | THE GENERAL CONVENTION OF THE NEW JERUSALEM IN THE U.S.A., ET AL. |
| GAIC Claim No. | 965-584-213-01-1 |
| Our File No.: | 13215 |

Dear Nick:

Thank you for your letter of January 25, 2004. We wish to respond and address, below, the Federal Litigation, the State Attorney General's investigation, and Judge Nolan's fees and costs. Please note that we continue to handle this matter pursuant to a reservation of Great American Insurance Company's rights and defenses under the Policy and the law. We understand the Insureds also reserve their rights.

**The Federal Litigation**

First, as I mentioned to you during our meeting of January 21, 2004, Great American has previously taken the position that the Federal litigation involved in this matter was not afforded coverage, either for indemnity or for a defense, by virtue of the application of the insured-versus-insured exclusion. This remains Great American's position and we have not yet learned anything about this matter that leads the Insurer to conclude that the insured-versus-insured exclusion does not apply to the federal court complaint. It is clear that George Chapin is

JAN 3 1 2005

**BSWB**

Nicholas Carter, Esq.
Todd & Weld, LLP
January 28, 2005
Page 2

included as a plaintiff in each count of the Federal litigation, either derivatively or as a successor in interest to the assets of the local congregation.

You have referred me to Mr. Chapin's deposition transcript to resolve this issue. In particular, your letter states that, "the General Convention (a "non-insured") has been leading, orchestrating and paying for this lawsuit. George Chapin is only involved at the invitation of the General Convention."

Mr. Chapin's deposition transcript also indicates that Mr. Chapin, and others within the Local Congregation, requested that the National and State organizations conduct an investigation regarding the practices of Reverend Ellis. Additionally, Mr. Chapin and others within the Local Congregation approached the Attorney General's office regarding the facts and circumstances involved in this matter. While you contend that Mr. Chapin was merely a figurehead for the litigation commenced by the National and State Organizations, his testimony indicates that he and other members of the Local Congregation were very active in seeking resolution to the issues that troubled them. Mr. Chapin, regardless of whether he is paying the attorneys, has been instrumental in assembling information and pursuing his complaints in the Federal court and with the Attorney General. Great American therefore, respectfully, rejects your suggestion that George Chapin was not a true plaintiff in the Federal Litigation. He is a named plaintiff in every count of the Federal Complaint and the facts indicate that he and other members of the Local Congregation were actively involved in bringing the action.

Great American understands that Massachusetts determines an insurer's duty to defend by comparing the language of the policy with the allegations contained in the complaint. *See Doe v. Liberty Mut. Ins. Co.,* 667 N.E.2d 1149, 1152 (Mass. 1996); *Liberty Mut. Ins. Co. v. SCA Servs., Inc.,* 588 N.E.2d 1346, 1347 (Mass. 1992); *see also Green v. Travelers Insurance Company,* 51 Mass.App.Ct. 1103, 743 N.E.2d 394 (2001); *TransAmerica Insurance Co. v. KMS Patriots, L.P.,* 52 Mass.App.Ct. 189 (2001). "[T]he process is one of envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy." *Liberty Mut.,* 588 N.E.2d at 1347 (citations omitted); *see Sterlite Corp. v. Continental Cas. Co.,* 458 N.E.2d 338, 341 (Mass. 1984). This rule, however, is not unqualified. An insurer must consider "facts that are known or [are] readily knowable by" it in determining its duty to defend. *Desrosiers v. Royal Ins. Co. of Am.,* 468 N.E.2d 625, 627-28 (Mass. 1984); *see Boston Symphony Orchestra v. Commercial Union Ins. Co.,* 545 N.E.2d 1156, 1158 (Mass. 1989).

In this case, Mr. Chapin is a plaintiff with regard to every count. Great American recognizes that "the insurer has a duty to defend the entire lawsuit if it 'has a duty to defend any

**BSWB**

of the underlying counts in the complaint.'" *Dash v. Chicago Ins. Co.*, 2004 WL 1932760 at 8 (D. Mass. 2004) *citing Liberty Mutual v. Metropolitan Life*, 260 F.3d 54 (1st Cir. 2001). More:

> Massachusetts courts have not definitively determined whether an insurer that has a duty to defend a covered, or potentially covered, claim must additionally defend claims alleged in the same suit which clearly are not covered. . . . Although Massachusetts law does not yet provide an answer, the weight of authority places the duty to defend all counts on an insurer which has a duty to defend *at least one count* of the complaint, barring a contrary agreement with the insured." *(emphasis added)*

*Dash v. Chicago Ins. Co.*, 2004 WL 1932760 at 8 (D. Mass. 2004) *citing Aetna Casualty and Surety Co. v. Continental Casualty Co.*, 413 Mass. 730, 732 (1992). However, no duty to defend exists with respect to *any* count, because *every* count is specifically excluded by operation of the insured-versus-insured exclusion. Great American therefore continues to deny coverage for the Federal Complaint.

### The Massachusetts State Attorney General's Investigation

Additionally, I also mentioned to you during our meeting that there was an issue regarding the State Attorney General's investigation into the local congregation. Briefly restated, the issue revolves around whether the Attorney General's investigation constitutes a "Claim" for which coverage would ostensibly be available under the terms of the Policy. As you know, the Policy defines "Claim" as follows:

> "**Claim**" shall mean: (1) any proceeding initiated against an **Insured**, including any appeals therefrom, before (a) any governmental body which is legally authorized to render an enforceable judgment or order for money damages or other relief against such **Insured**, or (b) the Equal Employment Opportunity Commission, or any similar governmental body whose purpose is to address employment practices; or (2) any written demand seeking money damages for a **Wrongful Act**.

An investigation commenced by the Attorney General or other regulatory agency is not a proceeding initiated before a governmental body which is legally authorized to render an enforceable judgment or order for money damages or other relief. The Civil Investigative Demand issued by the Office of the Attorney General on November 13, 2003 does not meet any of the applicable requirements under the Policy's definition of "Claim" and, for that reason, no coverage is a available for that investigation. Like the insured-versus-insured issue discussed above, we have seen nothing in the materials you have forwarded which alter our conclusions

**BSWB**

Nicholas Carter, Esq.
Todd & Weld, LLP
January 28, 2005
Page 4

that the Attorney General's investigation does not properly describe a "Claim" under the Policy for which coverage would be afforded.

In your correspondence of December 9, 2004, you mentioned that on or around June 14, 2004, the Attorney General filed a complaint in the Superior Court for Suffolk County for the limited purpose of having a consent order, which had been negotiated between the Attorney General's office and the Local Congregation (the "Consent Order") It is our understanding that the action in the Superior Court for Suffolk County was thereafter immediately dismissed by the parties, in light of the Consent Order being issued.

The complaint filed in Suffolk County would constitute a "Claim" under the Policy and therefore, Great American accepts that matter for coverage under the Policy. We are reviewing the defense fee invoices related to that action and, once we tabulate those amounts, we will advise you immediately.

Additionally, it is our understanding that the Attorney General's office has recently resumed its investigation of the Local Congregation. We have not seen any materials (e.g. Civil Investigative Demands, subpoenas, or other documents) related to a recent resumption of the investigation and we ask that you provide any such materials at your earliest convenience. If our understanding regarding any of these facts is incorrect, kindly advise us immediately. In light of the facts as we understand them, Great American reserves all its rights, remedies and defenses related to this continued investigation. Of course, for the reasons described above, an investigation by the Attorney General pursuant to a Civil Investigative Demand does not constitute a "Claim" under the Policy. Nevertheless, Great American would like to understand more about the continued investigation to understand whether it bears a significant relationship to the Consent Order proceeding of June of 2004.

Notwithstanding the relationship between the Consent Order proceeding and any continuing investigation, it does not appear that the activities of the Insureds after the Consent Order was entered encompass matters for which coverage is afforded under the Policy. To explain, fees associated with efforts being made to comply with the Consent Order do not constitute Loss under the Policy. Specifically, "Loss" is defined, under Section III (as modified by Endorsement No. 3) as follows:

> **"Loss"** shall mean settlements and judgments, including punitive or exemplary damages or the multiple portion of any multiplied damage award, and subject to the provisions of Section V and Section VI, **Costs of Defense** incurred by the **Insured**, provided always, however, that **Loss** shall not include taxes, criminal or civil fines or penalties imposed by law, or any matter which may be deemed uninsurable under the law pursuant to which the Policy shall be construed. It is

**BSWB**

Nicholas Carter, Esq.
Todd & Weld, LLP
January 28, 2005
Page 5

understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive or exemplary damages or the multiple portion of any multiplied damage award.

The Consent Order prescribes a number of procedures the Local Congregation will follow in order to be in compliance with Massachusetts State law. In particular, the Consent Order provides the following:

1. The Board of Trustees will adopt policies and procedures for addressing conflicts of interest, meeting notice procedures, and related party transactions;

2. The Local Congregation, Bostonview Corporation and/or Harborview shall not transfer or substantially encumber capital assets without notice to the Attorney General;

3. The Board of Trustees shall not convey any asset of the Local Congregation unless certain control procedures are followed and the transaction is aligned with the mission of the Local Congregation;

4. The Board of Trustees and officers of the Local Congregation shall operate in conformance with the by-laws of the Local Congregation;

5. The Local Congregation shall operate in conformance with the requirements of the Internal Revenue Code (particularly 501(c)(3));

6. The Local Congregation shall hire an interim chief financial officer (subject to the approval of the Attorney General) to monitor and control financial and accounting transactions; and

7. The financial officer shall provide the Attorney General with regular (Quarterly) financial reports;

Amounts expended by the Insured in compliance with the Consent Order do not appear to involve "Loss" under the Policy. Those amounts appear to involve administrative procedures and controls which relate directly to the Local Congregation's and Bostonview's daily business operations— none of which properly describe "Loss" to which the Policy would respond. Moreover, the definition of "Loss" specifically excludes amounts for criminal or civil fines or penalties. It appears that the Consent Order involves such a civil penalty. Great American therefore reserves its rights, remedies and defenses with respect to the nature of the investigation or proceedings which have taken place or are taking place since the Consent Order was issued.

**Mr. Nolan's Fees and Costs**

Last Friday in Boston, you and I discussed the role of Jospeh Nolan in the State Litigation. Based on our discussion, it is my understanding the Mr. Nolan was engaged to

**BSWB**

Nicholas Carter, Esq.
Todd & Weld, LLP
January 28, 2005
Page 6

represent the Local Congregation and Bostonview Corporation after Edwards & Angell was terminated by the Insureds. We understand that Mr. Nolan reviewed depositions and other materials in order to prepare for and assist with the motion to dismiss the state court complaint in November 2004. Great American accepts Mr. Nolan's fees as relating to the State Litigation. Great American agrees to reimburse the Insured for reasonable and necessary Costs of Defense the Insured has and will continue to incur with respect to the state court action and appeal. As we discussed, however, we are concerned by the potential for duplication and the lack of detail evidenced in Mr. Nolan's invoices. Please provide additional information regarding his activities in the State Litigation.

With respect to the State Litigation, we have not yet learned whether the plaintiffs have pursued an appeal to the trial court's dismissal of that action. We ask that you kindly provide us with information including any appellate briefs, notices or other materials related to this issue.

In an effort to compromise different views concerning the Policy's coverage, Great American is willing to reimburse reasonable and necessary fees incurred defending the State Action and those incurred in the context of the Consent Order proceedings. We recognize also that you have pressed for coverage for other fees, namely those incurred defending the Federal Action, as well as those incurred responding to the Attorney General's investigation. If you believe a compromise on any of these points is possible, then please share with us your further thoughts. Great American is willing to consider any reasonable compromise you propose. As you know, Great American is currently processing for payment invoices relating to the State Litigation. Once that process has been completed, we will forward that draft to your attention.

In the meantime, should you have any questions or require any additional information, please feel free to contact me at the number listed above.

Very truly yours,

BOUNDAS, SKARZYNSKI WALSH & BLACK, LLC

By:_____
Thomas M. Sheffield

TMS/sw
P:\GREA01\132151\Letters\Carter-Nicholas-04-tms.doc

$EV$ $P$

# TODD & WELD LLP

ATTORNEYS AT LAW
28 STATE STREET
BOSTON, MASSACHUSETTS 02109

NICHOLAS B. CARTER
Email: ncarter@toddweld.com

TELEPHONE: (617) 720-2626
FACSIMILE: (617) 227-5777
www.toddweld.com

January 12, 2005

BY FACSIMILE – (312) 946-4272
AND CERTIFIED MAIL – RETURN RECEIPT REQUESTED

Thomas M. Sheffield
Boundas, Skarzynski, Walsh & Black, LLC
200 East Randolph Drive, Suite 7200
Chicago, IL  60601

Re:    Insurer:       Great American Insurance Company
       Insureds:      Boston Society of the New Jerusalem, Inc./Bostonview Corporation/
                      Thomas Kennedy/Edward MacKenzie
       Policy No.:    EPP5796942
       Claim No.:     965-584-213-01-1
       Your File No.  13215

Dear Tom:

Thank you for your letter of January 7, 2005.  We are disappointed by Great American's refusal not to agree unequivocally and unconditionally to reimburse its insureds – the Boston Society of the New Jerusalem, Inc. ("Church"), Bostonview Corporation ("Bostonview"), Edward MacKenzie ("Mr. MacKenzie") and Thomas Kennedy ("Mr. Kennedy") – for their costs in defending the federal action and the state action.  I am also concerned that Great American has not responded to the request of its insureds for reimbursement of their costs to defend the actions commenced by the Massachusetts Attorney General's Office.  That request was made in a letter to you and Ms. Pietrucha of Great American dated December 9, 2004, and a response would be appreciated.

In light of your January 7 letter, my clients will consider their options, including a lawsuit against Great American for, *inter alia*, breach of contract, unfair and deceptive business practices in violation of M.G.L. c.93A and unfair insurance practices in violation of M.G.L. c. 176D. However, please be advised that my clients and I have been and will remain available at all times to discuss (either in person or by telephone or other means) these insurance coverage issues.

Time is of the essence in getting the insurance coverage issues resolved and, respectfully, neither your firm nor Great American has acted with due speed thus far.  About one month ago, you indicated that you would like to meet in Boston to discuss these coverage issues and you were going to provide me with possible dates after checking with another lawyer at your firm.  I told you that early January was available.  I still have not heard from you with possible dates to

Thomas M. Sheffield
January 12, 2005
Page 2

meet. If you are genuinely interested in meeting, please contact me with dates. I am available in the next two weeks for a meeting in Boston. I am always available to discuss these matters by telephone.

On the merits, I again disagree with your attempts to distinguish the federal and state actions for coverage purposes. In addition to those points already made in my letter to you dated December 16, 2004, I have the following comments. You seem to argue that each claim of the federal complaint is joined by an insured and therefore that the insured v. insured exclusion applies to the federal action. Your argument is plainly wrong as demonstrated best by Count IV, which was clearly not brought by the Church, Bostonview or any insured. In Count IV, a declaration was sought against the Church and Bostonview that its principal asset – the apartment building – no longer belongs to the Church or Bostonview and should be transferred to the General Convention in escrow until a new church, which is affiliated with the General Convention, is formed in Boston. Great American cannot argue in good faith that this claim was brought by or on behalf of the Church or Bostonview. The idea that either would sue to strip itself of the very building it operates from and depends on for income just does not make sense and is not consistent with a reasonable interpretation of the face of the complaint.

Contrary to your contention, George Chapin was not one of the plaintiffs asserting Count IV, which clearly was brought by the General Convention. However, even if we assume, as you state, that he brought Count IV in his individual capacity on behalf of himself "and not on behalf of the local congregation," Great American would still have an obligation to provide insurance coverage because a claim brought by an individual parishioner on behalf of himself does not fall within the scope of the insured v. insured exclusion. Only claims brought "by, or for the benefit of, or at the behest of the Organization [here, the Church]" are supposedly excluded from coverage.

Great American also overlooks the rule against allocating coverage obligations among claims or parties. "Massachusetts courts have unambiguously adopted the broad rule that an insurer has a duty to defend an entire suit in which any claim is even potentially covered." Dash v. Chicago Ins. Co., 2004 U.S. Dist. LEXIS 17309, *34 (D. Mass. 2004) (discussing Aetna Cas. & Surety Co. v. Cont'l Cas. Co., 413 Mass. 730, 732 n. 1 (1992)). Once Great American has an obligation to defend any claims in the complaint, it must defend all the claims in the complaint. There can be no dispute that Great American has always had an obligation to defend the claims asserted by the General Convention, even if another plaintiff (an alleged "insured") asserted the same claims. Thus, under the rule that an insurer must defend all claims as long as any single claim is potentially covered, Great American has always had an obligation to defend the entire suit brought by the General Convention and other plaintiffs.

This letter is further notice to Great American that it is in breach of its duty to defend and its obligations to provide insurance coverage. The Church, Bostonview, Mr. MacKenzie and Mr. Kennedy demand that Great American immediately agree to satisfy its full obligations to reimburse the insureds for their costs of defense. The failure and refusal of Great American to agree to provide complete and unconditional coverage of the insureds' substantial costs of defense has harmed and is continuing to cause harm to the insureds as they have had to incur

Thomas M. Sheffield
January 12, 2005
Page 3

substantial litigation costs without the assistance of the insurance coverage money that they are entitled to after paying premiums for years to Great American.

Since the federal action commenced in February 2004, the legal bills from Edwards & Angell LLP in connection solely with the defense of the federal case were approximately $375,500. Since February 2004, the legal bills from Todd & Weld LLP for the defense of the insureds total approximately $272,782.45. Great American is obligated to reimburse the insureds these amounts. I believe the legal bills itemizing these costs of defense have already been provided to you, but please let me know if you are missing any bills. Great American is aware that the costs to defend the state action are continuing as plaintiffs have given notice of their intent to file an appeal.

Great American is also obligated to reimburse the Church for the additional amounts it paid to Edwards & Angell LLP for legal defense of the Attorney General's actions. Those legal defense costs were at least $216,631.29. I have enclosed the invoices regarding Edwards & Angell's defense of the Attorney General's actions.

If Great American refuses to make prompt and full reimbursement of these amounts, which total at least $865,000, then the Church, Bostonview, Mr. MacKenzie and Mr. Kennedy will commence suit against Great American and will seek to recover multiple damages and attorney's fees pursuant to G.L. c. 93A, and G.L. 176D.

Please be advised that we are reviewing Great American's proposed Interim Funding and Reservation of Rights Agreement. Based on a very preliminary review of the Agreement, I have several serious concerns about it. Most significantly, Great American is only agreeing to advance the costs of defense in the state litigation, not the federal litigation or the defense of the Attorney General's action, and Great American reserves all of its rights to demand repayment of any amounts advanced. In any event, after we complete our review of the Agreement, I will let you know whether my clients will sign this Agreement or some modification of it. In that regard, it would be helpful if you would forward a copy of the Litigation Billing Guidelines referenced in the proposed Agreement; they were not attached to the Agreement provided to me.

I look forward to hearing from you promptly.

Very truly yours,

Nicholas B. Carter

NBC/mjm
Enclosures (by certified mail)
cc:     Rex Ellis, Chairman of the Board of Trustees of the Boston Society of the New
        Jerusalem, Inc., and Chairman of the Board of Directors of Bostonview Corporation

*by sheriff. No Motion for notice*
*Special Process Server*    5/13/05
*filed or Allowed* ·

4

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss:

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

|  |  |
|---|---|
| BOSTON SOCIETY OF THE NEW JERUSALEM, INCORPORATED , BOSTONVIEW CORPORATION, EDWARD MACKENZIE, and THOMAS KENNEDY,<br><br>    Plaintiffs,<br><br>v.<br><br>GREAT AMERICAN INSURANCE COMPANY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION
NO. 05-0536

MICHAEL JOSEPH DONOVAN
CLERK/MAGISTRATE

2005 MAR 10  P 4: 42

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE

## PLAINTIFFS' REQUEST FOR ENTRY OF DEFAULT

Pursuant to Massachusetts Rule of Civil Procedure 55(a), Plaintiffs Boston Society
of the New Jerusalem, Inc. ("Church"), Bostonview Corporation ("Bostonview"), Edward
MacKenzie ("MacKenzie") and Thomas Kennedy ("Kennedy") (collectively "Plaintiffs")
hereby request the entry of default against Great American Insurance Company ("Great
American").    As grounds for this request, Plaintiffs submit the Affidavit of Nicholas B.
Carter, Esq. and state as follows:

1.    On February 15, 2005, Plaintiffs served by hand delivery an original and
one copy of the Summons and two copies of the Complaint with the appropriate fee of
$6.00, upon the Commissioner of Insurance for the Commonwealth of Massachusetts,
One South Station, Boston, Massachusetts.

2.    Great American is an insurance company that conducts its insurance business in the Commonwealth of Massachusetts, and the Commissioner of Insurance is the duly authorized agent for service of process upon foreign insurance companies such as Great American.

3.    Pursuant to Massachusetts Rule of Civil Procedure 12, Great American's answer to the Complaint was required to be served upon Plaintiffs' attorney, Nicholas B. Carter, Esq., no later than Monday, March 7, 2005.

4.    As of today's date, Great American has not served its answer or responsive pleading upon Plaintiffs' counsel.

5.    Pursuant to Massachusetts Rules of Civil Procedure 55(a), the clerk shall enter default against Great American.

WHEREFORE, Plaintiffs request that the Clerk enter default against Great American as required pursuant to Massachusetts Rules of Civil Procedure 55(a).

Respectfully submitted,

BOSTON SOCIETY OF THE NEW
JERUSALEM, INC., BOSTONVIEW
CORPORATION, EDWARD
MACKENZIE, and THOMAS KENNEDY,

By their attorneys,

Howard M. Cooper (BBO #543842)
Nicholas B. Carter (BBO #561147)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA  02109
(617) 720-2626

I HEREBY ATTEST AND CERTIFY ON
APRIL 13, 2005, THAT THE
FORECOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:
ASSISTANT CLERK

Dated: March 10, 2005

2

| CIVIL ACTION COVER SHEET | 05-0536 | Trial Court of Massachusetts Superior Court Department County:_____ |
|---|---|---|

PLAINTIFF(S): BOSTON SOCIETY OF NEW JERUSALEM, INCORPORATED, BOSTONVIEW CORPORATION, EDWARD MACKENZIE and THOMAS KENNEDY.

DEFENDANT(S):
GREAT AMERICAN INSURANCE COMPANY

ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE
Nicholas B. Carter, Esq.
TODD & WELD LLP
28 State Street, Boston, MA 02109 (617)720-2626
Board of Bar Overseers number: 561147

ATTORNEY (if known)

**Origin code and track designation**

Place an x in one box only:
- [X] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

CODE NO.   TYPE OF ACTION (specify)   TRACK   IS THIS A JURY CASE?
A99   Breach of Insurance contract; violation of C.93A/176D   ( F )   ( X )Yes   ( )No

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses
2. Total Doctor expenses .................................... $.........
3. Total chiropractic expenses .............................. $.........
4. Total physical therapy expenses .......................... $.........
5. Total other expenses (describe) .......................... $.........
                                                    Subtotal $.........
B. Documented lost wages and compensation to date
C. Documented property damages to date ........................ $.........
D. Reasonably anticipated future medical and hospital expenses ... $.........
E. Reasonably anticipated lost wages ......................... $.........
F. Other documented items of damages (describe) ................ $.........

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)
                                                    $.........

                                                    $.........
                                            TOTAL $.........

**CONTRACT CLAIMS**
(Attach additional sheets as necessary)
Provide a detailed description of claim(s):

Breach of insurance agreement and bad faith claims handling in violation of G.L. c.93A and c.176D.

                                                    in excess of
                                            TOTAL $ 800,000

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____   DATE: 2/11/05

AOTC-6 mtcu05-11/99
A.O.S.C. 1-2000

---

I HEREBY ATTEST AND CERTIFY ON

**APRIL 13, 2005**, THAT THE

**FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.**

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: _____

ASSISTANT CLERK.

**3**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss:

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

|  |  |
|---|---|
| BOSTON SOCIETY OF THE NEW JERUSALEM, INCORPORATED , BOSTONVIEW CORPORATION, EDWARD MACKENZIE, and THOMAS KENNEDY,<br><br>    Plaintiffs,<br><br>v.<br><br>GREAT AMERICAN INSURANCE COMPANY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION
NO. 05-0536

## AFFIDAVIT OF NICHOLAS B. CARTER, ESQ.

Nicholas B. Carter, hereby deposes and states as follows:

1.      I am an attorney at the law firm of Todd & Weld LLP, which represents

Plaintiffs Boston Society of the New Jerusalem, Inc. ("Church"), Bostonview Corporation

("Bostonview"), Edward MacKenzie ("MacKenzie") and Thomas Kennedy ("Kennedy")

(collectively "Plaintiffs") in the above-referenced matter.

2.      On February 15, 2005, I caused Suvalle Jodrey & Associates, certified

Massachusetts constables, to serve by hand delivery an original and one copy of the

Summons and two copies of the Complaint in the above-referenced matter upon the

Commissioner of Insurance for the Commonwealth of Massachusetts, One South Station,

Boston, Massachusetts. The appropriate fee of $6.00 was also provided.

3.    I thereafter filed an original Return of Service with this Court. A true and accurate copy of the Return of Service is attached hereto for the Court's convenience.

4.    Great American is an insurance company that conducts its insurance business in the Commonwealth of Massachusetts, and the Commissioner of Insurance is the duly authorized agent for service of process upon foreign insurance companies such as Great American.

5.    Pursuant to Massachusetts Rules of Civil Procedure 12, Great American's answer to the Complaint was required to be served upon me, no later than Monday, March 7, 2005.

6.    As of today's date, Great American has not served its answer or responsive pleading upon me.

Signed under the pains and penalties of perjury this 10th day of March, 2005.

Nicholas B. Carter

I HEREBY ATTEST AND CERTIFY ON

APRIL 13, 2005 , THAT THE

FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:

ASSISTANT CLERK

2

# Commonwealth of Massachusetts



SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

BOSTON SOCIETY OF THE NEW JERUSALEM,
INCORPORATED, BOSTONVIEW CORPORATION,
EDWARD MACKENZIE, AND THOMAS KENNEDY,                , Plaintiff(s)

No. 05-0536

v.

GREAT AMERICAN INSURANCE COMPANY                , Defendant(s)

## SUMMONS

To the above-named Defendant:

GREAT AMERICAN INSURANCE COMPANY
c/o Commissioner, Division of Insurance, One South Stat
Boston, MA  02110 (as attorney for Great American Insur
Companies, 580 Walnut Street, Cincinnati, Ohio)

You are hereby summoned and required to serve upon Nicholas B. Carter, Esq.
TODD & WELD LLP

plaintiff's attorney, whose address is 28 State Street, Boston, MA  02109             , an answer to
the complaint which is herewith served upon you, within 20 days after service of this summons upon you,
exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the
relief demanded in the complaint. You are also required to file your answer to the complaint in the office
of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable
time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which
you may have against the plaintiff which arises out of the transaction or occurrence that is the subject
matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Barbara J. Rouse ~~Suzanne V. DelVecchio~~, Esquire, at Boston, the 14th day of
February                , in the year of our Lord two thousand and five .

*Michael Joseph Donovan*

Clerk/Magistrate

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.

2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT — (2) MOTOR VEHICLE TORT — (3) CONTRACT — (4) EQUITABLE RELIEF — (5) OTHER

FORM CIV.P. 1 3rd Rev.

# THE COMMONWEALTH OF MASSACHUSETTS

OFFICER'S RETURN: ___SUFFOLK__ SS.    ___BOSTON, MA.___    __February 15, 2005__

I THIS DAY, CERTIFY AND RETURN THAT I HAVE SERVED THE WITHIN

_____ SUMMONS AND COMPLAINT _____

UPON THE WITHIN-NAMED __DEFENDANT, GREAT AMERICAN INSURANCE COMPANY__

BY HANDING /2 SETS OF TRUE AND ATTESTED COPIES THEREOF ~~TO~~

__TOGETHER WITH THEIR FEE OF $6.00 TO MS. CAREY LUCKEY, ADMINISTRATIVE ASSISTANT FOR COMMISSIONER__

~~ITS~~   __OF INSURANCE FOR COMMONWEALTH OF MA., ITS__   ~~AND~~ DULY AUTHORIZED AGENT.

SAID SERVICE WAS MADE AT

_____ __ONE SOUTH STATION, BOSTON__ _____ , MASSACHUSETTS.

FEE: ___45.00___

Constable ~~and~~
~~Court Appointed Process Server~~

ALSO SERVED:

BOSTON
In Hand Service
Service                          $ 30.00
Copy                             $  5.00
Postage & Handling               $   -
Travel & Motor Vehicle           $ 10.00

          TOTAL                  $ 45.00

All Municipal Fees included
pursuant to Municipal Tax Relief
Act signed in to Law, July 21, 2003
House Bill 4003 Section 20 Chapter 41