UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BOSTON SOCIETY OF THE NEW JERUSALEM, INCORPORATED , BOSTONVIEW  CORPORATION, EDWARD MACKENZIE, and THOMAS KENNEDY,  Plaintiffs/Counterclaim Defendants, v.  GREAT AMERICAN INSURANCE COMPANY,  Defendant/Counterclaim Plaintiff. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. NO. 05-CV-10494-WGY |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

### Introduction

As a matter of law and by its own admission, Defendant Great American Insurance

Company ("Great American") had a duty to defend three lawsuits brought against Plaintiffs

Boston Society of the New Jerusalem, Inc. (the "Church"), the Church's subsidiary, Bostonview

Corp. ("Bostonview"), and two of the Church's and Bostonview's officers, directors, trustees

and/or employees, Edward MacKenzie ("MacKenzie") and Thomas Kennedy

("Kennedy")(collectively, "Plaintiffs" or "Insureds").  The three lawsuits stemmed in large part

from the Church's decision in November 2003 to disaffiliate from the voluntary national and

state organizations of Swedenborgian churches, respectively, The General Convention of the

New Jerusalem in the United States of America, Inc. ("General Convention"), and The

Massachusetts Association of the New Jerusalem ("Swedenborgian") ("Massachusetts

Association").

The Church and Bostonview had purchased a non-profit organization and executive practices liability policy from Great American that provided for a defense against all claims made against them, MacKenzie, Kennedy, and any of their other officers, directors, trustees or employees for, *inter alia*, any act, misstatement, misleading statement or breach of fiduciary duty by them in the course of conducting the affairs of the Church or Bostonview. The decision to disaffiliate, which resulted in two lawsuits spearheaded by the General Convention to seize all the Church's assets and a lawsuit brought by the Massachusetts Attorney General's Office ("Attorney General") to ensure that Church assets were not dissipated, certainly constituted a covered "act" that obligated Great American to provide a defense to these lawsuits. Great American's unjustifiable refusal to provide that defense forced Plaintiffs to provide their own defense, at a cost of $1 million during the last two years. The Church and the other Plaintiffs are now compelled to bring this action – at additional expense – to recover their defense costs.

Two of the lawsuits – the one commenced in this Court which was dismissed (the "Federal Lawsuit") and the one that followed in the Massachusetts Superior Court (the "State Lawsuit") – contained nearly identical claims and allegations. Importantly, they each contained the same claim, verbatim, by the General Convention seeking a declaratory judgment that the General Convention was entitled to seize all of the Church's property because of the Church's disaffiliation. That claim indisputably triggered Great American's defense obligation as the General Convention is a separate corporate entity with no legal authority over or relationship to the Church. It is not an "insured" party under the Church's policy and, hence, the "insured v. insured" exclusion, which Great American has tried to rely on to avoid its coverage obligations, has no applicability.

On this basis, Great American acknowledged its obligation to defend the State Lawsuit.

Yet in a plain act of bad faith, it has steadfastly refused to defend the Federal Lawsuit, even

though the Federal Lawsuit contained the identical claim by the General Convention. Great

American's refusal to defend the Federal Lawsuit, which was far more expensive in terms of

defense costs than the State Lawsuit, can only be deemed a willful and unsupportable attempt to

sidestep its coverage obligations. Consistent with its bad faith claims handling practices to date

and despite its agreement to do so, Great American has yet to pay a dime for the defense of the

State Lawsuit, seven months after acknowledging its obligation.

Based on false allegations about purported mismanagement of the Church which were

reported to the Attorney General by the few disgruntled parishioners who were unhappy with the

decision to disaffiliate, the Attorney General brought a (third) lawsuit against the Church in

Massachusetts Superior Court in his role as regulator of public charities (the "Attorney General's

Action"). The Attorney General's Action was commenced under a special statute, Mass. Gen.

Laws, ch. 12, § 8H, and differed procedurally from a typical case in that compulsory discovery,

commenced by the initial Civil Investigative Demand ("CID"), preceded the filing of the

Complaint. Yet the CID and the compulsory discovery that ensued were integral to and the

necessary precursor of the Complaint and the Consent Judgment, which ultimately was entered.

Nonetheless, Great American has sought to differentiate the compulsory discovery from the

entry of the Complaint and Consent Judgment, admitting that it had an obligation to defend

against the Complaint and the Consent Judgment (which were ministerial actions at the tail end

of the process), but refusing to cover the compulsory discovery and the negotiations over the

terms of the Consent Judgment. Great American's refusal to cover these latter costs, which

constituted the bulk of the Church's defense costs in the Attorney General's Action, constitutes bad faith claims handling.

Great American has either refused to provide a defense or, after agreeing to defend, has refused to fulfill its defense obligations. Plaintiffs are now forced to bring this action to recover their defense costs. There are no disputed material facts on any of these claims and Plaintiffs are entitled to summary judgment on all counts as a matter of law. Because Great American's bad faith is also established on the undisputed record, Great American is also entitled to summary judgment on its claim for unfair and deceptive claims handling practices under Mass. Gen. Laws, ch. 176D and 93A, §§ 2 and 9.

### Undisputed Facts

#### A.    The Policy

Great American issued an insurance policy covering the Church, Bostonview and their trustees, directors, officers and employees for claims made during the period November 4, 2003 to November 4, 2004 (the "Policy"). Affidavit of Rex Ellis ("Ellis Aff."), ¶ 4. A copy of the Policy is attached as Exhibit 1 to Plaintiffs' Local Rule 56.1 Statement, filed with this Motion.[1] The Policy provides as follows:

> If during the Policy Period . . . any Claim is made against an Insured for a
> Wrongful Act, the Insurer shall pay on their behalf Loss resulting from such
> Claim. The Insurer has the right and duty to defend any Claim to which this
> insurance applies, even if the allegations of the Claim are groundless, false or
> fraudulent.

Ex. 1, § I.

Pursuant to the Policy, a Claim is "any proceeding initiated against an Insured, including any appeals therefrom, before … any governmental body which is legally authorized to render an

---

[1] Subsequent citations to "Ex. __" are exhibits to Plaintiffs' L.R. Rule 56.1 Statement.

enforceable judgment ... or other relief against such Insured." Ex. 1, § III.K. A Wrongful Act

includes "any actual or alleged error, misstatement, misleading statement, act or omission,

neglect or breach of duty ... by the Organization, and/or Subsidiary, and/or any Insured Persons

acting in their capacity with the Organization or a Subsidiary." Ex. 1, § III.E.

The Church and Bostonview are both named as the insured "Organization" in the Policy.

Ex. 1, § III.A. MacKenzie and Kennedy are "Insured Persons." Ex. 1, § III.C.

**B.    The Church's Decision To Disaffiliate**

The Church is a non-profit charitable corporation organized under the laws of

Massachusetts more than a century ago to follow the teachings of Emanuel Swedenborg. Ellis

Aff., ¶ 2. See Ex. 2, ¶¶ 1, 9, 18, 19. During the Policy period, the Church owned all of the stock

of Bostonview, a subsidiary corporation that holds title to the Church's real estate. Ellis Aff., ¶

4. During the same period, MacKenzie was an officer of the Church and a director of

Bostonview, and Kennedy was a trustee of the Church and a director of Bostonview. Id., ¶¶ 4-5.

During the spring and early fall of 2003, after an overwhelming majority of Church

members elected new leaders as the Church's and Bostonview's officers, trustees and directors, a

handful of older parishioners, who either were voted out of office or who supported the former

officeholders, became severely dissatisfied because they had lost control of the Church to a new

generation of parishioners. Id., ¶ 6. Some of these disgruntled members, including George

Chapin ("Chapin"), contacted the leaders of the General Convention and the Massachusetts

Association[2] and falsely reported that Rev. G. Steven Ellis, who had been the Church's minister

since 1984, was mentally unstable and that MacKenzie and Kennedy were purportedly

exercising control over him for wrongful purposes. Id., ¶ 7; see Ex. 2, ¶¶ 28, 29.

---

[2] The General Convention and the Massachusetts Association are voluntary associations of Swedenborgian churches in, respectively, the United States and Massachusetts  Ellis Aff., ¶ 12.

The General Convention launched an "investigation" of Rev. Ellis and gave him an ultimatum that required him to resign or to exercise his ministerial duties under the authority and daily supervision of the General Convention. Ellis Aff., ¶ 8. See Ex. 2, ¶ 91, 94. Rev. Ellis, with nearly unanimous support from the members of the Church, spearheaded an effort to disaffiliate from the General Convention. Ellis Aff., ¶ 9. In November 2003, a motion to disaffiliate from the General Convention was overwhelmingly approved by the members, who voted 54 to 7 in favor of disaffiliation. Id., ¶ 10.

Unlike the structure in hierarchical religious denominations, neither the General Convention nor the Massachusetts Association has any legal, ecclesiastical or financial control over the Church. Id., ¶ 11. As a result, the disaffiliation had no effect on the Church's governance, finances, or religious mission. Id.

## C.    The Federal Lawsuit And Great American's Denial Of Coverage

On March 2, 2004, the General Convention, the Association, and Chapin (together, the "underlying plaintiffs") filed the Federal Lawsuit in this Court against the Insureds, Civil Action No. 04-10419 WGY. Ex. 2. The Federal Lawsuit was a vehicle for the General Convention to attempt wrongfully to acquire control of all of the Church's assets, including its religious sanctuary, administrative offices and the apartment building which has an estimated value of approximately $30 million.[3] Ex. 2 (Count IV); Ellis Aff., ¶ 3. The General Convention brought this claim based on a plain and deliberately self-serving misconstruction of one (former) Church by-law. Ex. 2, (Count IV); Ex. 11, p. 2 (by-law text); Ellis Aff., ¶¶ 14-15 (members voted to

---

[3] In the underlying plaintiffs' appeal of the Superior Court's decision to discuss the State Lawsuit, they admit that "the gravamen" of their suit is this property claim by the General Convention. Ex. 26, p.43. They also allege that a key issue is whether the Church properly admitted new members (id.), but even in the Complaint (Count IV of the Federal Lawsuit and Count I of the State Lawsuit) the General Convention tellingly admitted that it was prepared to abandon its challenge to the Church's membership process, if the Court ruled in its favor on its claim to the Church's property. Their goal here is clearly the Church's property.

6

remove by-law). Chapin brought virtually all of the remaining claims against MacKenzie and

Kennedy for alleged fraud and misappropriation of Church assets. Ex. 2 (Counts I - III, VI - IX).

All of Chapin's claims were brought purportedly "on behalf of himself, the Church, Bostonview,

and all other persons similarly situated, as members of the Church and beneficial holders of stock

in Bostonview." Id. Chapin was not a party, either individually or "derivatively," to the General

Convention's property claim. Id. (Count IV).

The Church gave notice of the Federal Lawsuit to its insurance agent in a letter dated

March 1, 2004. Ex. 3. Great American responded in a letter dated March 25, 2004, stating that

it was denying coverage or a defense. Ex. 4. In attempting to explain its coverage decision,

Great American stated:

> it [coverage] is specifically excluded by the Insured v. Insured
> clause of the Great American policy. In that regard, I direct you to
> Section IV.H. of the policy which states:
>
> "This policy does not apply to any claim made against any Insured:
>
> H. *by, or for the benefit of, or at the behest of the Organization* or
> a Subsidiary or any entity which controls, is controlled by, or is
> under common control with the Organization or a Subsidiary, or
> any person or entity which succeeds to the interest of the
> Organization or Subsidiary; (emphasis added.)"

Ex. 4. Great American went on to state, incorrectly, that:

> "Each and every count of the complaint states that it is being brought
> by the plaintiff, George Chapin, on behalf of himself, the Church,
> (our Insured), Bostonview, (an Insured entity of the Church), and all
> others similarly situated, as members of the Church and beneficial
> stockholders of Bostonview."

Id.

The Insureds pointed out the deficiencies in Great American's disclaimer of coverage in a

letter dated June 9, 2004, noting in part that Chapin clearly did not join the General Convention's

property claim. Ex. 6. Despite this fatal weakness in its coverage position, Great American persisted in denying the coverage to which the Insureds were entitled. Accordingly, the Insureds were forced to retain counsel to defend themselves in the Federal Lawsuit. The Church and Bostonview retained Edwards & Angell LLP, and MacKenzie and Kennedy retained Todd & Weld, LLP. Ellis Aff., ¶ 17.

This Court placed the case on an expedited discovery schedule during which thousands of documents were produced and reviewed and more than a dozen (multi-day) depositions were taken. This Court ultimately dismissed the RICO claims finding that the Complaint, as a matter of law, failed to allege an actionable pattern of racketeering activity. Ex. 7. The Court found there was no past pattern of racketeering activity and, given the entry of the Consent Judgment and the Attorney General's active oversight of the Church, there could be no basis for a claim of future racketeering activity. Id. Accordingly, this Court remanded the remaining state law claims to the Massachusetts Superior Court in an Order dated July 20, 2004. Id.

### D.    The State Lawsuit And Great American's Acknowledgment of Coverage

The underlying plaintiffs then commenced the State Lawsuit on or about August 2, 2004 and shortly thereafter filed an Amended Complaint. Ex. 8. Other than the re-ordering of some claims, the Amended Complaint was virtually identical to the Complaint in the Federal Lawsuit. Compare Ex. 2, ¶¶ 111-186 with Ex.8, ¶¶ 111-202. In particular, the General Convention's declaratory judgment claim to gain control of the Church's property remained identical in Count I of the State Lawsuit. Ex. 8 (Count I). The only substantive difference is that the General Convention added claims for conversion and unjust enrichment against MacKenzie and Kennedy to the State Lawsuit (Counts II and III), and purported to join Chapin's claims for breach of fiduciary duty, fraud, and Chapter 93A (Counts V-VIII). Ex. 8. The Church retained new

8

counsel (Joseph R. Nolan, Esq.) during the pendency of the State Lawsuit. Ellis Aff., ¶ 18.
MacKenzie and Kennedy continued to be represented by Todd & Weld LLP. Id.

In a letter dated September 10, 2004, the Insureds renewed their request for Great
American to provide coverage and specifically requested a defense in the State Lawsuit. Ex. 11.
Three months later, in a letter dated December 15, 2004, Great American agreed to defend the
Insureds against the State Lawsuit under a reservation of rights. Ex. 13. Great American noted
that "it appears that some of the counts set forth in the amended state court complaint appear to
now have been brought exclusively by the [General Convention and Massachusetts
Association]." Id., p. 4. Incredibly, Great American did not revisit its earlier decision to deny
coverage of the Federal Lawsuit, even though the General Convention brought the same property
claim on behalf of itself in that lawsuit. Ex. 13.

The timing of Great American's decision to provide a defense to the State Lawsuit was
not coincidental. The Superior Court (Brady, J.) had dismissed the State Lawsuit just one week
earlier in an Order dated December 7, 2004. Ex. 11. Thus, Great American's financial exposure
arising from the State Lawsuit was likely to be very limited.

### E.    The Attorney General's Action And Great American's Denial In Part And Acknowledgment In Part Of Coverage

While the General Convention and the other underlying plaintiffs pursued their civil
claims against the Church and the other Insureds, the Attorney General pursued its own legal
action against the Church. Prior to the underlying plaintiffs bringing their meritless claims in the
Federal Lawsuit, the same few disgruntled Church members, including Chapin, brought their
unfounded complaints to the Attorney General. Ellis Aff., ¶ 16. As a result of their reckless and
unfounded allegations, the Public Charities Division of the Attorney General's Office ("Attorney

9

General") initiated an action pursuant to its authority under Mass. Gen. Laws, ch. 12, § 8H, to investigate the financial operations of the Church. Ex. 19.

On November 13, 2003, the Attorney General obtained court approval to serve a CID on the Church. Id. As required, the Church thereafter produced all of its responsive records to the Attorney General and responded to numerous follow-up inquiries. Ellis Aff., ¶ 16. After approximately eight months of discovery and negotiations between the Church and the Attorney General, the parties reached an agreement on the terms of the Consent Judgment. Ex. 21; Ellis Aff., ¶ 16.

As a result, on or about June 14, 2004, the Attorney General filed a Complaint and the Consent Judgment, which the Church's Trustees endorsed. Ex. 20, 21. Two days later on June 16, 2004, the Massachusetts Superior Court endorsed the Consent Judgment. Ex. 21. Significantly, the Consent Judgment states that the Attorney General's Action came before the Superior Court "first through Civil Investigative Demand issued by the Department of the Attorney General pursuant to Mass. Gen. Laws, ch. 12, § 8H and served upon the defendants and others in Suffolk Civil Action 03-5408A." Id. (emphasis supplied).

On December 9, 2004, the Church gave notice of the Attorney General's Action to Great American and requested a defense. Ex. 22. In a letter dated January 20, 2005, Great American acknowledged receipt of the notice, Ex. 17, and in a letter dated January 28, 2005, disclaimed coverage for nearly all parts of the Attorney General's Action. Ex. 18. Great American agreed to cover only the negligible defense costs incurred during the two-day period between the filing of the Complaint and entry of the Consent Judgment. Id., p. 4. Despite numerous entreaties from Insured's counsel, Great American has refused to reconsider its position on defense of the Attorney General's Action or the Federal Lawsuit. Ex. 10, 12, 14, 16.

### F.    Defense Costs

The Insureds have tendered to Great American their invoices reflecting attorneys' fees and costs to defend the Federal and State Lawsuits and the Attorney General's Action in letters dated May 13 and December 16, 2004, and January 12, 2005. Ex. 5, 14, 16. The defense of the Federal Lawsuit totaled $536,747.54; the defense of the State Lawsuit totals $192,679.19 to date; and the defense of the Attorney General's Action totaled $272,697.78 through the entry of the Consent Judgment. Ellis Aff., ¶ 19; Ex. 23, 24, 25. Despite Great American's agreement to reimburse defense costs in the State Lawsuit, it has failed and refused to pay any of the Insured's legal expenses. Ex. 15, 17, 18; Ellis Aff., ¶ 20. Great American has also failed and refused to change its position regarding defense of the Federal Lawsuit, which contained precisely the same claim that even Great American acknowledges is a trigger for its duty to defend in the State Lawsuit. Ex. 15, 18. Out of pocket $1 million, the Insureds have been forced to bring this action.

### Argument

### I.    Summary Judgment Is Appropriate To Determine An Insurer's Duty To Defend.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is appropriate because no material facts are in dispute and the interpretation of an insurance policy is a matter of law for the Court. U.S. Liab. Ins. Co. v. Bourbeau, 49 F.3d 786, 787 (1st Cir. 1995).

## II.    Insurance Policies Are To Be Interpreted Broadly In Determining An Insurer's Duty To Defend.

The Massachusetts Supreme Judicial Court[4] has described how the scope of an insurer's

duty to defend is to be determined as follows:

> The question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense. The scope of an insurer's duty to defend is based on the facts alleged in the complaint and those facts which are known to the insurer. [5]

Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 394, 788 N.E.2d 522 (2003)

(internal quotation marks, citations, and alterations omitted).

The insurer must undertake the defense of its insured "even if the claim is baseless, as 'it

is the claim which determines the insurer's duty to defend.'" Mt. Airy Ins. Co. v. Greenbaum,

127 F.3d 15, 19 (1st Cir.1997) (quoting Sterilite Corp. v. Continental Cas. Co., 17 Mass. App.

Ct. 316, 324 n. 17, 458 N.E.2d 338, 344 (1983)).   "What is not permitted is that an insurer shall

escape its duty to defend the insured against a liability arising on the face of the complaint and

policy, by dint of its own assertion that there is no coverage . . . ." Sterilite, 17 Mass. App. Ct. at

324, 458 N.E.2d at 344. "[T]he process is one of envisaging what kinds of losses may be proved

as lying within the range of the allegations of the complaint, and then seeing whether any such

---

[4] Although the parties do not likely dispute the issue and the Policy does not contain a choice of law provision, the Court sitting in this diversity action applies Massachusetts substantive law to the claims at issue because the Insureds are all located in Massachusetts and all relevant events occurred in Massachusetts. See, e.g., Millipore Corp. v. Travelers Indem. Co., 115 F.3d 21, 29, 30 (1st Cir. 1997).

[5] Notably, facts outside the complaint known to the insurer can be used to bring the claim within the scope of coverage, Boston Symphony Orchestra v. Commercial Union Ins. Co., 406 Mass. 7, 10-11, 545 N.E.2d 1156, 1158 (1989), but such facts cannot be used to negate the duty to defend. Millipore Corp., 115 F.3d at 35-36 (citing Boston Symphony Orchestra, 406 Mass. at 10-11, 545 N.E.2d at 1158, and quoting Nashua v. Liberty Mut. Ins. Co., 1997 WL 89163 (Mass. Super. Ct., Feb. 18, 1997) ("Where a complaint is susceptible on its face of a reading that brings the claim within the policy, the insurer cannot rely on facts outside the complaint to justify a unilateral refusal to defend.")). See also Terrio v. McDonough, 16 Mass. App. Ct. 163, 168, 450 N.E.2d 190, 193 (1983).

loss fits the expectation of protective insurance reasonably generated by the terms of the policy."
Sterilite, 17 Mass. App. Ct. at 318, 458 N.E.2d at 340 (emphasis added). "[T]he underlying
complaint need only show, through general allegations, a possibility that the liability claim falls
within the insurance coverage." Id., 17 Mass. App. Ct. at 319, 458 N.E.2d at 341 (quotations and
citation omitted) (emphasis added). As such, the insurer must undertake the defense of the entire
claim whenever there is a possibility that one or more of the allegations could possibly be
covered. Id. [6]

The Court also "consider[s] what an objectively reasonable insured, reading the relevant
policy language, would expect to be covered." Ruggiero Ambulance Serv., Inc. v. Nat'l Grange
Mut. Ins. Co., 430 Mass. 794, 798, 724 N.E.2d 295, 299 (2000) (quoting Hakim v.
Massachusetts Insurers' Insolvency Fund, 424 Mass. 277, 285, 675 N.E.2d 1161 (1997))
(internal quotations omitted); see also MacLean v. Hingham Mut. Fire Ins. Co., 51 Mass. App.
Ct. 870, 874 n. 4, 750 N.E.2d 494, 497 (2001). When more than one interpretation of the policy
is possible, the interpretation most favorable to the insured prevails. Hazen Paper Co. v. United
States Fid. & Guar. Co., 407 Mass. 689, 700, 555 N.E.2d 576, 583 (1990). Where there is a
doubt about policy exclusions, the law is clear that "exclusionary policy terms and doubts
created by any potentially ambiguous words in a policy are to be strictly construed against the
insurer." MacLean, 51 Mass. App. Ct. at 875 n. 5, 750 N.E.2d at 498; see Preferred Mut. Ins.
Co. v. Gamache, 426 Mass. 93, 94, 686 N.E.2d 989, 990 (1997). The policy that an insurer will
defend its insured against any claim with even "a possibility" of coverage is so well established
that the insured "is entitled to attorney's fees, regardless of which party instituted the declaratory
judgment action, whenever the insured establishes that the insurer violated its duty to defend."

[6] The insured bears the initial burden of proving coverage under the insuring clause. The burden then shifts to the
insurer to prove application of a specific exclusion. Camp, Dresser & McKee, Inc. v. Home Ins. Co., 30 Mass. App.
Ct. 318, 321, 568 N.E.2d 631 (1991).

Rubenstein v. Royal Ins. Co. of Am., 429 Mass. 355, 358, 708 N.E.2d 639, 642 (1999); Sterilite,

17 Mass. App. Ct. at 319, 458 N.E.2d at 341. See Hanover Ins. Co. v. Golden, 436 Mass. 584,

588, 766 N.E.2d 838, 842 (2002) (insured entitled to legal fees required to establish insurer's

duty to defend whether or not insurer acted in bad faith).

"[I]n Massachusetts, as elsewhere, [Great American] must defend the entire lawsuit if it

has a duty to defend any of the underlying counts in the complaint." Liberty Mut. Ins. Co. v.

Metropolitan Life Ins. Co., 260 F.3d 54, 63 (1st Cir. 2001), citing Mt. Airy, 127 F.3d at 19;

Aetna Cas. & Sur. Co. v. Cont'l Cas. Co., 413 Mass. 730, 604 N.E.2d 30, 32 n.1 (1992). See

also  Palermo v. Fireman's Fund Ins. Co., 42 Mass. App. Ct. 283, 289, 676 N.E.2d 1158, 1163

(1997). "Massachusetts courts have unambiguously adopted the broad rule that an insurer has a

duty to defend an entire lawsuit in which any claim is even potentially covered." Dash v.

Chicago Ins. Co., 2004 U.S. Dist. LEXIS 17309, *34-35 (D. Mass. August 23, 2004) (copy

attached as Ex. 27 to Plaintiffs' L.R. 56.1 Statement).

### III.    Great American Already Acknowledged Its Duty To Defend The State Lawsuit And Thus Has No Basis To Refuse To Defend The Federal Lawsuit.

One of the most significant aspects of this insurance coverage suit is that Great American

already acknowledged its duty to defend the State Lawsuit in  pre-suit correspondence with the

Insureds.  Yet Great American has stubbornly refused to admit that the Federal Lawsuit presents

the exact same question on the duty to defend as the State Lawsuit and, therefore, it also

obligates Great American to provide a defense.  Great American's strained and erroneous efforts

to distinguish the State and Federal Lawsuits is nothing more than a self-serving strategy to

avoid paying the substantial defense costs of the Federal Lawsuit.

After having failed to provide a defense of the Federal Lawsuit, Great American, in its

letter to the Insureds' counsel dated December 15, 2004, agreed to provide a defense to the State

Lawsuit, with a reservation of rights. Great American explained that it had this insurance

obligation because at least one claim was brought "exclusively by the [General Convention and

the Association]." Ex. 13, p. 4. The claim described is Count I in the Amended Complaint of

the State Lawsuit in which the General Convention alone (and not the Association) seeks a

declaration that it is entitled to all of the Church's property. [7] Ex. 8, ¶¶ 111-116. Because the

General Convention was not an "insured" party under the Policy, Great American reasoned that

the "insured v. insured" exclusion of the Policy could not apply and, hence, Great American had

to admit its obligation to defend the State Lawsuit.

The same logic applies inescapably to the Federal Lawsuit. Count I of the State Lawsuit

is <u>identical</u>, word for word, to Count IV of the Federal Lawsuit. Ex. 2 (Count IV), 8 (Count I).

If, as Great American has conceded, the General Convention's property claim gives rise to its

obligation to defend the State Lawsuit, there can be no dispute that Great American is similarly

obligated to defend the Federal Lawsuit. Moreover, the two lawsuits effectively constitute one,

the State Lawsuit merely being an extension of the Federal Lawsuit. Accordingly, Great

American cannot sensibly take the position that it has an obligation to defend the State Lawsuit,

but not the Federal Lawsuit.

In its correspondence, Great American defends its incongruous position based on a

willful misreading of the plain language of the two Complaints. In particular, Great American

contends that:

> 1. "[b]ased on the materials we have received, it appears that the
> amended state court complaint does not contain the same language as
> the federal complaint and, specifically, does not premise each and

---

[7] Great American's statement in the letter that the Association asserted (or could assert) any claim to the Church's assets was wrong as the Association has no claim (and has never asserted a claim) to the Church's property. Nor does the Association have any standing to bring a claim to vindicate the General Convention's purported property rights. Even if the Association were deemed to have joined this claim, it would not alter Great American's duty to provide a defense because the Association is not an "insured" party under the Policy.

every count upon George Chapin's membership within the [Church];" and

2. "Moreover, it appears that some of the counts set forth in the amended state court complaint appear to now have been brought exclusively by the [General Convention] and [Association]. In particular, the [General Convention] and [Association] seek to obtain a declaration that they are entitled to hold the assets of the [Church] as a result of its disaffiliation from the [General Convention]."

Ex. 12, 4.

Neither of these contentions holds up under even the most superficial scrutiny. First, Count IV in the Federal Lawsuit does not contain the language the underlying plaintiffs inserted into other causes of action where Chapin was a plaintiff for those claims, namely, "This count is brought by Plaintiff, George Chapin, on behalf of himself, the Church, Bostonview, and all other persons similarly situated, as a member of the Church and beneficial holder of stock in Bostonview." See Ex. 2, ¶¶ 112, 122, 132, 155, 163, 171, and 180. Accordingly, Great American's assertion that each claim in the Federal Lawsuit was brought by Chapin was unquestionably incorrect.

The conclusion that Chapin was not a party to Count IV is even more inescapable given that the request for relief in that count provides: "Thus, the Denomination [General Convention] asks that the Court declare that it is entitled to hold the assets of the Church. Those assets include, without limitation, the apartment house and its revenue." Id., ¶ 146 (emphasis supplied). Nothing in Count IV or anywhere else in the Complaint alleges or suggests that Chapin joined (or had standing to join) the claim for the Church's assets. Therefore, the face of the Complaint in the Federal Lawsuit provides unambiguously that the General Convention alone brought Count IV, seeking a declaration that would effectively transfer the Church's assets to it. Since the General Convention is admittedly not an "insured" under the Policy, Great American's denial

16

of coverage on the basis of the "insured v. insured" exclusion was patently wrong.

Great American cannot point to anything in the State Lawsuit to support its other contention that the claim for the Church's assets (Count I) "now appear[s] to have been brought exclusively by" the General Convention. There is no difference between the declaratory judgment claim pleaded in the Federal Lawsuit (Count IV) and State Lawsuit (Count I), except the count number and paragraph numbers.

Great American correctly recognized its duty to defend this claim (and hence all the other claims) in the State Lawsuit, but refuses without any justification to acknowledge that the exact same claim is a covered claim in the Federal Lawsuit. Regrettably, it will take a court order to compel Great American to fulfill its unmistakable obligation to the Insureds to defend against both the Federal and State Lawsuits.

**IV.**     **Great American Had A Clear Duty To Defend The Federal Lawsuit.**

Notwithstanding Great American's prior admission of a duty to defend the State Lawsuit, the duty of Great American to defend the Federal Lawsuit is plainly established from the terms of the Policy. The "insured v. insured" exclusion does not even arguably apply to Great American's property claim against the Church (Count IV). Nor does it apply to Chapin's claim as Chapin obviously has no standing to assert any of these claims against the Insureds.

**A. The General Convention's Declaratory Judgment Claim Was Covered By The Policy, Triggering Great American's Duty To Defend.**

Based on the Policy, the General Convention's declaratory judgment claim seeking title to all of the assets of the Church (Count IV) clearly triggered Great American's duty to defend the entire Federal Lawsuit. The Policy obligates Great American to defend any Claim made against an Insured for a Wrongful Act during the Policy Period. Ex. 1, § I. The General

Convention's declaratory judgment claim seeking title to the Church's property is covered as it constitutes a claim: it was initiated in a court of law. And it arises from an alleged "Wrongful Act" by the Church, namely, its decision to disaffiliate from the General Convention. Ex. 1, § III, E., 2 (Count IV), 9 (Count I). All the other claims by the underlying plaintiffs arise from alleged "acts," "misstatements," "misleading statements," or "breach of duty" by the Insureds and are, therefore, also covered under the Policy. Ex. 1, § III.D.

The other coverage requirements are met. The Federal and State Lawsuits were commenced during the Policy Period, which ran from November 4, 2003 to November 4, 2004. And each Plaintiff is an "Insured" under the Policy; the Church and Bostonview are named in the Policy as the insured "Organization" and MacKenzie and Kennedy qualify as "Insured Persons" given that each was sued on account of their alleged actions as trustees, directors, officers and/or employees of the Church and Bostonview. Ex. 1, § III, A-C & Declarations page. Thus, unless some exclusion applies (which it does not), Great American has a duty under the Policy to defend against the Federal Lawsuit.

### B. The "Insured v. Insured" Exclusion Does Not Apply Because The General Convention, Which Is Not An "Insured," Brought Claims Against The Church.

Great American denied a defense of the entire Federal Lawsuit on the obviously unsustainable ground that all claims were brought by Chapin, a parishioner. Great American contends that Chapin's presence triggered the "insured v. insured" exclusion. As discussed in § III above, however, Chapin was not a party to Count IV. The General Convention was the only party that brought, or had standing to bring, this property claim against the Church. And because the General Convention is a separate organization with no legal, financial or ecclesiastical authority over the Church, as is clear from the pleadings and as Great American

18

has conceded  (Ex. 13, p.4),  the Policy's "insured v. insured" exclusion does not apply.

Great American cannot meet its burden to show that an exclusion to coverage applies here as there is no reading of the Federal Lawsuit that would bring the General Convention's claim within the scope of any other exclusion in the Policy.  See Camp, Dresser & McKee, Inc., 30 Mass. App. Ct. at 321, 568 N.E.2d at 633.  Accordingly, Great American owes a duty to defend its Insureds against the Federal Lawsuit.  See Sterilite, 17 Mass. App. Ct. at 319, 458 N.E.2d at 341.

### C.  The Insured v. Insured Exclusion Does Not Apply Where Chapin Clearly Lacked Standing To Bring Any Claims On Behalf Of The Church.

Even had Chapin been a party to Count IV in the Federal Lawsuit, which Great American concedes he was not when it agreed to defend the same claim in the State Lawsuit, Chapin's claims were facially defective as a matter of law because, as a parishioner in Massachusetts, Chapin has absolutely no standing to sue the Church to correct alleged abuses in its management. Because the "insured v. insured" exclusion only applies to claims made against an insured "by, or for the benefit of, or at the behest of" the Church (Ex. 1, Sec. IV, H) and Chapin had no standing to bring such a claim, his claims do not fall within that exclusion.  Great American, nonetheless, had a duty to defend Chapin's claims, as it had a duty to defend all "groundless" claims against the Church. [8]  (Ex. 1, Sec. I)

The Massachusetts Attorney General alone has jurisdiction to bring claims concerning the management of public charities in the Commonwealth.  In Weaver v. Wood, the Massachusetts Supreme Judicial Court stated:

---

[8] Chapin's claim to "derivative" status is also wrong on its face because he had no authority under the rules to bring a derivative claim.  Nowhere does Chapin allege that he is a stockholder in the Church, which is legally impossible, only that he is a "beneficial holder of stock in Bostonview."  Ex. 2, ¶ 155.  The Complaint itself acknowledges that, "The Church is the sole stockholder of Bostonview."  Id., ¶ 15.  Because Chapin is not an actual stockholder, he had no authority to bring a derivative claim.  See Fed. R. Civ. P. 23.1 (and Reporter's Notes) (only stockholders have standing to bring derivative claims on behalf of corporations, such as the Church; non-stockholding "members" have standing only for claims on behalf of an unincorporated association).

> A century ago we noted: "The law has provided a suitable officer to represent those entitled to beneficial interests in a public charity. It has not left it to individuals to assume this duty, or even to the Court to select a person for its performance. Nor can it be doubted that such a duty can be more satisfactorily performed by one acting under official responsibility than by individuals, however honorable their character and motives may be. In Dillaway v. Burton, we held that it is "the exclusive function of the Attorney General to correct abuses in the administration of a public charity by the institution of public proceedings.

425 Mass. 270, 275-76, 680 N.E.2d 918, 922 (1997) (emphasis added) (internal citations omitted). Not surprisingly, this black letter law provided one of the principal grounds for the Superior Court to dismiss all of Chapin's claims in the State Lawsuit. Ex. 11, p. 2.

While it was Great American's duty to compare the Federal Lawsuit and the Policy to determine whether it had a coverage obligation, it cannot ignore the legal reality that Chapin's claims were not what they purported to be, namely, alleged derivative claims brought on behalf of the Church. Cf. Doe v. Liberty Mutual Ins. Co., 423 Mass. 366, 370-71, 667 N.E.2d 1149, 1152 (holding insurer has no duty to defend allegations of wrongdoing, pled as negligence in the underlying complaint, where the allegations concerned intentional conduct as a matter of law). Great American had a duty to examine the Complaint's allegations and, if they were "reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms," Great American was required to undertake the defense. Liberty Mut. Ins. Co. v. SCA Servs, Inc., 412 Mass. 330, 332, 588 N.E.2d 1346 (1992), quoting Sterilite, 17 Mass. App. Ct. at 318, 458 N.E.2d at 339. It was unreasonable and wrong for Great American to deny coverage based on the mere assertion of claims by Chapin where he plainly had no standing to bring any claims "for the benefit of" the Church.

20

**D.  Where Great American Had A Duty To Defend One Claim, It Had A Duty
To Defend The Entire Federal Lawsuit.**

Because Great American had an unequivocal duty to defend one or more claims in the

Federal Lawsuit, it was obligated to defend all of the claims in that suit.  Liberty Mut. Ins. Co. v.

Metropolitan Life Ins. Co., 260 F.3d 54, 63 (1st Cir. 2001), citing Mt. Airy, 127 F.3d at 19;

Aetna Cas. & Sur. Co. v. Cont'l Cas. Co., 413 Mass. 730, 732 n.1, 604 N.E.2d 30, 32 (1992).

"Massachusetts courts have unambiguously adopted the broad rule that an insurer has a duty to

defend an entire lawsuit in which any claim is even potentially covered."  Dash v. Chicago Ins.

Co., 2004 U.S. Dist. LEXIS 17309, *34-35 (D. Mass. August 23, 2004).  See also  Simplex

Technologies, Inc. v. Liberty Mut. Ins. Co., 429 Mass. 196, 199, 706 N.E.2d 1135, 1137 (1999)

("That some, or even many, of the underlying claims may fall outside the coverage does not

excuse Liberty Mutual from its duty to defend these actions.").

Moreover, Great American may not try to escape part of the financial burden of

defending the claims by violating the duty to defend its insured and then attempting to pay only

for the defense of covered claims.  Dash, 2004 U.S. Dist. LEXIS at *36.  Where an insurer has

defaulted on its defense obligation, the "weight of authority" bars it from seeking to benefit from

its breach of contract by retroactively allocating defense costs that the insured should not have

had to bear in the first place.  Id. at *26-27, quoting Aetna, 413 Mass. at 732 n.1, 603 N.E.2d at

32.  In this case, Great American denied any defense obligation until the underlying actions were

successfully defended, and then only agreed to defend the State Lawsuit under a reservation of

rights.  Dash rejected an argument from the insurer in the same situation, based on law from

other states and federal courts outside this circuit, that it was entitled to apportion defense costs

after it "wholly defaulted on its duty to defend."  Id. at *30-31, *36.  This Court should similarly

reject any attempt by Great American to benefit from its breach of contract by trying to shift any

21

defense costs to the Insureds.

**V.    Great American Had A Clear Duty To Defend
        The State Lawsuit.**

Great American already has conceded its duty to defend the State Lawsuit. Ex. 13, p. 4.

Setting aside Great American's admission, its obligation is indisputable because at the very least,

Count I of the State Lawsuit contains the General Convention's claim for a declaratory judgment

to grab all of the Church's property and transfer it to the General Convention. That claim is a

"Claim" within the meaning of the Policy, brought by a non-insured alone; Chapin was not a

party to it. Accordingly, the "insured v. insured" exclusion does not apply. Because Great

American has a duty to defend this claim, it is obligated to provide a defense to the entire State

Lawsuit. See Dash, 2004 U.S. Dist. LEXIS at *34-35. Great American is also obligated to

defend for the additional reasons, discussed above, concerning its obligation to defend the

Federal Lawsuit.

**VI.   Great American Had A Clear Duty To Defend
        The Insureds Against The Attorney General's Action.**

In this case, the Attorney General's Action was initiated with the issuance of the CID and

concluded with the filing of a Complaint and entry of the Consent Judgment. All phases of the

Attorney General's Action constituted one lawsuit, and thus one "Claim" within the meaning of

the Policy.

Great American has agreed to defend the very last ministerial acts involved in the

Attorney General's Action (the filing of the Complaint and Consent Judgment). Therefore, it

cannot reasonably refuse to defend all of the necessary discovery and negotiations that followed

the CID which were necessary to bring about the filing of the Complaint and the Consent

Judgment.

22

The fact that the CID was part of one legal action that resulted in the Consent Judgment is confirmed by the text of the Consent Judgment itself. In particular, the Consent Judgment, at page 1 provides:

> This matter having come before the Court <u>first through Civil Investigative Demands</u> issued by the Department of the Attorney General pursuant to Mass. Gen. Laws, Chapter 12, § 8 (H) and served upon the defendants and other in Suffolk Civil Action No. 03-5408 A (the "CIDs"); and
>
> The Defendants having produced the requested documents, including financial records, and all parties having conferred as to the matters reflected in those documents; and
>
> All parties having agreed to finally resolve the matters covered by the CIDs and the Complaint in this action to avoid the expense, delay, and uncertainties of further investigation and/or litigation by taking the corrective action, and confirming or adopting certain practices and procedures, as set forth in this Consent Judgment, without trial or adjudication of any issue of fact or law, and without an admission of liability, which Defendants expressly deny.

Ex. 21 (emphasis supplied). The Consent Judgment perfectly articulates how the CID functioned as the initial act taken by the Attorney General, which triggered a lengthy (and expensive) discovery and negotiating process culminating in the Consent Judgment.[9] Great American cannot disclaim its duty to defend the Church during the discovery and negotiations that followed the CID merely because, as a requirement of Massachusetts statute, the Attorney General had to commence a separate civil action to initiate the CID. Ex. 19. <u>See</u> Mass. Gen. Laws, ch. 12, § 8H.

---

[9] The initiation of the Attorney General's Action by issuance of the CID triggered coverage because it was a "Claim," which the Policy defines to include "any proceedings initiated against the Insured … before … any governmental body which is legally authorized to render an enforceable judgment or order for money damages or other relief against such Insured." Ex. 1, § III.K.

**VII.    Great American's Actions Constitute Unfair Claims Settlement Practices And Per Se Violations Of Chapter 93A.**

The facts in the record demonstrate that Great American acted unreasonably and in bad faith in refusing to defend the Insureds against the Federal Lawsuit and the bulk of the Attorney General's Action, and thus far refusing to reimburse the Insureds' defense costs for the State Lawsuit and part of the Attorney General's Action even though it agreed to reimburse those defense costs more than six months ago. The undisputed facts lead to only one conclusion: that Great American is acting in bad faith and engaging in prohibited and unfair claims handling practices in order to avoid payment of substantial claims.

Under Massachusetts law, it is an unfair or deceptive act or practice in the business of insurance to engage in unfair claim settlement practices. Mass. Gen. Laws, ch. 176D, § 3(9). Where, as here, the unlawful claims settlement practice was committed in dealings with a consumer, as opposed to a business, it is *per se* an unfair or deceptive act or practice within the meaning of Mass. Gen. Laws, ch. 93A, §§ 2 and 9, entitling the insured to recover damages under Chapter 93A.[10]  Mass. Gen. Laws ch. 93A, § 9; Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 754, 610 N.E.2d 912, 917 (1992).

An insurer violates Chapter 93A where its refusal to defend a claim against its insured is objectively unreasonable, in bad faith, or for ulterior motives. Boston Symphony Orchestra, 406 Mass. at 14, 545 N.E.2d at 1160. An insurer acts unfairly where it relies on an implausible interpretation of the policy to deny a defense. Cf. id., 406 Mass. at 15, 545 N.E.2d at 1160 (holding that insurer who "in good faith, . . . relie[d] on a "plausible, although ultimately incorrect, interpretation of its policy" does not violate Chapter 93A); Polaroid Corp., 414 Mass. at 754, 610 N.E.2d at 916 (insurer not liable under Chapter 93A where it "could reasonably have

_____

[10] The Insureds sent a Chapter 93A demand letter, pursuant to Mass. Gen. Laws ch. 93A, § 9 on December 9, 2004. Ex. 12.

concluded that no aspect of the [insured's] claim was within the scope of its coverage").

In this case, Great American has relied on a totally implausible interpretation of its Policy, unreasonably refused to acknowledge that the Federal and State Lawsuits contain precisely the same defense-triggering claim, and unreasonably refused to acknowledge that it had a duty to defend the entire Attorney General's Action. Having raised insubstantial defenses in bad faith, Great American is now engaged in an additional unfair claim settlement practice, namely, by engaging in a "lengthy pattern of foot-dragging" to string the Insureds along, "with the intent . . . of pressuring [the Insureds] to compromise [their] claim." Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd., 217 F.3d 33, 43 (1st Cir. 2000) (affirming finding that reinsurer engaged in such a campaign violated Chapter 93A).

The frailty of Great American's argument for denying a defense in the Federal Lawsuit is simple and obvious. In almost Orwellian fashion, Great American argues that black is white, up is down, and two claims that are word-for-word the same are somehow different. A brief review of the General Convention's property claim (Count IV in the Federal Lawsuit and Count I in the State Lawsuit), from which Great American's obligation to defend all of the claims in those lawsuits flows, illustrates in a crystal clear fashion that the cause of action is identically stated in the two pleadings and that Great American's attempt to distinguish them is without merit. No reasonable insurer could conclude that the General Convention's claim for the Church's property in the State Lawsuit was covered but the identical claim in the Federal Lawsuit was not. See Boston Symphony Orchestra, 406 Mass. at 14, 545 N.E.2d at 1160. Precisely because Great American's misreading of the two claims, to avoid paying for the defense of the Federal Lawsuit, is so painfully obvious, it is also patently unreasonable, unfair, and deceptive, and is conclusive evidence of bad faith.

The bad faith in Great American's self-serving attempt to avoid paying defense costs in the Attorney General's Action, is also apparent from the record. As stated in the Consent Judgment itself, the CID was part and parcel of and merely the first necessary step toward the filing of the Complaint and entry of the Consent Judgment. From the issuance of the CID to entry of the Consent Judgment, the Attorney General's Action remained a Claim within the meaning of the Policy; Great American cannot rationally sever the two just as it could not agree to cover the defense costs to settle a lawsuit without agreeing to pay for the months of necessary discovery leading to that settlement. As such, Great American's agreement to defend a portion of the claim was a concession that it owed a duty to defend the entire Attorney General's Action.

Finally, Great American has added insult to injury in this process by failing and refusing to pay defense costs even after agreeing to do so. Months after Great American agreed to defend the State Lawsuit and received copies of the Insureds' relevant legal bills, it has stalled, delayed and impermissibly sought to second-guess the successful handling of the defense. See Herbert A. Sullivan, Inc., 439 Mass. at 407, 788 N.E.2d at 539; Aetna, 413 Mass. at 732 n.1, 604 N.E.2d at 32; Dash, 2004 U.S. Dist. LEXIS at *36. The pendency of this action does not suspend Great American's continuing obligation to act in good faith toward the Insureds. The Court should find that Great American's refusal to pay defense costs even after agreeing to do so is an unfair and deceptive practice clearly proscribed by Chapters 176D and 93A.

### VIII.    Great American Must Pay The Insureds Their Fees And Costs To Bring This Coverage Action.

Having established that Great American violated its duty to defend, the Insureds are entitled to reimbursement of their defense costs, together with their attorneys' fees and costs to bring this action. See Rubenstein, 429 Mass. at 358, 708 N.E.2d at 642. The legal fees and expenses were reasonable and necessary in light of the extremely serious, yet baseless,

allegations against the Church, Bostonview, MacKenzie and Kennedy.  In any event, having disclaimed coverage or agreed to defend under a reservation of rights, Great American lost the right to control or challenge the reasonableness of the defense.  See Herbert A. Sullivan, Inc., 439 Mass. at 407, 788 N.E. 2d at 539.

The costs for defending the Insureds totaled $536,747.54 for the Federal Lawsuit, $192,679.19 for the State Lawsuit,[11] and $272,697.78 for the Attorney General's Action through the entry of the Consent Judgment.  Ellis Aff., ¶ 19; Ex. 23, 24, 25.  Great American is obligated to pay at least this amount, plus the fees the Insureds have incurred in present lawsuit to establish Great American's duty to defend.

## Conclusion

For the reasons stated herein, Plaintiffs request that the Court enter summary judgment in their favor on all Counts of the Complaint and Defendant's Counterclaims, declaring that Great American had a duty to defend them in the Federal and State Lawsuits and the Attorney General's Action, and finding that it breached the terms of the Policy by failing to do so.  On Counts I and II of the Complaint, Plaintiffs request that the Court award Plaintiffs their defense costs to date as damages with interest.  On Count III of the Complaint, Plaintiffs request that the Court award multiple damages and their attorneys' fees for Great American's bad faith handling of Plaintiffs' insurance claims in violation of G.L. ch. 176D and 93A.  Plaintiffs further request that the Court award them their reasonable attorneys' fees and costs incurred in establishing Great American's duty to defend under the Policy.

---

[11] The costs continue to accrue in the State Lawsuit because the underlying Plaintiffs have appealed the Superior Court's dismissal of their claims.

Respectfully submitted,

BOSTON SOCIETY OF THE NEW
JERUSALEM, INCORPORATED,
BOSTONVIEW CORPORATION,
EDWARD MACKENZIE, and
THOMAS KENNEDY,

By their attorneys,

Howard M. Cooper (BBO #543842)
Nicholas B. Carter (BBO #561147)
Philip H. Graeter (BBO #645316)
TODD & WELD LLP
28 State Street, 31st Floor
Boston, MA 02109
(617) 720-2626

Dated: July 1, 2005

CERTIFICATE OF SERVICE

I, Nicholas B. Carter, hereby certify that on July 1, 2005, I caused a copy of the foregoing
Memorandum In Support Of Plaintiffs' Motion For Summary Judgment to be served by hand
upon counsel for Defendant/Counterclaim Plaintiff Barbara A. O'Donnell, Esq., Robinson &
Cole LLP, One Boston Place, Boston, MA  02108-4404.

Nicholas B. Carter