UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BOSTON SOCIETY OF THE NEW JERUSALEM, INCORPORATED, BOSTONVIEW CORPORATION, EDWARD MACKENZIE, and THOMAS KENNEDY,<br><br>    Plaintiffs and Counterdefendants,<br><br>v.<br><br>GREAT AMERICAN INSURANCE COMPANY,<br><br>    Defendant and Counterplaintiff. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO.<br>05-CV-10494-WGY |

**GREAT AMERICAN INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN
SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant, Great American Insurance Company ("Great American"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, submits this Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment and in Support of Its Cross-Motion for Summary Judgment.

## I.    INTRODUCTION

In 2003, Plaintiff Boston Society of the New Jerusalem, Inc. (the "Church") purchased from Great American an insurance policy affording liability and defense costs coverage for a wide variety of claims that might be brought against the Church and its management. The protection was not all encompassing, however; the parties agreed that certain types of claims would not be covered. For example, as manifested by the policy's "Insured versus Insured Exclusion," the parties agreed that Great American would have *no* obligations with respect to

internal political disputes among those in control of—or who would seek to control—the Church and its assets. The difficulty for plaintiffs here is that the two underlying private lawsuits embody precisely the sort of internecine squabble the Insured versus Insured Exclusion removes from coverage. Indeed, and contrary to plaintiffs' assertions, *every* count pled in those two underlying lawsuits falls within the Insured versus Insured Exclusion because every count was brought "for the benefit of" the Church or its successor in interest.

The Insured versus Insured Exclusion is not, however, the only policy provision involved. As other exclusions reflect, the parties to the insurance contract also agreed that Great American would have *no* obligations with respect to claims seeking to enforce any contractual obligation of the Church, or with respect to claims requiring proof that an insured committed some criminal or fraudulent act or gained some illegal profit or advantage. Another insurmountable obstacle facing plaintiffs is that all of the counts asserted in the two private lawsuits also implicate one or more of *those* exclusions as well. In other words, there is not a single count in either lawsuit that does not fall within the Insured versus Insured Exclusion and at least one other exclusion. That being the case, Great American could have no duty to defend.

As for the third matter in issue—a state court lawsuit by the Massachusetts Attorney General—plaintiffs argue that Great American not only had a duty to defend the lawsuit, but also an obligation to pay their legal expenses incurred in the separate investigation that preceded it. Great American's refusal to pay those expenses was justified, however, because the Attorney General's investigation was not within the policy's definition of "Claim." Under the plain language of the policy, unless and until there is a "Claim," there can be no defense obligation.

Characterizing its coverage defenses as "totally implausible," plaintiffs accuse Great American of bad faith and of engaging in prohibited and unfair claims handling practices. Great

American's coverage defenses are, however, much more than plausible. Indeed, they rest upon the only reasonable construction of the underlying pleadings and the relevant policy language. Although Great American previously did offer to pay some of the defense costs plaintiffs are seeking to recover here, it did so in the context of settlement negotiations and always subject to a full reservation of rights. Contrary to plaintiffs' theory, Great American's pre-suit effort to resolve this matter by offering to pay part of the amount in dispute is hardly a sign of bad faith, and plaintiffs should not be permitted to use that effort against Great American simply because it did not succeed. Having fully reserved its rights and having never admitted *any* coverage obligation, Great American is free to raise all of its coverage defenses in this action.

## II.    SUMMARY OF UNDISPUTED FACTS

A.    The Underlying Lawsuits

1.    The Chapin Federal Lawsuit

On March 2, 2004, the General Convention of the New Jerusalem in the United States of America, Inc. (the "General Convention"), the Massachusetts Association of the New Jerusalem (Swedenborgian) (the "Association"), and George Chapin (collectively, the "Chapin Plaintiffs") filed a civil action in this Court (Case No. 04-10419 WGY) (the "Chapin Federal Lawsuit") against:    the Church; the Church's wholly-owned subsidiary, Bostonview Corporation ("Bostonview"); Edward MacKenzie; and Thomas Kennedy (collectively, the "Insureds"). (Defendant Great American Insurance Company's Local Rule 56.1 Statement in Support of Its Cross-Motion for Summary Judgment ("Def.'s LR 56.1 Statement") ¶ 1) According to the complaint in that action, the General Convention is the religious denomination associated with churches that follow the teachings of Emanuel Swedenborg, and the Association is a group of five active Swedenborgian churches, previously including the Church. (Id. ¶ 2) Chapin is (or

was) a member of the Church. (<u>Id.</u>)

The Chapin Plaintiffs averred that Kennedy joined the Church before May 2002. (<u>Id.</u> ¶ 3) Allegedly, Kennedy observed the mental instability of the Church's pastor, Reverend Ellis, and then befriended Ellis with the intention of exploiting him. (<u>Id.</u>) In May 2002, Kennedy was elected President of the Massachusetts New Church Union (the "Union"), which held the assets of the several Swedenborgian churches in the Association (including the Church). (<u>Id.</u> ¶ 4) According to the Chapin Plaintiffs, Kennedy "grossly abused" that position by using it for his and his relatives' personal gain. (<u>Id.</u>) Allegedly, Kennedy resigned in December 2002, to avoid a January 2003 election intended to remove him. (<u>Id.</u>)

Subsequently, Kennedy and MacKenzie, who joined the Church in late 2002, allegedly caused numerous friends and relatives to become Church members so that the pair could gain control over a majority of the voting membership. (<u>Id.</u> ¶ 5) Later, having allegedly directed the votes of the new members and extorted the votes of numerous elderly members, Kennedy and MacKenzie were elected Officers and Trustees of the Church, and also directors of Bostonview, which owns the building housing both the Church and some 30 residential apartments. (<u>Id.</u> ¶ 6) Obtaining positions as directors of Bostonview allegedly enabled Kennedy and MacKenzie to control the real property and the $1.2 annual net revenue it generated. (<u>Id.</u>)

In May 2003, Chapin and others allegedly alerted the General Convention to Kennedy's and MacKenzie's actions, and, after investigating, the General Convention attempted to impose corrective measures. (<u>Id.</u> ¶ 7) Soon thereafter, Kennedy and MacKenzie allegedly forced the Church to disaffiliate from the General Convention. (<u>Id.</u>)

The Chapin Plaintiffs asserted in their federal complaint nine counts: three counts alleging RICO violations by Kennedy and MacKenzie (Counts I-III); a count seeking a

declaration that the Church's bylaws pertaining to disaffiliation were breached and that the General Convention could hold the Church's assets in escrow pending creation of a new affiliated church (Count IV); a count seeking a declaration that the Church's bylaws pertaining to the admission of new members were breached and seeking enforcement of those bylaws so that the memberships of those who joined the Church in 2002 and 2003 were held void (Count V); two counts against Kennedy and MacKenzie asserting derivative claims for breach of fiduciary duties owed to the Church (Count VI) and to Bostonview (Count VII): a derivative claim against Kennedy and MacKenzie for fraud (Count VIII); and a derivative claim against Kennedy and MacKenzie for unfair and deceptive acts under Mass. G. Law ch. 93A § 2 (Count IX). (Id. ¶ 8)

On July 20, 2004, this Court dismissed the Chapin Federal Lawsuit because the Chapin Plaintiffs had alleged an insufficient period of criminal activity to support their RICO claims. (Id. ¶ 9) This Court declined to exercise jurisdiction over the state law claims. (Id.)

2.    The Chapin State Lawsuit

On August 2, 2004, the Chapin Plaintiffs filed a civil action (the "Chapin State Lawsuit") against the Insureds in Massachusetts state court. (Id. ¶ 10) The Chapin State Lawsuit involved the same parties and many of the same averments as the federal action. (Id.) The state court complaint included (in a different order) the same nine counts pled in the Chapin Federal Lawsuit and added two more against Kennedy and MacKenzie: one alleging conversion of Church assets (Count II); and one alleging unjust enrichment/restitution (Count III). (Id.)

On December 7, 2004, the state court dismissed the Chapin State Lawsuit, which is currently pending on appeal. (Id. ¶ 11)

3.    The Attorney General Investigation and Lawsuit

On November 13, 2003, the Massachusetts Attorney General issued to the Church a Civil

Investigation Demand (the "CID") pursuant to Mass. Gen. Laws, ch. 12 § 8H. (Id. ¶ 12) The CID commanded the Church to produce several categories of documents. (Id.) The Church complied fully with the commands of the CID. (Id.)

On June 14, 2004, the Attorney General filed a complaint against the Church in Massachusetts state court. (Id. ¶ 13) That complaint included a single count, labeled "Disposition of Charitable Assets," asserting that Church Officers and Trustees had: failed to ensure the due application of charitable assets; failed to ensure that the Church's proceeds were used solely to further the Church's mission; and approved distributions from Church assets for the benefit of certain private individuals. (Id.) On June 16, 2004, the court entered a Consent Judgment agreed by the parties. (Id. ¶ 14)

B.    The Policy

Great American issued Non-Profit Organization Executive Protection and Employment Practices Liability Insurance Policy No. EPP5796942 to the Church (and Bostonview) for the Policy Period November 4, 2003 to November 4, 2004 (the "Policy"). (Id. ¶ 15) The Policy has a $1,000,000 aggregate Limit of Liability, and is subject to a $5,000 per Claim Retention. (Id.)

The Policy's Insuring Agreement states:

> If during the Policy Period . . . any Claim is first made against an Insured for a Wrongful Act . . . the Insurer shall pay on their behalf Loss resulting from such Claim. The Insurer has the right and duty to defend any Claim to which this Insurance applies, even if the allegations of the Claim are groundless, false or fraudulent.

(Id. ¶ 16)

Under the Policy, the term "Insured" means the "Organization and any Subsidiary and all Insured Persons." (Id. ¶ 17) The "Organization" is the Church and Bostonview. (Id.) The "Insured Persons" are "all persons who were, now are, or shall be directors, trustees, officers,

employees, volunteers or staff members of the Organization or its Subsidiaries, . . .." (Id.)
"Loss" includes, among other things, "Costs of Defense incurred by the Insured." (Id. ¶ 19)
"Costs of Defense" means, among other things, "any reasonable and necessary legal fees and
expenses incurred in defense of any Claim and appeals therefrom." (Id.)

The Policy's Section VI contains several exclusions. (Id. ¶ 20) Those pertinent to this
dispute are quoted later in this Memorandum.

C.    Communications Concerning Coverage, Including Failed Settlement Efforts

On March 25, 2004, Great American denied coverage for the Chapin Federal Lawsuit on
grounds that the Insured versus Insured Exclusion precluded coverage. (Id. ¶ 23) In its March
25, 2004 letter, Great American also reserved its right to raise all other coverage defenses. (Id.)

On September 10, 2004, Kennedy and MacKenzie, through counsel, sent Great American
notice of the Chapin State Lawsuit and demanded coverage. (Id. ¶ 24) By letter dated December
9, 2004, the Insureds' counsel threatened to sue Great American if it did not immediately
acknowledge that it would provide coverage "in full" for the two private actions. (Id. ¶ 25) In a
separate letter dated December 9, 2004, the Insureds' counsel requested coverage from Great
American for "two separate proceedings" initiated by the Attorney General. (Id. ¶ 26) That
letter constituted the first tender to Great American of the 2003 CID, the Attorney General's
action, or the Consent Judgment that had resolved the action *nearly six months earlier*. (Id.)

On December 15, 2004, Great American's counsel reiterated that the Insured versus
Insured Exclusion applied to the Chapin Federal Lawsuit but offered to defend the Chapin State
Lawsuit, under a full reservation of rights. (Id. ¶ 27) Great American expressly conditioned its
offer on the Insureds' execution of an interim funding agreement. (Id.) By letter dated
December 16, 2004, the Insureds' counsel advised Great American that the state court had

dismissed the Chapin State Lawsuit, and that the Insureds disagreed that the Insured versus Insured Exclusion applied to either the Chapin Federal Lawsuit or the Chapin State Lawsuit. (Id. ¶ 28)  In that same letter, the Insureds' counsel indicated that his clients were prepared to sue Great American for coverage, but expressed a willingness to meet with Great American's representatives to try to resolve the coverage dispute. (Id.)

Great American's counsel responded in a January 7, 2005 letter, which again reserved Great American's rights fully, which again proposed that the parties' counsel meet to discuss their differences on coverage, and which again proposed that the Insureds enter into a funding agreement. (Id. ¶ 29)  Attached was a draft "Interim Funding and Reservation of Rights Agreement" that would have allowed the Insureds their Chapin State Lawsuit defense costs while preserving Great American's right to contest coverage. (Id.)

Over the next several weeks, the parties continued to dispute the applicability of the Insured versus Insured Exclusion. (Id. ¶ 30)  Great American's counsel flew to Boston in late January 2005 to negotiate a settlement, but that effort was unsuccessful. (Id. ¶ 31)  The Insureds never accepted Great American's compromise offer to pay the their defense costs in the Chapin State Lawsuit, subject to the Interim Funding Agreement and a full reservation of rights. (Id.)

### III.    ARGUMENT

A.    Standards

Summary judgment is appropriate where the pleadings and affidavits, among other designated items, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Insurance coverage disputes are often amenable to disposition by summary judgment because the interpretation of an insurance policy is, ordinarily, a question of law for the court. B & T Masonry Constr. Co., Inc.

v. Public Serv. Mut. Ins. Co., 382 F. Supp., 38-39 (1st Cir. 2004) (Massachusetts law).  Where

the material facts upon which the answer to a coverage question hinges are not genuinely

disputed, the application of the policy language to those facts is likewise a question of law

properly resolved on summary judgment.  Id.  An insurer can obtain a summary judgment that it

has no duty to defend when the subject claims lie outside the policy's coverage.  Travelers Ins.

Co. v. Waltham Indus. Labs. Corp., 883 F.2d 1092, 1098-99 (1st Cir. 1998) (Massachusetts law).

        In Massachusetts, the question of whether an insurer has a duty to defend its insured

against a claim by a third party requires a comparison of the third party's complaint and the

policy.  Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 788 N.E.2d 522, 530 (Mass. 2003).  If

the allegations of the complaint, when read in light of extrinsic facts known to the insurer at the

time of tender, are reasonably susceptible to an interpretation that they state or adumbrate a claim

covered by the policy terms, the insurer must defend.  Id.; Open Software Found., Inc. v. United

States Fidelity & Guar. Co., 307 F.3d 11, 14-15 (1st Cir. 2002)(Massachusetts law).  More

particularly, "'*the process is one of envisaging what kinds of losses may be proved as lying*

*within the range of the allegations of the complaint, and then seeing whether any such loss fits*

*the expectation of protective insurance reasonably generated by the terms of the policy.*'"

Sullivan, 788 N.E.2d at 530-31 (quoting Sterilite Corp. v. Continental Cas. Co., 458 N.E.2d 338

(Mass. App. Ct. 1984)) (emphasis added).  Thus, the Court's task here is to examine the

underlying pleadings in order to determine whether there was any set of facts that, if proven,

would have resulted in a Loss covered by the Policy.

B.    The Insured Versus Insured Exclusion Relieved Great American Of The Duty To Defend

        The Policy's Insured versus Insured Exclusion states:

        This Policy does not apply to any Claim made against any Insured:

- 9 -

by, or for the benefit of, or at the behest of the Organization or a Subsidiary or any entity which controls, is controlled by, or is under common control with the Organization or a Subsidiary, or any person or entity which succeeds to the interest of the Organization or a Subsidiary.

(Def.'s LR 56.1 Statement ¶ 20)

The complaint in the Chapin Federal Lawsuit included nine counts, seven of which—all but Counts IV and V—were brought expressly "on behalf of" the Church and Bostonview.[1]  (Id. ¶ 8)  The complaint in the Chapin State Lawsuit included eleven counts, seven of which—all but Counts I through IV—were likewise brought expressly "on behalf of" the Church and Bostonview.  (Id. ¶ 10)  Because only the Church or Bostonview would have been the direct beneficiary of any relief awarded had the Chapin Plaintiffs proven those claims, they were unquestionably "for the benefit of the Organization or a Subsidiary," and, thus, fall within the Exclusion.

Resisting application of the Exclusion to those counts, the Insureds argue that Chapin could not have brought any of his claims for the benefit of the Church because he lacked standing to assert them.  (Plaintiffs' Memorandum in Support of Motion for Summary Judgment ("Pltfs.' Mem.") at 19-20)  Whether Chapin had standing is irrelevant, however, because that question pertains to the viability of his claims, not their eligibility for coverage.  Chapin's lack of standing would not mean the claims were not brought for the benefit of the Church, only that someone else had the legal authority to bring them.  The Exclusion's applicability, in other words, depends not upon the merits of a Claim, but, rather, upon the Claim's intended beneficiary.[2]  Therefore, regardless of Chapin's standing, Counts I through III and VI through IX

---

[1]  In fact, every one of those counts that did not expressly state that it had been brought "on behalf of" the Church and Bostonview specifically incorporated language from other counts making that allegation.

[2]  Indeed, for purposes of the Policy, the merits of a Claim are beside the point.  The Policy expressly extends coverage to any Claim to which the insurance applies "even if the allegations of the Claim are groundless, false or fraudulent."  (Def.'s LR 56.1 Statement ¶ 16)

of the Chapin Federal Lawsuit, and Counts V through XI of the Chapin State Lawsuit implicate the Insured versus Insured Exclusion because they all were intended to benefit the Church.

The question remains:  does the Insured versus Insured Exclusion apply to those counts not brought *expressly* for the benefit of the Church?  The Insureds, who focus on Count IV of the Chapin Federal Lawsuit and Count I of the Chapin State Lawsuit, argue that the Exclusion does not apply to those counts because Chapin was not a party to them.  (See Pltfs.' Mem. at 16-17). This is plainly wrong because every count in both lawsuits begins with "Plaintiffs," *a group that included Chapin*, restating and incorporating by reference all preceding allegations.  Moreover, the prayers for relief and the footnotes to Counts IV and I make it clear that they were brought by the Chapin Plaintiffs as a group, and not by the General Convention or any other plaintiff individually.  (See Plaintiffs' Local Rule 56.1 Statement in Support of Their Motion for Summary Judgment (Pltfs.' LR 56.1 Statement"), Exhibit 2 ¶ 141, Exhibit 8 ¶ 111)

Regardless of who brought those counts, however, the Insured versus Insured Exclusion must still apply because they necessarily were brought for the benefit of the Church, or its successor in interest, or both.  Count IV of the Chapin Federal Lawsuit and Count I of the Chapin State Lawsuit, for example, were both predicated on a Church bylaw requiring that, in the event the Church "ceased to exist," all of its funds and holdings be transferred to the General Convention and held in escrow pending the establishment of another Swedenborgian church in Boston.  (See Pltfs.' LR 56.1 Statement, Exhibit 2 ¶ 105, Exhibit 8 ¶ 100)[3]  The Chapin Plaintiffs alleged that this bylaw required the Church, upon its disaffiliation, to transfer all of its assets to the General Convention so that they could be held in escrow until a new church, affiliated with the denomination, could be formed.  (Id., Exhibit 2 ¶¶ 142-146, Exhibit 8 ¶¶ 112-116)

---

[3] That bylaw further provided that if no such church existed after 20 years, the capital and income would revert to the General Convention subject to any restrictions of uses that may have been voted by the Church members at the time of dissolution.  (Id.)

The clear purpose of Count IV of the Chapin Federal Lawsuit and Count I of the Chapin State Lawsuit, then, was to enforce a Church bylaw that had allegedly been breached. To prevail on that theory, the Chapin Plaintiffs would have had to establish that the Church had an interest—expressed in its own bylaw—in seeing its assets preserved following its disaffiliation, and then transferred to a new affiliated church when and if one were formed. Because the claim was intended to protect *that* purported interest, it necessarily was brought for the benefit of the Church, notwithstanding that enforcement would mean the Church would be divested of its assets in favor of a successor. The claim's premise was that the Church desired such divestment in the event of disaffiliation, and, whether that premise were valid or invalid, the intention was to promote the Church's interest in seeing its bylaws followed. By definition, a claim to enforce a Church bylaw is a claim for the benefit of the Church.[4]

The Insured versus Insured Exclusion applies for yet another reason. Again, had the relief sought in Count IV of the Chapin Federal Lawsuit and Count I of the Chapin State Lawsuit been granted, the Church's assets would have been transferred to the General Convention to be held in escrow pending the establishment of a new church. The claim, then, was also brought for the benefit of the entity—whether it was the General Convention or the yet-to-be-formed affiliated church—that would have succeeded to the interest of the Church had the declaratory judgment issued. For this additional and independent reason, the Insured versus Insured Exclusion relieved Great American of any duty to defend Count IV of the Chapin Federal Lawsuit and Count I of the Chapin State Lawsuit.

This same analysis applies, with equal force, to Counts II and III of the Chapin State Lawsuit. Although cast as claims for conversion and unjust enrichment, those counts sought to

---

[4] Thus, Count V of the Chapin Federal Lawsuit and Count IV of the Chapin State Lawsuit, which both sought to enforce a bylaw pertaining to Church membership, were also brought for the benefit of the Church.

have Church assets, allegedly controlled or possessed by Kennedy and MacKenzie, transferred to the General Convention. The only basis for the General Convention's claimed right to those assets was the bylaw purportedly requiring the transfer of the Church's funds and holdings to the General Convention upon disaffiliation. The clear purpose of Counts II and III, then, was to marshal the Church's assets and apply them as set forth in its bylaw, and, so, those claims were likewise intended to benefit the Church, or its successor in interest.

Contrary to the Insured's assertions, the Insured versus Insured Exclusion bars coverage for *each* and *every* count asserted in the underlying pleadings because *each* and *every* count was brought for the benefit of the Church or its successor in interest. Accordingly, Great American had no duty to defend either the Chapin Federal Lawsuit or the Chapin State Lawsuit.

C.    The Liability Under Contract Exclusion Applies To Those Claims Seeking Enforcement Of Church Bylaws

The only claims in the underlying complaints that the Insureds argue are not encompassed by the Insured versus Insured Exclusion are Count IV of the Chapin Federal Lawsuit and Count I of the Chapin State Lawsuit. Even if that Exclusion did not apply to those counts, Great American still would have no duty to defend because the parties to the insurance contract agreed that Claims seeking to enforce the Church's contractual obligations would not be covered:

> This Policy does not apply to any Claim against any Insured:
>
> for any actual or alleged liability of any Insured under any contract or agreement, express or implied, written or oral, except for employment related obligations which would have attached absent such contract or agreement.

(Def.'s LR 56.1 Statement ¶ 21)

Under settled Massachusetts law, the bylaws of a corporation are a contract between the corporation and its members. Jessie v. Boynton, 361 N.E.2d 1267, 1273 (Mass. 1977); ER

Holdings, Inc. v. Norton Co., 735 F. Supp. 1094, 1097 (D. Mass. 1990).[5]  Accordingly, to the

extent the Chapin Plaintiffs sought to force the Church to comply with its contractual obligations

in the bylaws, the liability under contract exclusion would preclude coverage.  Great American,

therefore, had no duty to defend Count IV of the Chapin Federal Lawsuit or Count I of the

Chapin State Lawsuit or, for that matter, Count V of the Chapin Federal Lawsuit or Counts II

through IV of the Chapin Federal Lawsuit, each of which also sought to enforce those bylaws.

D.    The Illegal Profit, Fraud, And Criminal Acts Exclusion Bars Coverage

The Policy's Section IV.A. provides:

This Policy does not apply to any Claim made against any Insured:

> brought about or contributed to in fact by:  (1) any Insured gaining any profit,
> advantage, or remuneration to which the Insured was not legally entitled; or
> (2) the fraudulent, dishonest or criminal acts of any Insured; however, the
> Wrongful Act of an Insured Person shall not be imputed to any other Insured
> Person for the purpose of determining the applicability of this exclusion.

(Def.'s LR 56.1 Statement ¶ 22)

In Massachusetts, although the duty to defend is broader than the duty to indemnify, an

insurer is relieved of any duty to defend when there is no possibility that the liability claim falls

within the insurance coverage.  Sullivan, 788 N.E.2d at 531.  When presented with an exclusion

like the Policy's illegal profit, fraud and criminal acts exclusion, the court's task, then, is to

compare the allegations in the complaint with the exclusionary language in order to determine

whether there is any potential for a covered judgment.  Where the insured could be held liable

upon proof of either excluded or non-excluded conduct, there is a potential for coverage and the

insurer must defend unless and until it can show that the liability was "in fact" premised on

excluded conduct.  Where, however, the insured can only be held liable upon proof of conduct

---

[5] See also Bello v. South Shore Hosp., 429 N.E.2d 1011, 1016 (Mass. 1981); Mitchell v. Albanian Orthodox
Diocese In Am., Inc., 244 N.E.2d 276, 279 (Mass. 1969); Farber v. Chatham Conserv. Found., Inc., 823 N.E.2d 435,
2005 WL 498416 (Mass. App. Ct. Mar. 3, 2005).

that is excluded, there is no potential for coverage and, consequently, no duty to defend.

In Steadfast Insurance Company v. Stroock & Stroock & Lavan LLP, 277 F. Supp. 2d 245, 252-53 (S.D.N.Y. 2003), aff'd, 108 Fed. Appx. 663 (2nd Cir. 2004), the court applied a similar analysis and concluded that the plaintiff insurer had no duty to defend its insured, a law firm, against settled claims for conspiracy, aiding and abetting others' breaches of fiduciary duty, and fraudulent transfers. The court reasoned that because those claims *required* the claimant to prove conduct expressly excluded by the subject policy's knowingly wrongful act exclusion or unlawful profit exclusion, the insurer could have no duty to indemnify and, thus, had no duty to defend. Id. See also Brown & LaCounte, LLP v. Westport Ins. Corp., 307 F.3d 660 (7th Cir. 2002) (ruling that insurer could invoke personal profit exclusion to deny duty to defend because underlying complaint directly and unequivocally alleged that insured reaped an illegal profit); Davis v. Home Ins. Co., No. 95 Civ. 0094 (LMM), 1995 WL 380133 (S.D.N.Y. June 26, 1995) (concluding insurer had no duty to defend civil racketeering claims because they required proof of conduct barred by an exclusion applicable to any judgment or final adjudication based upon or arising out of any dishonest, fraudulent, criminal, malicious, or deliberate wrongful acts).

In this case, both Chapin lawsuits included the same three claims under Sections 1962(b), 1962(c), and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1962.[6] All six claims rested on the same alleged facts: that Kennedy and MacKenzie had engaged in a pattern of racketeering activity, and that their predicate acts included, without limitation, the use of extortion to obtain the votes of elderly Church members in 2003, and at least five instances of mail fraud. (See Pltfs.' LR 56.1

---

[6] The RICO statute imposes criminal and civil liability upon those who engage in certain "prohibited activities." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 232 (1989). Each "prohibited activity" includes, as a necessary element, proof either of a "pattern of racketeering activity" or "collection of an unlawful debt." Id. "Racketeering activity" means "any act or threat involving" certain specified state-law crimes, any "act" indictable under various specified federal statutes, and certain specified federal "offenses." Id.

Statement, Exhibit 2 Counts I-III, Exhibit 8 Counts IX-XI ) It is "settled beyond peradventure" that RICO liability requires a defendant "to have participated in the commission of two or more predicate *crimes* within the compendium described in 18 U.S.C. § 1961(1)." Miranda v. Ponce Federal Bank, 948 F.2d 41, 45 (1st Cir. 1991)(emphasis added).    Moreover, to state a claim under Section 1962, a plaintiff must, at a minimum, allege related predicate acts that "amount to or pose a threat of continued criminal activity." H.J. Inc., 492 U.S. at 239.  Chapin's RICO claims, therefore, required proof that Kennedy and MacKenzie had in fact committed criminal acts. Under the plain language of the exclusion, however, there is no coverage for claims where no recovery may be had absent proof of a crime.  The Insureds, then, could not have had a reasonable expectation of coverage for any loss resulting from the RICO claims—which means, under the Massachusetts test, that Great American had no duty to defend those claims.

Chapin also asserted against Kennedy and MacKenzie derivative claims for fraud and unfair and deceptive acts as defined in Mass. Gen. Laws ch. 93A § 2.  To have recovered on those claims, Chapin would have had to prove the commission of some fraudulent or dishonest act.  Therefore, Chapin's fraud and chapter 93A claims could not have resulted in a judgment covered by the Policy, and, consequently, did not give rise to any duty to defend.  The claims for conversion and unjust enrichment likewise could not have resulted in a judgment covered by the Policy, and, thus, likewise did not give rise to a duty to defend.  In those counts, the Chapin Plaintiffs sought the disgorgement of Church money and assets Kennedy and MacKenzie had allegedly used or retained improperly for their own personal gain.  Because those claims necessarily required proof that Kennedy or MacKenzie had gained some illegal profit, remuneration, or advantage, there was no potential for coverage had the claims succeeded. Consequently, Great American had no duty to defend those claims either.

In sum, because the Insured versus Insured Exclusion applies to *all* counts asserted in *both* of the underlying Chapin lawsuits, Great American had no duty to defend either action. Furthermore, every one of those counts also fell within at least one other Policy exclusion. Accordingly, even if the Court were to decide the Insured versus Insured Exclusion did not apply to any particular count, Great American would still have no defense obligation.

E.    Great American Had No Duty To Defend The Attorney General's Investigation

The Insureds did not even notify Great American of the Attorney General's investigation until more than a year after the Attorney General had issued the CID and several months after the Attorney General's lawsuit had been concluded by the Consent Judgment. (Def.'s LR 56.1 Statement ¶ 26) Indeed, only after they had threatened to sue Great American to recover their defense costs in the two Chapin lawsuits did the Insureds belatedly demand that Great American also pay their legal expenses incurred in responding to the CID. (Id.) They now posit that Great American had a duty to defend the Attorney General's investigation because it and the action filed on June 14, 2004, "all constituted one lawsuit" and, thus, one "Claim" under the Policy. (Pltfs.' Mem. at 22) The Insureds cannot sustain this position.

Under the Policy's Insuring Agreement, Great American has no duty to defend unless and until a "Claim" is made. (Def.'s LR 56.1 Statement ¶ 16) The Policy defines "Claim" as:

> (1) any proceeding initiated against an Insured, including any appeals therefrom, before (a) any governmental body which is legally authorized to render an enforceable judgment or order for money damages or other relief against such Insured, . . . ; or (2) any written demand seeking money damages for a Wrongful Act.

(Id. ¶ 18)

In this case, the CID contained no written demand for money damages, so it was not a "Claim" under subpart (2) of this definition. Furthermore, the investigation commenced by the CID was not a "Claim" under subpart (1) because the investigation was not a proceeding before a

governmental body "legally authorized to render an enforceable judgment or order for money damages or other relief." Under Massachusetts law, neither the Attorney General nor the court that approved the issuance of the CID had the legal authority to render such a judgment or order. Mass. Gen. Laws ch. 12 § 8H. If the Insureds had not voluntarily complied with the CID, the law would have required the Attorney General to commence a separate proceeding to enforce it. Id. Therefore, until the Attorney General filed his civil action on June 14, 2004, there was no "Claim" for Great American to defend. See Center For Blood Research, Inc. v. Coregis Ins. Co., 305 F.3d 38, 42-42 (1st Cir. 2002) (holding, under Massachusetts law, that the defendant insurer had no duty to pay legal expenses incurred by its insured in responding to an investigative subpoena because the United States Attorney had to file a separate proceeding to secure a binding adjudication of liability for damages or other relief).

Moreover, it was not inevitable that the Attorney General's investigation would lead to the institution of a separate proceeding against any Insured. He might have concluded that those in control of the Church had done nothing wrong and closed his file. Under the Insureds' theory, had that happened, the investigation would not have been a "Claim" and Great American would have had no duty to defend. That cannot be right, as an insurer's duty to defend is necessarily determined prospectively, based on *allegations* of wrongdoing and the potential for coverage in the event a claimant proves its allegations. Where, as in the CID, there are no allegations of wrongdoing, but merely requests for documents and information, a duty to defend cannot exist.

The Policy's definition of "Claim" establishes a bright line for triggering Great American's coverage obligations, including its duty to defend. The argument that the Attorney General investigation was a "Claim" blurs this bright line and, therefore, should be rejected.

F.    Great American Did Not Engage In Any Unfair Claims Settlement Practices

The Insureds contend that Great American's refusal to pay their defense costs constitutes unfair claims settlement practices under Mass. Gen. Laws ch. 176D and 93A. Their theory is that Great American has no plausible basis on which to deny coverage. (Pltfs.' Mem. at 25-26). As Great American has established, however, its position that there is no coverage is, *at the very least*, plausible. Accordingly, Great American cannot be liable under chapter 93A. See Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 545 N.E.2d 1156, 1160 (Mass. 1989) (holding that an insurer, as a matter of law, does not engage in unfair or deceptive acts where it relies upon a plausible, although ultimately incorrect, interpretation of its policy).

Furthermore, liability under chapter 93A flows from immoral, unethical, or oppressive conduct by an insurer. Id. In this case, although the Insureds make much of Great American's offer to pay for the defense of the Chapin State Lawsuit but not the Chapin Federal Lawsuit, they neglect to mention that Great American differentiated between the two lawsuits, and made its offer to pay, *in the context of settlement negotiations and subject to a full reservation of rights*. Great American's effort to settle the coverage dispute outside the litigation context is hardly the sort of immoral, unethical, or oppressive conduct chapter 93A targets.

G.    Material Factual Issues Preclude Entry Of Summary Judgment On Damages

Finally, the Insureds insist that, by disclaiming coverage, Great American forfeited the right to challenge the reasonableness of the Insureds' defense costs. (Pltfs.' Mem. at 27). The opinion the Insureds cite for this proposition, however, does *not* state that an insurer in breach of its duty to defend must pay, as a consequence of its breach, fees that are excessive. See Sullivan, 788 N.E.2d at 539 (merely holding that an insurer that reserves its rights must relinquish control over the defense to the insured and reimburse the insured's defense costs). Nor does Sullivan— or, to Great American's knowledge, any other opinion—instruct that an insurer that breached its

duty to defend must pay for tasks not associated with the defense of the claim in issue.

The Policy obligates Great American to pay only those "reasonable and necessary fees and expenses incurred in defense of any Claim." (Def.'s LR 56.1 Statement ¶ 19)  Having attached to their motion only billing summaries, not the bills themselves, the Insureds have not established, as matter of fact or law, the reasonableness or necessity of the fees and expenses they say are due. Moreover, Great American disputes that, in the event of a breach, it would owe the amount alleged by the Insureds because, among other reasons, the Insureds' legal bills reflect services that have no apparent relation to the any of the underlying matters. (Defendant's Local Rule 56.1 Statement in Opposition to Plaintiffs' Motion for Summary Judgment ¶ 3)  Under no theory would such fees be recoverable. Given such genuine issues of material fact, the extent of any reimbursable Costs of Defense cannot properly be resolved on summary judgment.

## IV.    CONCLUSION

Because there is no genuine issue of material of fact as to the lack of any coverage for the two underlying lawsuits or the Attorney General investigation, Great American, as a matter of law, can have no contractual or statutory liability to plaintiffs. It is on that basis that Great American not only opposes plaintiffs' motion for partial summary judgment, but also asks the Court to enter summary judgment in its favor and against the Insureds on its counterclaims.

Dated: August 10, 2005                    Respectfully submitted,

                                          GREAT AMERICAN INSURANCE COMPANY

                                          Barbara A. O'Donnell BBO# 544458
                                          Stephen J. Abarbanel BBO# 010110
                                          ROBINSON & COLE LLP
                                          One Boston Place
                                          Boston, MA  02108-4404
                                          (617) 557-5900

Of Counsel:

Peter F. Lovato III
Ellen D. Jenkins
BOUNDAS SKARZYNSKI WALSH & BLACK, LLC
200 East Randolph Drive, Suite 7200
Chicago IL 60601
(312) 946-4200
(312) 946-4272 (fax)

> Counsel for Defendant, Great American
> Insurance Company

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of August 2005, I have served the foregoing document upon all parties to this action by sending a copy by hand or first class mail, postage prepaid, to plaintiffs' counsel of record in his action:

> Nicholas B. Carter, Esq.
> Todd & Weld LLP
> 28 State Street
> Boston, MA  02109