UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON SOCIETY OF THE NEW JERUSALEM, INCORPORATED, BOSTONVIEW CORPORATION, EDWARD MACKENZIE, and THOMAS KENNEDY,<br><br>    Plaintiffs and Counterdefendants,<br><br>v.<br><br>GREAT AMERICAN INSURANCE COMPANY,<br><br>    Defendant and Counterplaintiff. | CIVIL ACTION NO.<br>05-CV-10494-WGY |

### DEFENDANT GREAT AMERICAN INSURANCE COMPANY'S LOCAL RULE 56.1 STATEMENT IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant, Great American Insurance Company ("Great American"), pursuant to Local Rule 56.1 and in conjunction with its Cross-Motion for Summary Judgment, submits this statement of material facts of record as to which there is no genuine issue to be tried

1. On March 2, 2004, the General Convention of the New Jerusalem in the United States of America, Inc. (the "General Convention"), the Massachusetts Association of the New Jerusalem (Swedenborgian) (the "Association"), and George Chapin (collectively, the "Chapin Plaintiffs") filed a civil action in this Court (Case No. 04-10419 WGY) (the "Chapin Federal Lawsuit") against: Boston Society of the New Jerusalem, Inc. (the "Church"); the Church's wholly-owned subsidiary, Bostonview Corporation ("Bostonview"); Edward MacKenzie; and Thomas Kennedy (collectively, the "Insureds"). (Exhibit 2 to Plaintiffs' Local Rule 56.1 Statement in Support of Their Motion for Summary Judgment ("Pltfs.' LR 56.1 Statement"))

2. According to the complaint in the Chapin Federal Lawsuit, the General

Convention is the religious denomination associated with churches that follow the teachings of Emanuel Swedenborg, and the Association is a group of five active Swedenborgian churches, previously including the Church. (Id. ¶¶ 9-10) Chapin is (or was) a member of the Church. (Id. ¶ 11)

3. The Chapin Plaintiffs averred that Kennedy joined the Church before May 2002. (Id. ¶ 30) Allegedly, Kennedy observed the mental instability of the Church's pastor, Reverend Ellis, and then befriended Ellis with the intention of exploiting him. (Id. ¶ 32)

4. In May 2002, Kennedy was elected President of the Massachusetts New Church Union (the "Union"), which held the assets of the several Swedenborgian churches in the Association (including the Church). (Id. ¶¶ 33-34) According to the Chapin Plaintiffs, Kennedy "grossly abused" that position by using it for his and his relatives' personal gain. (Id. ¶¶ 37-47) Allegedly, Kennedy resigned in December 2002, to avoid a January 2003 election intended to remove him. (Id. ¶ 48)

5. Subsequently, Kennedy and MacKenzie, who joined the Church in late 2002, allegedly caused numerous friends and relatives to become Church members so that the pair could gain control over a majority of the voting membership. (Id. ¶ 53, ¶¶ 65-66)

6. Later, having allegedly directed the votes of the new members and extorted the votes of numerous elderly members, Kennedy and MacKenzie were elected Officers and Trustees of the Church, and also directors of Bostonview, which owns the building housing both the Church and some 30 residential apartments. (Id. ¶¶ 75-79, ¶ 88) Obtaining positions as directors of Bostonview allegedly enabled Kennedy and MacKenzie to control the real property and the $1.2 annual net revenue it generated. (Id. ¶ 90)

7.  In May 2003, Chapin and others allegedly alerted the General Convention to Kennedy's and MacKenzie's actions, and, after investigating, the General Convention attempted to impose corrective measures. (Id. ¶¶ 91-96) Soon thereafter, Kennedy and MacKenzie allegedly forced the Church to disaffiliate from the General Convention. (Id. ¶¶ 100-102)

8.  The Chapin Plaintiffs asserted in their federal complaint nine counts: three counts alleging RICO violations by Kennedy and MacKenzie (Counts I-III); a count seeking a judicial declaration that the Church's bylaws pertaining to disaffiliation were breached and that the General Convention was entitled to hold the Church's assets in escrow pending creation of a new affiliated church (Count IV); a count seeking a judicial declaration that the Church's bylaws pertaining to the admission of new members were breached and that the memberships of those who joined the Church in 2002 and 2003 were void (Count V); two counts against Kennedy and MacKenzie asserting derivative claims for breach of fiduciary duties owed to the Church (Count VI) and to Bostonview (Count VII): a derivative claim against Kennedy and MacKenzie for fraud (Count VIII); and a derivative claim against Kennedy and MacKenzie for unfair and deceptive acts under Mass. Gen. Law ch. 93A § 2 (Count IX). (Id. ¶¶ 111-186) Of those nine counts, all but Counts IV and V were brought expressly on behalf of the Church and Bostonview. (Id. ¶¶ 112, 122, 132, 155, 163, 171, 180)

9.  On July 20, 2004, this Court dismissed the Chapin Federal Lawsuit on grounds that the Chapin Plaintiffs had alleged an insufficient period of criminal activity to support their RICO claims. (Exhibit 7 to Pltfs.' LR 56.1 Statement) This Court declined to exercise jurisdiction over the state law claims. (Id. at 4)

10. On August 2, 2004, the Chapin Plaintiffs filed a civil action (the "Chapin State Lawsuit") against the Insureds in Massachusetts state court. (Exhibit 8 to Pltfs.' LR 56.1

Statement) The Chapin State Lawsuit involved the same parties and many of the same averments as the federal action. (Id. ¶¶ 1-110) The state court complaint included (in a different order) the same nine counts pled in the Chapin Federal Lawsuit and added two more against Kennedy and MacKenzie: one alleging conversion of Church assets (Count II); and one alleging unjust enrichment/restitution (Count III). (Id. ¶¶ 111-202) Of these eleven counts, all but Counts I through IV were brought expressly on behalf of the Church. (Id. ¶¶ 135, 143, 151, 160, 168, 184, 194)

11. On December 7, 2004, the state court dismissed the Chapin State Lawsuit. (Exhibit 11 to Pltfs.' LR 56.1 Statement) The Chapin State Lawsuit is currently pending on appeal. (Plaintiffs' Memorandum in Support of Their Motion For Summary Judgment p. 27 n.11)

12. On November 13, 2003, the Massachusetts Attorney General issued to the Church a Civil Investigation Demand (the "CID") pursuant to Mass. Gen. Laws, ch. 12 § 8H. (Exhibit 19 to Pltfs.' LR 56.1 Statement) The CID commanded the Church to produce several categories of documents. (Id.) The Church complied fully with the commands of the CID. (Pltfs.' LR 56.1 Statement ¶ 40)

13. On June 14, 2004, the Attorney General filed a complaint against the Church in Massachusetts state court. (Exhibit 20 to Pltfs.' LR 56.1 Statement) That complaint included a single count, labeled "Disposition of Charitable Assets," asserting that Church Officers and Trustees had: failed to ensure the due application of charitable assets; failed to ensure that the Church's proceeds were used solely to further the Church's mission; and approved distributions from Church assets for the benefit of certain private individuals. (Id. ¶¶ 17-20)

14. On June 16, 2004, the court entered a Consent Judgment agreed by the parties. (Exhibit 21 to Pltfs.' LR 56.1 Statement)

15. Great American issued to the Church (and Bostonview) Non-Profit Organization Executive Protection and Employment Practices Liability Insurance Policy No. EPP5796942 for the Policy Period November 4, 2003 to November 4, 2004 (the "Policy"). (Exhibit 2 to Pltfs.' LR 56.1 Statement) The Policy has a $1,000,000 aggregate Limit of Liability, and is subject to a $5,000 per Claim Retention. (Id. at Declarations, Items 4-5)

16. The Policy's Insuring Agreement states:

> If during the Policy Period . . . any Claim is first made against an Insured for a Wrongful Act . . . the Insurer shall pay on their behalf Loss resulting from such Claim. The Insurer has the right and duty to defend any Claim to which this Insurance applies, even if the allegations of the Claim are groundless, false or fraudulent.

(Id. § I)

17. Under the Policy, the term "Insured" means the "Organization and any Subsidiary and all Insured Persons." (Id. § III.B) The "Organization" is the Church and Bostonview. (Id. § III.A) The "Insured Persons" are "all persons who were, now are, or shall be directors, trustees, officers, employees, volunteers or staff members of the Organization or its Subsidiaries, . . .." (Id. § III.C)

18. The Policy defines "Claim" as:

> (1) any proceeding initiated against an Insured, including any appeals therefrom, before (a) any governmental body which is legally authorized to render an enforceable judgment or order for money damages or other relief against such Insured, . . . ; or (2) any written demand seeking money damages for a Wrongful Act.

(Id. § III.K)

19. "Loss" includes, among other things, "Costs of Defense incurred by the Insured." (Id. § III.G (as amended by Endorsement No. 3)) "Costs of Defense" means, among other things, "any reasonable and necessary legal fees and expenses incurred in defense of any Claim and appeals therefrom." (Id. § III.H)

20. The Policy's Section VI contains several exclusions. (Id. §§ IV.A-J) Among these are the "Insured versus Insured Exclusion," which states:

> This Policy does not apply to any Claim made against any Insured:
>
> by, or for the benefit of, or at the behest of the Organization or a Subsidiary or any entity which controls, is controlled by, or is under common control with the Organization or a Subsidiary, or any person or entity which succeeds to the interest of the Organization or a Subsidiary.

(Id. § IV.H)

21. The Policy's Section IV.I provides:

> This Policy does not apply to any Claim made against any Insured:
>
> for any actual or alleged liability of any Insured under any contract or agreement, express or implied, written or oral, except for employment related obligations which would have attached absent such contract or agreement.

(Id. § IV.I)

22. The Policy's Section IV.A. provides:

> This Policy does not apply to any Claim made against any Insured:
>
> brought about or contributed to in fact by: (1) any Insured gaining any profit, advantage, or remuneration to which the Insured was not legally entitled; or (2) the fraudulent, dishonest or criminal acts of any Insured; however, the Wrongful Act of an Insured Person shall not be imputed to any other Insured Person for the purpose of determining the applicability of this exclusion.

(Id. § IV.A)

23. On March 25, 2004, Great American denied coverage for the Chapin Federal Lawsuit on grounds that the Insured versus Insured Exclusion precluded coverage. (Exhibit 4 to Pltfs.' LR 56.1 Statement) In its March 25, 2004 letter, Great American also reserved its right to raise all other coverage defenses. (Id. at 2)

24. On September 10, 2004, Kennedy and MacKenzie, through counsel, sent Great American notice of the Chapin State Lawsuit and demanded coverage. (Exhibit 9 to Pltfs.' LR 56.1 Statement)

25. By letter dated December 9, 2004, the Insureds' counsel threatened to sue Great American if it did not immediately acknowledge that it would provide coverage "in full" for the two private actions. (Exhibit 12 to Pltfs.' LR 56.1 Statement)

26. In a separate letter dated December 9, 2004, the Insureds' counsel requested coverage from Great American for "two separate proceedings" initiated against the Church by the Attorney General. (Exhibit 22 to Pltfs.' LR 56.1 Statement) That December 9, 2004 letter constituted the first tender to Great American of the CID, the Attorney General's action, or the June 16, 2004 Consent Judgment that had resolved the action nearly six months earlier. (Affidavit of Thomas M. Sheffield, Esq. ("Sheffield Aff.") ¶ 5) (Attached as Exhibit A)

27. On December 15, 2004, Great American's counsel reiterated that the Insured versus Insured Exclusion applied to the Chapin Federal Lawsuit but offered to defend the Chapin State Lawsuit, under a full reservation of rights. (Exhibit 13 to Pltfs.' LR 56.1 Statement) Great American expressly conditioned its offer to defend the Chapin State Lawsuit on the Insureds' execution of an interim funding agreement. (Id. at 6)

28. By letter dated December 16, 2004, the Insureds' counsel advised Great American that the state court had dismissed the Chapin State Lawsuit, and that the Insureds disagreed that

the Insured versus Insured Exclusion applied to either the Chapin Federal Lawsuit or the Chapin State Lawsuit. (Exhibit 14 to Pltfs.' LR 56.1 Statement) In that same letter, the Insureds' counsel again indicated that his clients were prepared to sue Great American for coverage, but counsel also expressed a willingness to meet with Great American's representatives to try to resolve the coverage dispute. (Id. at 2)

29. Great American's counsel responded in a January 7, 2005 letter, which again reserved Great American's rights fully, which again proposed that the parties' counsel meet to discuss their differences on coverage, and which again proposed that the Insureds enter into a funding agreement. (Exhibit 15 to Pltfs.' LR 56.1 Statement) Attached was a draft "Interim Funding and Reservation of Rights Agreement" that would have allowed the Insureds their Chapin State Lawsuit defense costs while preserving Great American's right to contest coverage. (Id.)

30. Over the next several weeks, the parties continued to dispute the applicability of the Insured versus Insured Exclusion. (Exhibits 16-18 to Pltfs.' LR 56.1 Statement)

31. Although Great American's counsel flew to Boston in late January 2005, to attempt to negotiate a settlement, that effort was unsuccessful. (Sheffield Aff. ¶ 7) The Insureds never accepted Great American's offer of compromise, which was to pay the Insureds' defense costs incurred in the Chapin State Lawsuit, subject to the Interim Funding Agreement and under a full reservation of rights, but not those incurred in the Chapin Federal Lawsuit. (Id.)

Dated: August 10, 2005

Respectfully submitted,

GREAT AMERICAN INSURANCE COMPANY

_____
Barbara A. O'Donnell BBO# 544458
Stephen J. Abarbanel BBO# 010110
ROBINSON & COLE LLP
One Boston Place
Boston, MA 02108-4404
(617) 557-5900

**Of Counsel:**

Peter F. Lovato III
Ellen D. Jenkins
BOUNDAS SKARZYNSKI WALSH & BLACK, LLC
200 East Randolph Drive, Suite 7200
Chicago IL 60601
(312) 946-4200
(312) 946-4272 (fax)

Counsel for Defendant, Great American Insurance Company

### CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of August, 2005, I have served the foregoing document upon all parties to this action by sending a copy by first class mail, postage prepaid, to plaintiffs' counsel of record in his action:

Nicholas B. Carter, Esq.
Todd & Weld LLP
28 State Street
Boston, MA 02109

_____
Barbara O'Donnell

# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOSTON SOCIETY OF THE NEW JERUSALEM, INCORPORATED, BOSTONVIEW CORPORATION, EDWARD MACKENZIE, and THOMAS KENNEDY,<br><br>      Plaintiffs and Counterdefendants,<br><br>v.<br><br>GREAT AMERICAN INSURANCE COMPANY,<br><br>      Defendant and Counterplaintiff. | CIVIL ACTION NO.<br>05-CV-10494-WGY |

## AFFIDAVIT OF THOMAS M. SHEFFIELD, ESQ.

I, Thomas M. Sheffield, having been first duly sworn on oath, depose and state as follows:

1. I am an attorney with the law firm of Boundas, Skarzynski, Walsh & Black, LLC ("BSWB"), which represents the Defendant, Great American Insurance Company ("Great American"), in this action.

2. I make this affidavit on personal knowledge of the facts stated herein.

3. Prior to the filing of this action, Great American retained BSWB to assist with its efforts to resolve a dispute with Plaintiffs, Boston Society of the New Jerusalem, Inc. (the "Church"), Bostonview Corporation ("Bostonview"), Edward MacKenzie, and Thomas Kennedy (collectively, the "Insureds"), over the parties' respective rights and obligations under Non-Profit Organization Executive Protection and Employment Practices Liability Insurance Policy No. EPP5796942 issued by Great American to the Church (and Bostonview) for the Policy Period November 4, 2003 to November 4, 2004 (the "Policy").

4.      The Claims in issue initially included:  1) a lawsuit against the Insureds filed in this Court on March 2, 2004, by the General Convention of the New Jerusalem in the United States of America, Inc., the Massachusetts Association of the New Jerusalem (Swedenborgian), and George Chapin (collectively, the "Chapin Plaintiffs") (Case No. 04-10419 WGY) (the "Chapin Federal Lawsuit"); and 2) a lawsuit against the Insureds filed in Massachusetts state court on August 2, 2004, by the Chapin Plaintiffs.

5.      In addition, by letter addressed to Great American and me dated December 9, 2004, the Insureds' counsel provided notice of, and tendered for coverage under the Policy, "two separate proceedings" against the Church initiated by the Massachusetts Attorney General. (Exhibit 22 to Plaintiffs' Local Rule 56.1 Statement in Support of Their Motion for Summary Judgment ("Pltfs.' LR 56.1 Statement"))  Those matters consisted of an investigation by the Attorney General, commenced by a Civil Investigative Demand ("CID") issued to the Church on November 13, 2003, and a lawsuit against the Church by the Attorney General, commenced by the filing in Massachusetts state court of a complaint on June 14, 2004, and concluded by the entry of an agreed Consent Judgment on June 16, 2004.  (Id.)  That December 9, 2004 letter constituted the first tender to Great American of the CID, the Attorney General's action, or the June 16, 2004 Consent Judgment that had resolved the action nearly six months earlier.

6.      In various letters—including those attached as Exhibits 13, 15, 17, and 18 to Pltfs.' LR 56.1 Statement—I, on behalf of Great American, attempted to resolve the dispute and avoid the coverage litigation the Insureds had threatened to bring by proposing a compromise. More particularly, as reflected in those Exhibits, Great American offered to compromise by paying for the defense of the Chapin State Lawsuit on the condition that the Insureds enter into an Interim Funding and Reservation of Rights Agreement that, if executed, would have allowed

the Insureds their Chapin State Lawsuit defense costs while preserving Great American's right to contest coverage and to recover amounts advanced. (The Interim Funding and Reservation of Rights Agreement proposed by Great American is part of Exhibit 15 to Pltfs.' LR 56.1 Statement.)

7.   In late January 2005, I flew to Boston, Massachusetts and met with the Insureds' counsel to negotiate a settlement. That meeting was unsuccessful, as no settlement agreement was reached. Prior to the filing of this action, the Insureds never accepted Great American's offer of compromise, which was to pay the Insureds' defense costs incurred in the Chapin State Lawsuit, subject to the Interim Funding Agreement and under a full reservation of rights, but not those incurred in the Chapin Federal Lawsuit.

8.   By letters dated December 16, 2004, and January 12, 2005, the Insured submitted to me, for payment by Great American, numerous billing statements issued by various law firms that purportedly reflected legal fees and expenses incurred by the Insureds in defense of the Chapin Federal Lawsuit, the Chapin State Lawsuit, the Attorney General's investigation, and the Attorney General's action. (Those letters are Exhibits 14 and 16 to Pltfs.' LR 56.1 Statement.) While some of the entries on those billing statements appear to relate to the defense of the Chapin Federal Lawsuit, the Chapin State Lawsuit, the Attorney General's investigation, and the Attorney General's action, others bear no—or no apparent—relationship to the defense of any of those matters. For example, the billing statements contain numerous time entries pertaining to insurance coverage work by counsel, such as research and analysis of whether the Policy's Insured versus Insured Exclusion might apply. The billing statements also refer, for additional examples, to communications between counsel and the Boston Globe—which sounds like public relations work, rather than defense work—and a number of time entries concern issues

surrounding a mortgage taken by Rev. Steven Ellis, the Church's pastor. The Insureds have not explained their theory as to why these and other billings qualify as "Costs of Defense" reimbursable under the Policy.

Under penalty of perjury, I hereby certify that the foregoing facts are true to the best of my knowledge and belief.



_____
Thomas M. Sheffield

Subscribed and sworn to before me this 8 day of August, 2005.

_____
Notary Public
My Commission Expires:

-4-